# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JONATHAN R., *et al*.,

*Plaintiffs-Appellants*,

v.

PATRICK MORRISEY, *et al*.,

*Defendants-Appellees*.

On Appeal from the U.S. District Court for the Southern District of West Virginia, Huntington Division, Case No. 3:19-cv-00710

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

Marcia Robinson Lowry
Julia K. Tebor
Laura Welikson
Robyn Goldberg
John Hazelwood
David Baloche
A BETTER CHILDHOOD
355 Lexington Avenue, Floor 16
New York, NY 10017
(646) 795-4456
mlowry@abetterchildhood.org
jtebor@abetterchildhood.org
lwelikson@abetterchildhood.org
rgoldberg@abetterchildhood.org
jhazelwood@abetterchildhood.org
dbaloche@abetterchildhood.org

Richard W. Walters
J. Alexander Meade
SHAFFER & SHAFFER, PLLC
2116 Kanawha Boulevard, East Post
Office Box 3973
Charleston, WV 25339-3973
(304) 344-8716
rwalters@shafferlaw.net
ameade@shafferlaw.net

Nicholas Ward
DISABILITY RIGHTS OF WEST VIRGINIA
5088 Washington St W, St. 300
Charleston, WV 25313
(304) 346-0847
nward@drofwv.org

*Counsel for Plaintiffs*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _25-1232_        Caption: _Jonathan R. minor, by Next Friend et al. v. Patrick Morrisey, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Jonathan R. minor, by Next Friend et al._
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                                       ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                                 ☐YES ☑NO
       If yes, identify all such owners:

4.	Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?	☐YES ☑NO
	If yes, identify entity and nature of interest:

5.	Is party a trade association? (amici curiae do not complete this question)	☐YES ☑NO
	If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.	Does this case arise out of a bankruptcy proceeding?	☐YES ☑NO
	If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.	Is this a criminal case in which there was an organizational victim?	☐YES ☑NO
	If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Richard W. Walters	Date: 3/24/2025

Counsel for: Plaintiff - Appellant

Print to PDF for Filing

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ........................................................5

STATEMENT OF ISSUES .....................................................................5

STATEMENT OF THE CASE ................................................................6

SUMMARY OF THE ARGUMENT ....................................................12

ARGUMENT ..........................................................................................15

   I.   Standard of Review ....................................................................15

  II.  Federal Courts Have the Power to Grant Plaintiffs' Requested Relief, and Such Relief is Likely to Redress Plaintiffs' Injuries. ...................................16

      A. The Test for Redressability Is Not Onerous and Plaintiffs Satisfy It. ......17

      B. Federal Courts Have Authority to Enjoin State Officials from Violating the Constitution and Federal Statutes. ....................................21

      C. The District Court Disregarded the Rulings and Reasoning of *Jonathan R. I* .....................................................26

      D. The District Court Conflated Redressability with Concerns About the Precise Contours of Relief. .....................................30

         1.  Courts have methods to respect the interest of state and local stakeholders in the remedies phase...................................31

         2.  The District Court prematurely determined the appropriateness of remedies before deciding the merits of Plaintffs' claims .................34

  III.  The Remedies Plaintiffs Seek Are Not Novel and Courts Have Ordered Them to Effectively Redress Similar Rights Violations ...............................36

  IV.  The District Court Erred in Holding That Plaintiffs' Claims for Declaratory Relief Could Not Independently Confer Standing. .......................................41

V. Reassignment Is Necessary to Ensure Impartiality, or at Minimum Preserve the Appearance of Justice. ............................................................44

   A. It Is Reasonable to Expect That Upon Remand, the District Court Judge Will Have Substantial Difficulty Putting Aside His Long-Held Views on the Unconstitutionality of Institutional Reform. ......................................46

   B. Reassignment Is Necessary to Preserve the Appearance of Justice.........50

   C. Any Waste or Duplication Would Not Be Out of Proportion to the Appearance of Fairness a Reassignment Will Preserve...........................51

CONCLUSION ......................................................................................52

REQUEST FOR ORAL ARGUMENT..................................................53

CERTIFICATE OF COMPLIANCE ......................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Legislative Black Caucus v. Alabama,*
    575 U.S. 254 (2015) ...................................................................35

*B.K. by Tinsley v. Snyder,*
    922 F.3d 957 (9th Cir. 2019)...................................................25

*Bender v. Williamsport Area School Dist.,*
    475 U.S. 534 (1986) ...................................................................29

*Briggs v. Elliott,*
    103 F. Supp. 920 (D.S.C. 1952) ..................................... 14, 43

*Brinkley v. Hill,*
    981 F. Supp. 423 (S.D.W. Va. 1997) ......................................40

*Brown v. Bd. of Educ.,*
    349 U.S. 299-300 (1955)......................................... 3, 22, 31

*Brown v. Plata,*
    563 U.S. 493 (2011) ..........................................................*passim*

*Buscemi v. Bell,*
    964 F.3d 252 (4th Cir. 2020)........................................ 34, 35

*Charlie and Nadine H. v. Murphy,*
    No. 2:99-cv-03678-SRC-CLW (D.N.J.), ECF. No. 373 (June 21,
    2022) ............................................................................................39

*D.G. v. Yarbrough,*
    No. 4:08-cv-00074-GKF-FHM (N.D. Okla.), ECF No. 773 (Jan.
    23, 2012) .....................................................................................38

*Deal v. Mercer Cnty. Bd. of Educ.,*
    911 F.3d 183 (4th Cir. 2018)........................................ 15, 19

*Doe v. Shenandoah Valley Juvenile Ctr. Com'n,*
    985 F.3d 327 (4th Cir. 2021)........................................ 18, 24

iv

*Evans v. Fenty*,
701 F. Supp. 2d 126 (D.D.C. 2010) ....................................................37

*Evers v. Dwyer*,
358 U.S. 202, 204 (1958) ........................................................42

*FDA v. All. For Hippocratic Med.*,
602 U.S. 367 (2024) ...........................................................17, 19

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ...........................................................*passim*

*Frew v. Hawkins*,
540 U.S. 431 (2004) ..................................................................21

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
204 F.3d 149 (4th Cir. 2000) (en banc)..................................17, 20

*Garcia v. Noem*,
No. 25-1404, 2025 U.S. App. LEXIS 9237 (4th Cir. Apr. 17, 2025) ...............51

*Gary G. v. Newsom*,
No. 5:23-cv-947-MEMF-BFM, 2024 U.S. Dist. LEXIS 177977
(C.D. Cal. Sep. 30, 2024) ...........................................................25

*Graves v. Arpaio*,
623 F.3d 1043 (9th Cir. 2010) .....................................................32

*Heyer v. New York City Hous. Auth.*,
2006 U.S. Dist. LEXIS 25089 (S.D.N.Y. Apr. 27, 2006)..................................41

*Horne v. Flores*,
557 U.S. 433 (2009) ..................................................................34

*Hutto v. Finney*,
437 U.S. 678 (1978) ...........................................................22, 23, 24

*Jeremiah M. v. Crum*,
695 F. Supp. 3d 1060 (D. Alaska 2023).........................................25

*Jonathan R. v. Justice*,
41 F.4th 316 (4th Cir. 2022).....................................................*passim*

v

*Juliana v. United States,*
    947 F.3d 1159 (9th Cir. 2020)................................................................43

*Kentucky v. EPA,*
    2024 U.S. App. LEXIS 18971 (6th Cir. July 29, 2024)....................36

*Larson v. Valente,*
    456 U.S. 228 (1982) ...............................................................19, 43

*LaShawn A. v. Kelly,*
    887 F. Supp. 297 (1995)...............................................................37

*Liteky v. United States,*
    510 U.S. 540, 114 S. Ct. 1147 (1994) .........................................51

*United States ex rel. Little v. Shell Expl.,*
    602 F. App'x 959 (5th Cir. 2015) ...............................................52

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)..........................................................*passim*

*M.D. by Stukenberg v. Abbott,*
    907 F.3d 237 (5th Cir. 2018)................................................22, 32, 38

*M.D. by Stukenberg v. Abbott,*
    No. 2:11-CV-84 (E.D. Tex.), ECF No. 606 (Nov. 20, 2018)...........37

*M.D. v. Abbott,*
    152 F. Supp. 3d 684 (S.D. Tex. 2015) .........................................25

*Maldonado Santiago v. Velazquez Garcia,*
    821 F.2d 822 (1st Cir. 1987) .......................................................48

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ....................................................................21

*McMahan v. Int'l Ass'n of Bridge, etc., Local 601,*
    964 F.2d 1462 (4th Cir. 1992).....................................................29

*Milliken v. Bradley,*
    433 U.S. 267 (1977) ........................................................*passim*

*Nunez v. N.Y.C. Department of Corrections*,
No. 11-CV-5845-LTS, 2024 U.S. Dist. LEXIS 215888 (S.D.N.Y. Nov. 27, 2024).................................................................................41

*Ocean S. v. Los Angeles Cnty.*,
No. LA CV23-06921 JAK (Ex), 2024 U.S. Dist. LEXIS 158702 (C.D. Cal. June 11, 2024) ........................................................25

*Plata v. Schwarzenegger*,
603 F.3d 1088 (9th Cir. 2010)..........................................................37

*Procunier v. Martinez*,
416 U.S. 396 (1974) ..........................................................................31

*R.C. v. Walley*,
475 F. Supp. 2d 1118 (M.D. Ala. 2007) ...........................................38

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
713 F.3d 175 (4th Cir. 2013).............................................................16

*Sierra Club v. U.S. Dep't of the Interior*,
899 F.3d 260 (4th Cir. 2018).............................................................19

*Sommerville v. Union Carbide Corp.*,
No. 2:19-cv-00878, 2024 U.S. Dist. LEXIS 86064 (S.D. W. Va. May 13, 2024) .................................................................................48

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ..........................................................................16

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ......................................................................43, 51

*Steffel v. Thompson*,
415 U.S. 452 (1974) ......................................................................4, 42

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 1 (1971) ......................................................................*passim*

*Timothy B. v. Kinsley*,
No. 1:22-cv-1046, 2024 U.S. Dist. LEXIS 57276 (M.D.N.C. Mar. 29, 2024) .................................................................................25, 35

*United Source One, Inc. v. Frank*,
    No. 23-cv-1481, 2024 U.S. App. LEXIS 6135 (4th Cir. Mar. 14,
    2024) .................................................................................................36

*United States v. Aberant*,
    No. 19-4786, 2021 U.S. App. LEXIS 34308 (4th Cir. Nov. 18,
    2021) ..................................................................................... 46, 47

*United States v. Bell*,
    5 F.3d 64 (4th Cir. 1993).................................................................30

*United States v. Guglielmi*,
    929 F.2d 1001 (4th Cir. 1991).........................................................45

*United States v. Lentz*,
    383 F.3d 191 (4th Cir. 2004)...........................................................16

*United States v. Martinovich*,
    810 F.3d 232 (4th Cir. 2016)...........................................................49

*United States v. McCall*,
    934 F.3d 380 (4th Cir. 2019).........................................44, 50, 51, 52

*United States v. Nicholson*,
    611 F.3d 191 (4th Cir. 2010)...........................................................45

*United States v. Robin*,
    553 F.2d 8 (2d Cir. 1977)....................................................45, 47, 48

*United States v. Sutherland*,
    103 F.4th 200 (4th Cir. 2024)..........................................................18

*United States v. Texas*,
    599 U.S. 670 (2023) .......................................................................21

*Wyatt B. v. Kotek*,
    No. 6:19-cv-00556-AA (D. Oreg.), ECF No. 497 (June 14, 2024) ............37, 38

*Ex Parte Young*,
    209 U.S. 123 (1908) .......................................................................26

*Younger v. Harris*,
    401 U.S. 37 (1971) .........................................................................26

*Zwickler v. Koota*,
  389 U.S. 241 (1967) ...................................................................................42

**Statutes**

28 U.S.C. § 1291 ...........................................................................................5

28 U.S.C. § 1331 ...........................................................................................5

28 U.S.C. § 1343(a) .......................................................................................5

28 U.S.C. § 2201 .....................................................................................14, 41

42 U.S.C. § 12131(2) .....................................................................................5

29 U.S.C. § 794 .............................................................................................5

**Rules**

Fed. R. App. P. 4(1)(A) .................................................................................5

Fed. R. Civ. P. 12(h)(3) ...............................................................................27

Fed. R. Civ. P. 60(b)(5) ..........................................................................33, 34

**Other Authorities**

Andy Shookhoff, *Reflections on the Role of the Monitor in Child
  Welfare Litigation*, Center for the Study of Social Policy, *For the
  Welfare of Children: Lessons Learned from Class Action
  Litigation* (2012) .....................................................................................37

Charles F. Sabel & William H. Simon, *Destabilization Rights: How
  Public Law Litigation Succeeds*, 117 Harv. L. Rev. 1015 (2003) ....................33

Jason Parkin, *Aging Injunctions and the Legacy of Institutional
  Reform Litigation*, 70 Vand. L. Rev. 167 (2007) .............................................38

John C. Jeffries and George A. Rutherglen, *Structural Reform
  Revisited*, 95 Calif. L. Rev. 1387 (2007)....................................................38, 50

Molly Armstrong, Eileen Crummy, Kevin Ryan, Lisa Taylor, *New Jersey: A Case Study and Five Essential Lessons For Reform*, Center for the Study of Social Policy, *For the Welfare of Children: Lessons Learned from Class Action Litigation*, 115 (2012)..............................39

William Fletcher, *The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy*, 91 Yale L. J. 635 (1982)...........................33

# INTRODUCTION

As the District Court stated, "West Virginia's foster care system has cycled through inaction, bureaucratic indifference, shocking neglect, and temporary fixes for years. The blame squarely lies with West Virginia state government." (JA1515). As a consequence of this deep dysfunction, "there are children who deeply suffer in the custody of the State." (JA1532). Yet, the District Court dismissed this case with prejudice. It decided *sua sponte*, after years of litigation and on the eve of trial, that Plaintiffs lacked Article III standing because their claims for injunctive and declaratory relief against Defendants were not redressable.

According to the lower court, "the U.S. Constitution prevents federal courts from intervening in complex state institutions" and "this court cannot order [Plaintiffs'] requested relief without usurping 'the powers of the political branches.'" (JA1518, JA1522). The District Court reached this incredible conclusion solely because Plaintiffs were asking for a "system-wide" injunction that could entail setting standards or mandating changes to policies or practices. (*E.g.*, JA1530). The lower court was "clear about [its] long-held concern that courts lack [that] kind of power." (JA1531). To the District Court, Plaintiffs' only recourse for the agency's "bureaucratic indifference" and the failure of "the legislature, the governor, and his appointees [to] do their job," is voting West Virginia elected officials out of office.

(JA1515, JA1532-1533). No matter that executives of the State child welfare administration are not elected or that Plaintiffs, who are children, cannot vote.

The District Court's decision that Plaintiffs' claims are not redressable turns the test for Article III standing on its head. The test for standing is well-established and the standard for redressability, particularly at the pleading stage, is not onerous. The question is whether some kind of relief can be granted that mitigates the plaintiff's injury. That relief need not alleviate every one of the plaintiff's injuries. Nor does it need to be shaped exactly as the plaintiff requests in her complaint. Standing jurisprudence is not so formalistic. When, as here, the Plaintiffs' injury is clearly traceable to the government action or inaction, "there is ordinarily little question . . . that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992).

Departing from any recognizable application of the standing test, however, the District Court decided to construct its own unprecedented and rigid standard, premised on the notion that federalism and the separation of powers bar federal courts from intervening in complex state institutions. It is an extraordinarily sweeping decision that contains no limiting principles. It effectively turns federalism and the separation of powers into talismans to ward off federal jurisdiction when the remedies are difficult or complicated. The decision ignores decades of Supreme Court precedent affirming federal courts' equitable authority to order state agencies

to correct violations of federal law, notwithstanding the presence of federalism concerns. It brashly departs from universal consensus among courts across the country that the injunctive claims Plaintiffs bring are redressable by a federal court.

No doubt, institutional reform of a state agency is a daunting and arduous task. But difficulty does not deprive federal courts of Article III jurisdiction. Under the District Court's logic, *Brown v. Board of Education* should have been dismissed for lack of standing because desegregation is hard. Federal courts have a constitutional duty to confront that task, not to shy away from it. "Plaintiffs bring federal claims, and federal courts 'are obliged to decide' them in all but 'exceptional circumstances." *Jonathan R. v. Justice*, 41 F.4th 316, 321 (4th Cir. 2022) ("*Jonathan R. I*") (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72, 73 (2013)). This District Court cannot yield to these constitutional principles simply because of its disagreement with them. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 13 (1971) (quoting *Brown v. Board of Education*, 349 U.S. 299-300 (1955) ("*Brown II*")).

Furthermore, the District Court's decision rests entirely on rationales that this Court rejected in *Jonathan R. I.* Specifically, this Court unequivocally rejected the District Court's conclusion that principles of federalism require it to abstain from exercising jurisdiction over Plaintiffs' federal claims. "In this case, principles of federalism not only do not preclude federal intervention, they compel it." *Id.* at 321.

The Court recognized that Plaintiffs' allegations of "wide-reaching, intertwined, and 'systemic' failures" needed to be redressed by "systemic relief," *i.e.*, "deep structural changes within the Department." *Id.* at 321, 336, 338. And it bade the District Court to do it. Instead, the District Court applied a different label to the same analysis, calling the problem "redressability," and disposed of Plaintiffs' case yet again. Additionally, to the extent any specific relief raised special concerns, the *Jonathan R. I* Court instructed the District Court to "cross the bridge of remedies only when the precise contours of the problem have been established after a trial." *Id.* at 334 (citation omitted). This too the District Court ignored.

Moreover, the District Court's decision needs to be reversed twice over. It was so bent on "dismiss[ing] the case en masse," *id.* at 338, that it manufactured a new black letter rule that a claim for declaratory relief, standing alone, is not sufficient to establish standing. (JA1532). This is simply wrong. Declaratory claims can give rise to standing without corresponding injunctive relief. *See Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) ("For purposes of establishing standing, . . . we need not decide whether injunctive relief . . . was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief . . . alone.") (plurality opinion). Declaratory relief is redressable because it puts state officials on notice that their conduct is illegal; it can incentivize compliance and deter further illegal conduct. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 470 (1974).

Regrettably, the District Court's long-held view of institutional reform as a "perilous enterprise," (JA1524), colored its rulings. If this opinion was actually law, the legal rights of children in the custody of the state to basic safety and well-being would be meaningless and unenforceable. Indeed, federal courts' capacity to vindicate any widespread violations of constitutional rights would be eviscerated.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a), as well as under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the respective implementing regulations. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

This appeal is timely under Federal Rule of Appellate Procedure 4(1)(A) because it was noticed on March 10, 2025 (JA1534), within 30 days after the District Court entered Judgment on February 28, 2025 (JA1534, JA1535).

## STATEMENT OF ISSUES

1.     Whether the District Court erred as a matter of law in holding that principles of federalism and the separation of powers categorically bar federal courts from redressing Defendants' systematic violation of Plaintiffs' rights through systemic injunctive relief of the kind requested by Plaintiffs?

2.     Whether the District Court erred as a matter of law in holding that Plaintiffs' claims for declaratory judgment were not redressable without an injunction?

3.     Whether reassignment is warranted in light of the District Court's admittedly long-held beliefs that institutional reform litigation is unconstitutional and ineffective, the reasonable expectation that the District Court will have substantial difficulty putting aside those beliefs on remand, and the need to preserve the appearance of impartiality and justice?

## STATEMENT OF THE CASE

Plaintiffs-Appellants ("Plaintiffs") represent the nearly 7,000 West Virginia foster children who rely on the West Virginia foster care system for their health, safety, and well-being. (JA158). Defendants-Appellees ("Defendants") are the Governor of West Virginia, the West Virginia Department of Human Services, or "DoHS" (formerly the Department of Health and Human Resources, or "DHHR"), and government officials responsible for operating the West Virginia foster care system.

The District Court's February 28, 2025 order ("Order") described the West Virginia foster care system as "cycl[ing] through inaction, bureaucratic indifference, shocking neglect, and temporary fixes for years. The blame squarely lies with West Virginia state government." (JA1515). And the court stated, "I know that there are

children who deeply suffer in the custody of the State." (JA1532). Nevertheless, the District Court has dismissed this case with prejudice on the face of the Complaint.

For years, West Virginia's child welfare system has operated in a state of crisis. (JA149). Nearly a quarter of caseworker positions in the system remain vacant, and even those positions are well below what is needed. There is constant turnover. (JA150-151, JA219). Caseworkers carry caseloads with more than fifty children, despite nationally recognized standards that recommend limiting caseloads to between twelve and fifteen in-custody children per worker. (See JA220-221). DoHS routinely hires unqualified caseworkers with no social work background who are poorly trained and ill-equipped to help children and families in crisis. (JA217, JA219-220). Children do not receive timely needs assessments when entering care, which is critical to the creation of an individualized case plan for their health and safety. (JA222). Individualized case plans are sometimes never developed. (JA222-223). Caseworkers routinely fail to visit, or maintain any meaningful contact, with children, parents, and foster parents. (JA220-221, JA223). Under these circumstances, DoHS cannot ensure children and parents receive critical medical and mental health services. (JA223). DoHS likewise fails to engage in necessary planning to either reunify children with their families or find them another permanent home. (JA226).

Similarly, because DoHS fails to maintain enough safe and appropriate foster placements, many children entering foster care sleep in DoHS offices, hotels, camps, or emergency shelters. (JA203, JA205). And children are routinely put in kinship homes that Defendants fail to license, oversee, and/or support. (JA151, JA204-205).

For children with disabilities, including mental health disabilities, DoHS fails to recruit sufficient therapeutic homes and ensure the availability of sufficient community-based services, making institutionalization the only option. (JA224-226). Unsurprisingly, as of the Complaint's filing, "71 percent of youth between the ages of 12 and 17 are institutionalized." (JA150, JA214, JA230). These children are often sent to out-of-state institutions far from their homes and communities, which are not well supervised, and many of which have been the subject of criminal and licensure investigations. (JA215-216). Unsurprisingly, "children who are diagnosed with physical, mental, intellectual, or cognitive disabilities often find their health conditions worsen while in foster care." (JA203).

Defendants have known about these issues for well over a decade, yet have failed to take meaningful action. (JA217).

On September 30, 2019, Plaintiffs filed their Complaint, alleging that as a result of these systemic failures, Defendants are violating their constitutional and federal statutory rights. (JA237-246). On November 26, 2019, Defendants moved to dismiss the Complaint, arguing, in part, that the District Court did not have

jurisdiction or should decline to exercise it due to the *Younger* and *Rooker-Feldman* abstention doctrines. (JA64). On July 28, 2021, the District Court granted the motion and dismissed the action on abstention grounds. (JA91). Plaintiffs appealed, and on July 20, 2022, the Fourth Circuit Court of Appeals reversed, finding that the District Court had jurisdiction over this action and that the doctrine of abstention did not apply. *Jonathan R. I*, 41 F.4th 316. The Fourth Circuit issued its mandate on August 23, 2022. (JA92).

On January 13, 2023, the District Court denied in part and granted in part Defendants' motion to dismiss Plaintiffs' outstanding claims. (JA1230-1272). After Chief Judge Johnston recused himself on April 3, 2023, the case was reassigned to Judge Goodwin. (JA97). Plaintiffs filed a renewed motion for class certification on May 16, 2023.[1] (JA1273-1274). The District Court granted the motion in part on August 17, 2023 (JA1357-1403). The certification order did not mention Plaintiffs' Article III standing at all, much less any issue with establishing it. (JA1357-1403). The parties proceeded to engage in extensive discovery and motion practice. For example, Plaintiffs brought and won, in part, a motion for sanctions after Defendants spoliated thousands of emails of named Defendants and other DHHR officials who

---

[1] Plaintiffs had initially moved for class certification before the Court had dismissed the case. (JA77).

had left their employment. (JA121). The parties also engaged in substantial document discovery and took a total of 45 depositions.

Defendants filed an extensive summary judgment motion on July 8, 2024. (JA127-128). Plaintiffs submitted an equally extensive opposition on July 29, 2024. (JA131). The District Court had initially scheduled a bench trial for June 25, 2024 (JA99), which the Court rescheduled for September 24, 2024 (JA111-112), and then rescheduled again for November 5, 2024. (JA122). The parties collectively filed six *Daubert* motions and five motions *in limine*. (JA135-137, JA141-142). They filed a proposed pretrial order on October 11, 2024. (JA143). On October 15, 2024, the District Court issued an amended scheduling order moving the trial to March 4, 2025, and stating that "[w]hile the court considers the Motion for Summary Judgment, judicial economy requires that this case be continued." *See* ECF No. 647. (JA144). On January 29, 2025, the District Court moved the trial date yet again to May 6, 2025. (JA145).

Then, on February 28, 2025, over five years after Plaintiffs filed the Complaint and approximately two months from trial, the District Court issued the Order, dismissing the case *sua sponte* on the pleadings for lack of jurisdiction. (JA1515-1533). Despite a fully briefed and pending summary judgment motion, the District Court did not rely on any argument from the parties, as it stated "neither party has raised standing as an issue." (JA1530). And despite Plaintiffs' claims

surviving a motion to dismiss and being certified to proceed as a class action, the District Court improbably decided that Plaintiffs had no Article III standing. Not because they failed to allege a concrete injury, or that Defendants had caused it. "The filings paint a grim picture of a dysfunctional foster care system," the court noted. (JA1516). "This compelled dismissal is in no way an endorsement of the system as it remains." (JA1532).

But the District Court erroneously held that redress was unavailable because "the U.S. Constitution prevents federal courts from intervening in complex state institutions" and "this court cannot order [Plaintiffs'] requested relief without usurping 'the powers of the political branches.'" (JA1518, JA1522). In the District Court's penurious conception of federal equity power, federal courts lack the power to "issue system-wide injunctions," "establish statewide policy," "set standards," or mandate state officials to undertake specific actions that would otherwise be within their purview. (JA1530). The District Court also summarily dismissed Plaintiffs' claims for declaratory relief, holding that they were insufficient, standing alone, to establish standing. (JA1532).

To the District Court, Plaintiffs' only recourse for the agency's "bureaucratic indifference" and the failure of "the legislature, the governor, and his appointees [to] do their job," is voting West Virginia elected officials out of office. (JA1515, JA1532-1533).

## SUMMARY OF THE ARGUMENT

The District Court's decision that Plaintiffs' claims are not redressable turns the Article III test for redressability on its head. The test for Article III standing is well-established and the standard for redressability, particularly at the pleading stage, is not onerous. Where, as here, there is no reasonable dispute that Plaintiffs adequately allege concrete injuries that are traceable to Defendants' actions or inaction, "there is ordinarily little question . . . that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62. Findings of this Court and the District Court make the redressability analysis easy. *Jonathan R. I* observed that the morass of bureaucratic dysfunction in West Virginia's foster care system leaves children "in inadequate and outright dangerous environments, deprives them of badly-needed social and mental-health services, and, when all else fails . . . simply institutionalizes the children for years, segregating them from the outside world at the time socialization matters most." 41 F.4th at 322.

Departing from any recognizable application of the standing test, however, the District Court constructed its own unprecedented and rigid standard, premised on the notion that federalism and the separation of powers bar federal courts from "intervening in complex state institutions." (JA1522). Standing doctrine already accounts for these important constitutional principles. *See, e.g.*, *Lujan*, 504 U.S. at 559-60. The District Court, by contrast, turns federalism and the separation of

powers into free-floating doctrines that can be used as talismans to ward off federal jurisdiction when the remedies are difficult or complicated. And it grossly underestimates federal equity authority. Decades of Supreme Court precedent affirm that federal courts have equitable authority to correct systemic violations of federal law through systemic injunctive relief. Moreover, there is universal consensus among courts across the country that the kinds of claims Plaintiffs bring are redressable by a federal court.

The Order essentially reinvents a new abstention doctrine in the guise of redressability. It rests entirely on rationales for declining jurisdiction that this Court rejected in *Jonathan R. I*.

*Jonathan R. I* held that federalism does not bar the District Court from adjudicating Plaintiffs' claims. This Court recognized "the kind of systemic relief" Plaintiffs are asking for, discussed it in detail in its opinion, and found the federal court to be the most appropriate forum to litigate these claims. *See* 41 F.4th at 334, 336-39. If a federal court has no authority to grant these reforms under the Constitution, this Court would have had both the opportunity and the obligation to affirm dismissal of the case. Instead, it reversed. Moreover, the District Court ignored *Jonathan R. I*'s clear instruction to determine the propriety of specific remedies only after the merits of Plaintiffs' claims were established at a trial.

Well-established doctrines guide courts in fashioning the appropriate scope of relief at the remedial phase of a case. These doctrines address the District Court's concerns and reinforce that determining the propriety of any particular form of relief at this pre-trial stage of the case, before the contours of the State's liability has been established, is premature. Moreover, the reforms Plaintiffs seek are not novel and are similar to relief other courts have granted or approved in similar cases. These cases have redressed extreme suffering and ushered in meaningful and effective change to severely dysfunctional government systems.

The District Court's holding that Plaintiffs' claims for declaratory relief do not independently establish redressability is also wrong. Contrary to the District Court's superficial assessment, declaratory judgment is not a paper tiger. Congress intended declarations to "have the force and effect of a final judgment or decree." 28 U.S.C. § 2201. Thus, declaratory claims can give rise to standing without corresponding injunctive relief. *Id.*; *see also Franklin*, 505 U.S. at 803. Declaratory judgment can be an effective form of redress as it can incentivize compliance or deter illegal conduct. *See, e.g.*, *Briggs v. Elliott*, 103 F. Supp. 920, 921 (D.S.C. 1952) (after court issued declaratory judgment that unequal school facilities violated the 14th Amendment, school took steps to comply with decree), *rev'd and remanded on other grounds*, *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) ("*Brown I*").

Finally, this Court should exercise its supervisory authority to order that the case be reassigned on remand. Reassignment is warranted here. The District Court admits to its long-held and erroneous views regarding the incapacity of federal courts to order institutional reform and its firm belief that such efforts are futile. These views prevented the District Court from heeding the directives of *Jonathan R. I*. It can reasonably be expected that the judge would have difficulty putting these views to the side on remand. The unprecedented nature of the Court's rulings coupled with its open antagonism toward institutional reform litigation demonstrates that reassignment is necessary to preserve the appearance of justice. Any potential waste or duplication would not outweigh these factors, particularly as there has been no trial and summary judgment has not been decided. To the contrary, reassignment would prevent the waste of inevitable future appeals prompted by the District Court's hardened posture.

## ARGUMENT

### I.    Standard of Review.

This Court reviews a district court's dismissal for lack of standing *de novo*. *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018). "When standing is challenged on the pleadings, we accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *S. Walk*

*at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181–82 (4th Cir. 2013) (internal quotations omitted).

This Court disposes of reassignment requests as an exercise of its own supervisory powers to order reassignment of a case as part of a remand order. *See, e.g.*, *United States v. Lentz*, 383 F.3d 191, 222 (4th Cir. 2004).

## II. Federal Courts Have the Power to Grant Plaintiffs' Requested Relief, and Such Relief is Likely to Redress Plaintiffs' Injuries.

The District Court's holding that Plaintiffs' claims are not redressable is contradicted by decades of Supreme Court precedent, this Court's decision in *Jonathan R. I*, and universal consensus among federal courts across the country finding that these kinds of claims are redressable by a federal court. The test for Article III standing is well-established and the standard for redressability, particularly at the pleading stage, is not onerous. Departing from any recognizable application of the standing test, however, the District Court decided to construct its own unprecedented and rigid standard, premised on the notion that federalism and the separation of powers bar federal courts from "intervening in complex state institutions." (JA1522). The test for Article III standing already accounts for these important constitutional principles. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("The standing doctrine developed 'to ensure that federal courts do not exceed their authority as it has been traditionally understood.'"); *Lujan*, 504 U.S. at

559-60 (standing test ensures federal court jurisdiction is limited to "cases" and "controversies"). The District Court's flawed rulings must be rejected.

## A. The Test for Redressability Is Not Onerous and Plaintiffs Satisfy It.

"The fundamentals of standing are well-known and firmly rooted in American constitutional law." *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 380 (2024). Plaintiffs must establish:

> (1) injury in fact; (2) traceability; and (3) redressability. The injury in fact prong requires that a plaintiff suffer an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent. The traceability prong means it must be likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court. Finally, the redressability prong entails that it must be likely, and not merely speculative, that a favorable decision will remedy the injury.

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (en banc) (cleaned up) (citing *Lujan*, 504 U.S. at 560-61).

There is no reasonable dispute that Plaintiffs adequately allege they have suffered a legally cognizable injury traceable to Defendants. Indeed, the District Court concludes its opinion by admonishing "the legislature, the governor, and his appointees" for breaching their duty to ensure the safety and wellbeing to which foster children are entitled under the U.S. Constitution and federal statutes, and recognizes that children are deeply suffering as a result. (JA1532-1533). This Court summed up the case succinctly in *Jonathan R. I*:

To sum up, the Department maintains responsibility for planning and delivering the care, the circuit courts for supervising it. However effective this arrangement appears on paper, Plaintiffs assert the Department has made a mockery of it in practice. Rather than take children away from abuse and neglect, Plaintiffs charge, the Department only compounds it. It houses children in inadequate and outright dangerous environments, deprives them of badly-needed social and mental-health services, and, when all else fails—which it often does in West Virginia—simply institutionalizes the children for years, segregating them from the outside world at the time socialization matters most.

*Jonathan R. I*, 41 F.4th at 322. And the District Court made consistent findings when denying Defendants' Rule 12(b)(6) motion to dismiss on remand:

High caseloads prevent caseworkers from "timely assessing the needs of children entering the foster care system." Without timely assessments, DHHR cannot properly develop a foster child's individualized case plan. Caseworkers are often unable to engage in meaningful visits with foster children, which further impedes case plan development. Unsurprisingly, individualized case plans are sometimes never developed. DHHR then adds insult to injury by "failing to engage in necessary permanency planning for foster children." These failures, Plaintiffs allege, force foster children to "languish in the foster care system for years."

(JA1232 (cleaned up) (citations omitted)).[2]

The redressability prong is not intended to be "onerous." *Doe v. Shenandoah Valley Juvenile Ctr. Com'n*, 985 F.3d 327, 336 (4th Cir. 2021) (quoting *Deal*, 911 F.3d at 189). When, as here, the Plaintiffs' injury is clearly traceable to the government action or inaction, "there is ordinarily little question . . . that a judgment

---

[2] These findings are not in dispute and are the law of the case. *United States v. Sutherland*, 103 F.4th 200, 209 n.5 (4th Cir. 2024).

preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62; *see also All. For Hippocratic Med.*, 602 U.S. at 380 ("causation and redressability—are often 'flip sides of the same coin.'").

Plaintiffs "need not show that a favorable decision will relieve [their] *every* injury." *Larson v. Valente*, 456 U.S. 228, 242-44 & n.15 (1982) (emphasis in original); *see also Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 285 (4th Cir. 2018) (the "removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability."). Moreover, Plaintiffs do not need to prove they will receive the exact relief they request in the Complaint's prayer for relief to establish standing. The Court's "jurisprudence does not require such formalism." *Deal*, 911 F.3d at 190 (pleading a specific outcome will ensue from a favorable decision is not required to establish standing); *Larson*, 456 U.S. at 243 n.15 (rejecting dissent's "draconian interpretation of the redressability requirement" that would require plaintiffs to "show that they are certain, ultimately, to receive" the relief they request).

Plaintiffs seek declaratory and injunctive relief to declare "unconstitutional and unlawful" Defendants' violations of Plaintiffs' legal rights and to "[p]ermanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights." (JA246, JA247). For example, Plaintiffs ask for an order requiring Defendants to ensure that they:

- receive "a complete and thorough evaluation of the child's needs, performed by a qualified individual . . . and that the child be re-evaluated as the child's needs and the information available to [Defendants] change;"

- receive "an adequate and individualized written case plan for treatment, services, and supports to address the child's identified needs;"

- receive the services and treatment identified as necessary by the child's case plan;

- are "placed in a safe home or facility and are adequately monitored in accordance with federal standards;"

- "hire, employ, and retain an adequate number of qualified and appropriately trained caseworkers;"

- ensure that caseloads generally "do not exceed 15 children per-worker;"

- develop and implement "an adequate statewide plan . . . for recruiting and retaining foster and adoptive homes;"

- and ensure "that an adequate array of community based therapeutic services are available to children with disabilities."

(JA247-250). Finally, Plaintiffs seek the appointment of a neutral Monitor to "conduct record reviews as necessary to ensure compliance" with the ultimate decree. (JA251).

This requested relief is directly targeted to the problems in the West Virginia foster care system detailed in Plaintiffs' Complaint, in *Jonathan R. I*, and in the District Court's decisions. The relief is "likely, and not merely speculative," *Friends*

*of the Earth*, 204 F.3d at 154, "to benefit [them] in a tangible way," *Sierra Club*, 899

F.3d at 284. "While it may be true that [a favorable decision] will not by itself

*reverse* [every risk posed to West Virginia's foster children], it by no means follows

that [federal courts] lack jurisdiction to decide whether [Defendants have] a duty to

take steps to *slow* or *reduce* it." *Massachusetts v. EPA*, 549 U.S. 497, 525-26 (2007)

(emphasis in original).

This is all that is required to satisfy the Article III standard for redressability.

The District Court, however, bypassed this test because it determined of its own

accord that federal courts lack the power to right any of Plaintiffs' wrongs through

a systemwide injunction. It further opined that even if it had that power, there was

no point in using it because institutional reform has consistently failed. (JA1524).

The District Court's conclusions are wrong both legally and practically.

### B. Federal Courts Have Authority to Enjoin State Officials from Violating the Constitution and Federal Statutes.

If the District Court was legitimately concerned about confirming that it had

authority to order Plaintiffs' requested relief, it need only look to "history and

tradition . . . as a meaningful guide to the types of cases that Article III empowers

federal courts to consider." *United States v. Texas*, 599 U.S. 670, 676-77 (2023)

(internal quotations omitted). Historically, it is beyond dispute that a federal court

has the power to issue "prospective injunctive relief against state officials acting in

violation of federal law." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Ex*

*Parte Young*, 209 U.S. 123 (1908)). And "the scope of a district court's equitable powers . . . is broad." *Brown v. Plata*, 563 U.S. 493, 538 (2011) (cleaned up) (collecting cases). "[S]tate and local authorities have primary responsibility for curing constitutional violations." *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978) (citing *Milliken v. Bradley*, 433 U.S. 267, 281 (1977)). "If, however, those authorities fail in their affirmative obligations . . . judicial authority may be invoked." *Id.* (cleaned up) (citation omitted). "Once invoked, 'the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies.'" *Milliken*, 433 U.S. at 281 (quoting *Swann*, 402 U.S. at 15).

Since *Brown II*, the Supreme Court has made clear that federal courts sitting in equity can require broad systemwide reforms of state and local government to redress systemic constitutional violations. *See also Plata*, 563 U.S. at 532, 533 (An injunction "is not overbroad because it encompasses the entire . . . system" or "because it limits the State's authority to run [the system]."); *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018) (*"Stukenberg I"*) (the responsibility to redress systemic violations of federal law "includes, when appropriate, issuing permanent injunctions mandating institutional reform") (affirming in part comprehensive injunction against state child-welfare regime imposed upon detailed findings of systemic constitutional violations).

In cases of chronic and severe bureaucratic dysfunction, constitutional violations "are rarely susceptible of simple or straightforward solutions." *Plata*, 563 U.S. at 524; *Hutto*, 437 U.S. at 688 (noting the "interdependence of the conditions producing the [constitutional] violation"). "Only a multifaceted approach aimed at many causes . . . will yield a solution." *Plata*, 563 U.S. at 526. "Courts faced with the sensitive task of remedying unconstitutional . . . conditions must consider a range of available options, including appointment of special masters or receivers and the possibility of consent decrees." *Id.* at 511. Likewise, federal courts have both the power and the duty to supervise compliance with their decrees for as long as those decrees remain necessary. "A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order." *Plata*, 563 U.S. at 542; *Swann*, 402 U.S. at 21 ("When necessary, district courts should retain jurisdiction to assure that these responsibilities are carried out.").[3]

Contrary to the District Court's restrictive view of federal court power, the Supreme Court has, time and time again, affirmed the power of federal courts to

---

[3] The District Court endorsed these principles when it certified the Plaintiffs' class: "[T]he court is cognizant that several federal courts have formulated and implemented broad relief in systemic reform cases." (JA1358). The Order on appeal similarly walked through a bevy of cases where courts issued the kind of relief Plaintiffs request. (*See* JA1527-1530).

issue system-wide injunctions when proven necessary, even when those remedies mandate changes to policies or practices, set standards, or require the expenditure of state funds to achieve compliance. *See, e.g.*, *Plata*, 563 U.S. at 510-11 (affirming the district court's authority to order the state to reduce its prison population even though such a "remedy would involve intrusion into the realm of prison administration."); *Hutto*, 437 U.S. at 684 (affirming comprehensive injunction that limited "the number of men that could be confined in one cell, required that each have a bunk, discontinued the 'grue' diet, and set 30 days as the maximum isolation sentence"); *Milliken*, 433 U.S. at 275-79 (affirming order instituting comprehensive remedial educations programs even though education policy is typically "left to the discretion of the elected school board and professional educators"); *id.* at 289-90 (affirming requirement that state defendants share costs of remedial programs "as a necessary consequence of [prospective] compliance"); *Swann*, 402 U.S. at 10-11, 16 (affirming injunction requiring public school system to comply with a detailed and comprehensive desegregation plan created by the court-appointed expert).

This Court has not held differently. In *Shenandoah Valley Juvenile Center Commission*, plaintiffs, unaccompanied immigrant children detained in a municipal detention facility, sought an injunction requiring the facility to "implement a 'trauma-informed' standard of care. 985 F.3d at 329. This Court held that they had standing because the "proposed remedy focuses on the treatment and services

provided" by the facility, and thus the relief was "likely to redress their injuries." *Id.* at 336.

Other courts addressing similar requests for relief in child welfare litigation have held the same. *See, e.g.*, *B.K. by Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019) (class of Arizona foster children had standing to seek reforms of state foster care agency because the allegedly deficient policies and practices could be abated by an injunction); *Gary G. v. Newsom*, No. 5:23-cv-947-MEMF-BFM, 2024 U.S. Dist. LEXIS 177977, at *10-16 (C.D. Cal. Sep. 30, 2024) (rejecting arguments that foster children lacked standing to pursue systemwide reforms of the child welfare system due to separation of powers and federalism principles); *Ocean S. v. Los Angeles Cnty.*, No. LA CV23-06921 JAK (Ex), 2024 U.S. Dist. LEXIS 158702, at *33-35 (C.D. Cal. June 11, 2024) (same); *Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1089 (D. Alaska 2023) (same); *Timothy B. v. Kinsley*, No. 1:22-cv-1046, 2024 U.S. Dist. LEXIS 57276 (M.D.N.C. Mar. 29, 2024) (same); *M.D. v. Abbott*, 152 F. Supp. 3d 684, 773 (S.D. Tex. 2015) (finding foster care plaintiffs had standing to bring claims for systemic relief, determining Texas liable for violating their constitutional rights, and issuing comprehensive remedial injunction to abate violations), *aff'd Stukenberg I*, 907 F.3d 237.

The District Court cited many of these cases but dismissed them as failing to "approach [redressability] in the systematic way I believe necessary." (JA1529). It

is the District Court however, whose approach is unsystematic and unmoored by either principle or precedent. The District Court had no discretion to divest itself of jurisdiction over the case at this stage. *Jonathan R. I*, 41 F.4th at 327; *Ex parte Young*, 209 U.S. at 143 ("The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us.").

## C. The District Court Disregarded the Rulings and Reasoning of *Jonathan R. I.*

The District Court effectively created another abstention doctrine and shoehorned it into the test for standing. In doing so, it flouted the rulings and reasoning of *Jonathan R. I*. In fact, the District Court did not once cite *Jonathan R. I* (aside from its inclusion as subsequent history in a citation to the District Court's decision dismissing the case on abstention (JA1516)). It is remarkable that this Court's decision in this case received no mention whatsoever in the District Court's Order.

In the first appeal, this Court reversed the District Court's dismissal of Plaintiffs' case on the ground that the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), applied and foreclosed Plaintiffs' ability to vindicate their rights in federal court. Importantly, *Younger* abstention begins with the premise that the federal court *has* jurisdiction. *Id.* at 320-21. Under the doctrine, the court examines

whether it nonetheless should decline to exercise its otherwise obligatory jurisdiction in the interests of comity and federalism. *Id.* This Court thoroughly examined the case for federalism and held that "principles of federalism not only do not preclude federal intervention, they *compel* it." *Id.* at 320 (emphasis added). The Court remanded with instructions that the case should proceed "so that the district court can consider West Virginia's substantive arguments for dismissal and, if appropriate, Plaintiffs' motion for class certification." *Id.* at 324. After deciding those two motions, denying in part the former and granting the latter, enabling the parties to engage in extensive discovery, brief summary judgment, and prepare for an imminent trial, the District Court *sua sponte* dismissed the case on the pleadings on the ground that principles of federalism deprived Plaintiffs of standing to bring their claims in federal court. (JA1515-1533).

Although a court may address the issue of jurisdiction at any point in the proceedings, *see* Fed. R. Civ. P. 12(h)(3), the District Court's dismissal for lack of standing is not a new issue; it treads the same ground as *Jonathan R. I*, while entirely ignoring its conclusions. In *Jonathan R. I*, this Court held that the District Court was the most appropriate forum to address West Virginia's "wide-reaching, intertwined, and 'systemic' failures" because, among other challenges, "an individual foster child is unlikely to have standing in state juvenile proceedings to ask for systemic changes not tied directly to her own maltreatment." 41 F.4th at 336-37. The Court was also

troubled by the "state courts' reluctance to order deep structural changes within the Department," their refusal to "contemplate revision of any Department policies or practices at all," and mere "'hope the Legislature and [the Department] will address this crisis'" *Id*. at 338. These remarks could just as easily describe the Order on appeal.

In the first appeal, this Court explained how Plaintiffs' requested relief is likely to redress the alleged harms: for example, Plaintiffs' request to "bring the inner workings of the executive branch in compliance with federal law" will produce "more placement and services options if Plaintiffs succeed." *Id*. at 333. The Court observed "[t]he district court can offer meaningful relief solely by monitoring executive action." *Id*. at 334. It expressly and emphatically held that Plaintiffs were on "sure footing" to seek such reforms. *Id.* at 339.

The District Court's Order is an unapologetic rejection of *Jonathan R. I*. It held that plaintiffs did not have standing to bring a class action in federal court because "the U.S. Constitution prevents federal courts from intervening in complex state institutions." (JA1522). It held that ordering "structural overhaul" of the agency, indeed any changes to its policies or practices, was "not a power available to the judiciary," but rather the sole province of "elected officials," without regard to whether those policies or practices violate federal law. (JA1518, JA1522, JA1530, JA1532). In short, it held that the "institutional reform" which *Jonathan R. I*

expressly stated the District Court was authorized and obligated to do (presuming liability was established at trial), was not within its power, or any of its business. (JA1518 ("This court has no such power"), JA1523 ("The federal courts 'should not be in the business of administering institutions,' but appointing a Monitor does just that." (citation omitted))).

If a federal court has no authority to grant these reforms under the Constitution, this Court would have had both the opportunity and the obligation to affirm dismissal of the case in *Jonathan R. I. See McMahan v. Int'l Ass'n of Bridge, etc., Local 601*, 964 F.2d 1462, 1467 (4th Cir. 1992) ("We of course have the power to affirm a judgment for any reason appearing on the record, notwithstanding that the reason was not addressed below."); *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review[.]'") (citation omitted)). Instead, it reversed and remanded for further proceedings.

Moreover, *Jonathan R. I* was clear that it was premature for the district court to determine the specific remedies it could issue before the precise contours of the problem were established at trial:

> But above all, halting the litigation on this record would be premature. Should the district court determine that certain specific relief would overstep *Younger*'s bounds, it can always reject it to secure our comity interests. *See O'Shea* [*v. Littleton*, 414 U.S. 488, 510 1974] (Douglas,

J., dissenting) (proposing courts "cross the bridge of remedies only when the precise contours of the problem have been established after a trial")[.] . . . West Virginia's approach, by contrast, would deny all foster children all resort to federal courts.

41 F.4th at 334. And yet, this is exactly the approach the lower court has taken on remand, dismissing the entire case based on objections to the shape of the ultimate injunction without adjudicating the merits of any of Plaintiffs' claims.

The District Court's rejection of *Jonathan R. I* is so brazen, it can nearly be said that it violates the spirit of this Court's mandate. *See United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (The mandate rule "compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court."). In any event, there can be no doubt that the Order directly conflicts with *Jonathan R. I.*

### D. The District Court Conflated Redressability with Concerns About the Precise Contours of Relief.

The District Court made quite clear in its Order that it harbored serious concerns about institutional reform litigation and the kinds of decrees that courts have issued in other institutional cases. There are fair-minded debates regarding the scope and nature of the relief ultimately granted in these cases. But these debates should not be conflated with the ability of federal courts to hear these cases at all. Moreover, there are several well-established doctrines that guide courts in fashioning the appropriate scope of relief at the remedial phase of a case. These

doctrines adequately address the District Court's concerns. Furthermore, determining the propriety of any particular form of relief at this stage of the case is premature. The nature and scope of the violation must be determined first in order to gauge the appropriate remedy. *Jonathan R. I*, 41 F.4th at 334.

### 1. Courts have methods to respect the interests of state and local stakeholders in the remedies phase.

Institutional reform litigation calls upon federal courts to balance respect for state and local institutions against their obligation to remedy rights violations. *Procunier v. Martinez*, 416 U.S. 396, 405-06 (1974); *see also Plata*, 563 U.S. at 511 ("Courts must be sensitive to the State's interest . . . . Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all persons." (cleaned up) (internal quotations omitted)). (*But see* JA1522 ("*Balancing* state issues is not a power available to the judiciary.") (emphasis in original)).

There are a number of ways in which these competing interests are taken into account during the remedies phase of a case. *See Brown II*, 349 U.S. at 300 ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.").

First, remedies must be tailored to redress the constitutional violation. "[T]he nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation." *Milliken*, 433 U.S. at 280. Accordingly, district courts make detailed factual findings of the evidence supporting the constitutional

violations and shape the remedies to match those violations. *E.g.*, *Graves v. Arpaio*, 623 F.3d 1043, 1046-47, 1051 (9th Cir. 2010) (per curiam) (affirming the district court's injunction issued after a 12-day hearing on liability and remedies and holding that relief ordered "did not go beyond what was necessary to correct those violations"). Thus, after a trial on the merits to determine the constitutional violations and during the remedies phase, the district court could either delay or disapprove any specific provisions it found to be unnecessary to redress Plaintiffs' legal injuries. After that, appellate courts also can review and ensure that the provisions are sufficiently tailored "to remedy the specific action[s] which gives rise to the order," and prune the injunction if necessary. *E.g.*, *Stukenberg I*, 907 F.3d at 272.

Second, "the decree must indeed be remedial in nature, that is, it must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.'" *Milliken*, 433 U.S. at 280.

Third, "federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Id.* at 280-81. One way of doing this is to ensure state officials are consulted and have sufficient discretion in executing the objectives of the decree. *Plata*, 563 U.S. at 511. Furthermore, contrary to the District Court's notions about

how remedies are selected and compliance with the decree is supervised (*see* JA1521-1524), the process in institutional reform cases is frequently cooperative and collaborative. Courts typically solicit plans from the parties and frequently hear from experts as to the optimal and least intrusive manner of achieving the objectives of the decree. *E.g.*, *Swann*, 402 U.S. at 6-11 (district court held numerous hearings, received voluminous evidence, and invited plans from both the parties and a court-appointed expert to determine appropriate methods for desegregating Charlotte-Mecklenburg school system); *see also* William Fletcher, *The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy*, 91 Yale L. J. 635, 639 (1982) ("When soliciting plans from the parties or formulating the decree itself, the court frequently hears additional evidence and expert testimony concerning the possible effects of contemplated decrees; sometimes the court appoints its own experts, special masters or committees[.]"); Charles F. Sabel & William H. Simon, *Destabilization Rights: How Public Law Litigation Succeeds*, 117 Harv. L. Rev. 1015, 1067-69 (2003) (describing remediation process as one of "stakeholder negotiation" that is often deliberative with consensus as the goal).

Finally, once remedies have been established, Federal Rule of Civil Procedure 60(b)(5) offers defendants a vehicle to modify or terminate the decree if circumstances have changed or the objectives of the decree have been attained.

*Horne v. Flores*, 557 U.S. 433, 454-55 (2009).[4] A "flexible approach" to Rule 60(b)(5) ensures that federal courts can "vigilantly enforce federal law" while ensuring that an injunction does not "improperly interfere with a State's democratic processes." *Id.* at 450, 453.

## 2. The District Court prematurely determined the appropriateness of remedies before deciding the merits of Plaintiffs' claims.

In light of *Milliken*, 433 U.S. at 280-81, and *Jonathan R. I*, 1 F.4th at 334, it was premature for the District Court to adjudicate remedies before deciding the merits of Plaintiffs' claims. Although *Jonathan R. I* issued this admonition in the context of *Younger* abstention, this Court has previously clarified that the same principle applies to adjudicating standing. In *Buscemi v. Bell*, 964 F.3d 252 (4th Cir. 2020), the Fourth Circuit rejected an argument that the plaintiffs lacked standing because they were not entitled to the specific injunction they requested. *Id.* at 261-62. "The [district] court has broad equitable authority to order such relief. . . The appropriateness of any remedy will be decided after a determination of the merits of the claim." *Id.* at 262 (citing *McCarthy v. Briscoe*, 429 U.S. 1317, 1322-23 (1976) and *Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968)); *see also Timothy B.*, 2024 U.S.

---

[4] The District Court erroneously cited *Horne v. Flores*, 557 U.S. 433, as support for its ruling that it lacked jurisdiction to adjudicate Plaintiffs' claims. (JA1521-1522). *Horne* was not a case about standing; it involved a motion to modify an existing remedial injunction pursuant to Federal Rule of Civil Procedure 60(b)(5). 557 U.S. at 439. *Horne*, therefore, has no bearing on the issue of standing.

Dist. LEXIS 57276, at *25-26 ("[T]his court will 'cross the bridge of remedies only when the precise contours of the problem have been established' later in these proceedings." (citation omitted)).[5]

Therefore, the District Court erroneously dismissed the case on remedies grounds, where it should have first adjudicated the case on the merits. Compounding this error, the District Court dismissed the case for lack of standing with prejudice. "Dismissal for lack of standing, however, requires that a complaint be dismissed without prejudice because a court that lacks jurisdiction necessarily lacks the 'power to adjudicate and dispose of a claim on the merits.'" *Buscemi*, 964 F.3d at 261 (citation omitted).

Moreover, the District Court dismissed *sua sponte*, on the eve of trial, without notice to the parties that these issues were in question, or an opportunity to be heard. (JA1530 ("I recognize that it is late in litigation to address standing. I now take note of the obvious, neither party has raised standing as an issue.")). This was error.

Although a district court has "an independent obligation to confirm its jurisdiction," it may not, *sua sponte*, dismiss a case for lack of standing without affording plaintiffs notice and an opportunity to be heard. *Ala. Legisl. Black Caucus*

---

[5] The District Court appeared to heed this instruction when granting Plaintiffs' motion for class certification, recognizing that while it was "skeptical" regarding some of the relief requested, it would "address this issue should the plaintiffs prevail on their claims." (JA1358).

*v. Alabama*, 575 U.S. 254, 270 (2015); *see also Kentucky v. EPA*, 2024 U.S. App. LEXIS 18971, *4-5 (6th Cir. July 29, 2024) (vacating district court's erroneous *sua sponte* dismissal of complaints where plaintiffs were not afforded "notice and the opportunity to be heard"); *United Source One, Inc. v. Frank*, No. 23-cv-1481, 2024 U.S. App. LEXIS 6135, at *1 (4th Cir. Mar. 14, 2024) (same). For these reasons too, the District Court's Order must be vacated.

## III. The Remedies Plaintiffs Seek Are Not Novel and Courts Have Ordered Them to Effectively Redress Similar Rights Violations.

The Court "need go no further" to reverse the District Court's Order dismissing Plaintiffs' injunctive claims. *Jonathan R. I*, 41 F.4th at 341 (Rushing, J., dissenting in part, and concurring in the judgment). However, the District Court's grievous misapprehensions about the relief Plaintiffs request warrant some correction.

For example, the District Court particularly decried Plaintiffs' request for the appointment of a monitor because she "operates her own bureaucracy to replace the state agency." (JA1523). These comments not only misconstrue the scope of federal equity (and ignore *Jonathan R. I*'s tacit approval of the remedy, 41 F.4th at 334), but they also betray a misunderstanding of how monitors function.

Although monitors have the authority the district court chooses to give them, they do not take over management of a state agency, as a receiver would.[6] *See* Andy Shookhoff, *Reflections on the Role of the Monitor in Child Welfare Litigation*, Center for the Study of Social Policy, *For the Welfare of Children: Lessons Learned from Class Action Litigation* 23, 25 (2012), https://perma.cc/URL3-CNG3. Nor do they act as a special master might, "who would be exercising active, ongoing judicial oversight of and authority over the agency." *Id.* Rather, they gather data and information, report on compliance and progress toward established performance measures, and provide advice and assistance to both the court and the parties. *See generally id.* Moreover, monitors typically have extensive experience administering the kinds of policies and programs that the case involves. *See, e.g.*, *Wyatt B. v. Kotek*, No. 6:19-cv-00556-AA (D. Oreg.), ECF No. 497, at 4-5 (June 14, 2024) (selecting monitor due to his "considerable experience with complex child welfare systems,

---

[6] To be sure, a federal court has the power to appoint a receiver to "take over" the West Virginia foster care system, contrary to the District Court's belief otherwise (JA1515). *See Plata*, 563 U.S. at 511; *see, also, e.g.*, *LaShawn A. v. Kelly*, 887 F. Supp. 297, 298 (1995) (appointing full receivership of District of Columbia's child welfare system on motion for contempt "[b]ecause all reasonable alternative measures of change have been exhausted"); *Plata v. Schwarzenegger*, 603 F.3d 1088, 1097 (9th Cir. 2010) (affirming district court's denial of motion to terminate receivership imposed "after the State admitted its inability to comply with consent orders intended to remedy the constitutional violations in its prisons"). Such relief is a "'remedy of last resort,' that 'should be undertaken only when absolutely necessary.'" *Evans v. Fenty*, 701 F. Supp. 2d 126, 140 (D.D.C. 2010). But it remains an available tool in the District Court's arsenal.

including the successful reform of the New Jersey child welfare system"). Monitoring provides the transparency necessary to meaningfully evaluate progress. Jason Parkin, *Aging Injunctions and the Legacy of Institutional Reform Litigation*, 70 Vand. L. Rev. 167, 217 (2007). When monitors are involved, "structural reform injunctions have been more fine-grained, more process-oriented, and in important ways less intrusive." John C. Jeffries and George A. Rutherglen, *Structural Reform Revisited*, 95 Calif. L. Rev. 1387, 1412 (2007).

For these reasons, several courts have successfully appointed monitors in numerous child welfare reform cases to assist with compliance. *See, e.g.*, *M.D. by Stukenberg v. Abbott*, No. 2:11-CV-84 (E.D. Tex.), ECF No. 606 (Nov. 20, 2018) (Texas); *R.C. v. Walley*, 475 F. Supp. 2d 1118 (M.D. Ala. 2007) (Alabama); *Wyatt B. v. Kotek*, *supra* ECF No. 497 (Oregon); *D.G. v. Yarbrough*, No. 4:08-cv-00074-GKF-FHM (N.D. Okla.), ECF No. 773 (Jan. 23, 2012) (Oklahoma).

Institutional reform injunctions have also helped dysfunctional bureaucracies bring their workforce numbers and workload capacity within limits sufficient to enable them to achieve constitutional compliance. *E.g.*, *Stukenberg I*, 907 F.3d at 273-76 (affirming broad injunction requiring child welfare agency to "track caseloads on a child-only basis" and "ensure statewide implementation of graduated caseloads for newly hired . . . caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class").

*Charlie and Nadine H. v. Murphy*, No. 2:99-cv-03678-SRC-CLW (D.N.J.) is an example of extraordinary success in this sphere. When the case was filed, New Jersey's child welfare system suffered from unmanageable caseworker caseloads, inadequate resources and support for staff, and a severe shortage of available foster homes. Molly Armstrong, Eileen Crummy, Kevin Ryan, Lisa Taylor, *New Jersey: A Case Study and Five Essential Lessons For Reform*, Center for the Study of Social Policy, *For the Welfare of Children: Lessons Learned from Class Action Litigation*, 115, 115 (2012), https://perma.cc/URL3-CNG3. "[C]hildren in the system were not safe, were not achieving permanency and were not receiving care to meet their own or their family's basic needs." *Id*. However, through a series of negotiated consent decrees among the parties, the agency was able to make "wide-ranging improvements," with four successive positive reports from the court-appointed monitor "for building a stable platform for enduring reform and setting state records on a variety of important outcomes." *Id*. at 115-16; *Charlie and Nadine H.*, *supra* ECF. No. 373 (June 21, 2022) (Exit Plan and Agreement), at 1-7.

None of the other relief Plaintiffs request is novel either. Nor is it as extreme or draconian as the District Court's caricature suggests. (*See, e.g.*, JA1515) (contending Plaintiffs are asking the court to "develop public policy, write budgets, hire caseworkers, [and] administer state agencies"). Such overstatements regarding the impact of institutional reform are also not new, nor are they valid. The defendants

levied the same kinds of criticism against the institutional reform injunction in *Milliken*. The Supreme Court flatly rejected their argument that the comprehensive injunction there abrogated principles of federalism or the separation of powers:

> The District Court has neither attempted to restructure local governmental entities nor to mandate a particular method or structure of state or local financing. The District Court has, rather, properly enforced the guarantees of the Fourteenth Amendment consistent with prior holdings, and in a manner that does not jeopardize the integrity of the structure or functions of state and local government.

433 U.S. at 291. Plaintiffs are not asking for anything different. They are merely asking for what is necessary to correct Defendants' systemic violations of their rights under the Due Process Clause of the Fourteenth Amendment.

After holding that it lacked jurisdiction over Plaintiffs' claims, the District Court devoted several more pages of dictum to recounting examples of supposed failed attempts at institutional reform. (JA1524-1527). The Court lectured: "I believe it instructive to show by example that this is a perilous enterprise." (JA1524). This screed against institutional reform was both unnecessary and unfair. The cases of successful institutional reforms achieved through litigation discussed above bely the District Court's cynicism.

Even the District Court's anecdotal examples do not prove that institutional reform is futile. In *Brinkley v. Hill*, 981 F. Supp. 423, 425, 443 (S.D.W. Va. 1997), for example, the court's decision to "pass the torch" to the state offices was due to an intervening Supreme Court ruling that invalidated the basis of the plaintiffs'

claim—not the ineffectiveness of the relief ordered. *Heyer v. New York City Housing Authority*, No. 80-CV-1196 -RWS, 05-CV-5286-RWS, 2006 U.S. Dist. LEXIS 25089 (S.D.N.Y. Apr. 27, 2006), never reached the merits of the plaintiffs' claims, let alone whatever relief to which they might be ultimately entitled, or the effectiveness thereof. And in *Nunez v. New York City Department of Corrections*, No. 11-CV-5845-LTS, 2024 U.S. Dist. LEXIS 215888 (S.D.N.Y. Nov. 27, 2024), the court granted the plaintiffs' contempt motion on a profound record of noncompliance with the consent agreements. The monitoring team reported among other things that "supervisory failures at multiple levels of uniform leadership have been and remain a consistent and pervasive source of dysfunction within DOC." *Id.* at *37. Where there is rot at the top of an organization, it is hardly surprising that reform efforts are hard to come by. This proves nothing except the challenges when government officials operate without sufficient accountability.

## IV. The District Court Erred in Holding That Plaintiffs' Claims for Declaratory Relief Could Not Independently Confer Standing.

The District Court further erred by holding that "a declaration that the actions of DHS are unconstitutional . . . fails to redress Plaintiffs' injuries." (JA1532). It stated that without an injunction, "Plaintiffs would be left with, at most, the 'psychic satisfaction' of having DHS declared unconstitutional." (JA1532). Although Plaintiffs are entitled to both injunctive and declaratory relief and strongly maintain

that an injunction is necessary, the Court's holding that their declaratory claims are not independently redressable is wrong, both as a legal and practical matter.

Contrary to the District Court's superficial assessment, a declaratory judgment is not mere psychic satisfaction. Congress intended declarations to "have the force and effect of a final judgment or decree." 28 U.S.C. § 2201. Thus, declaratory claims can give rise to standing without corresponding injunctive relief. *See Franklin*, 505 U.S. at 803 (plurality opinion) ("For purposes of establishing standing, . . . we need not decide whether injunctive relief against the President was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone."). Indeed, "a federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction." *Zwickler v. Koota*, 389 U.S. 241, 254 (1967).

A declaratory judgment can be an effective form of redress in itself because it puts state officials on notice that their conduct is illegal; it can incentivize them to comply with the law and deter further illegal conduct. *See, e.g.*, *Steffel*, 415 U.S. at 470 ("The persuasive force of the court's opinion and judgment may lead state prosecutors, courts, and legislators to reconsider their respective responsibilities toward the statute" or Constitution.); *Evers v. Dwyer*, 358 U.S. 202, 204 (1958) (holding that the district court "erred in not proceeding to the merits" of plaintiff's

request for declaratory judgment because a state official's intent to engage in conduct "until its unconstitutionality has been finally adjudicated" amounts to an "actual controversy"); *Larson*, 456 U.S. at 243 (finding that a declaration that a state statute is unconstitutional would satisfy the redressability standard for standing because it would motivate the State's compliance); *Briggs*, 103 F. Supp. at 921 (after court issued declaratory judgment that unequal school facilities violated the 14th Amendment, school took steps to comply with decree, including successfully petitioning state legislature to allocate additional funds to correct constitutional violation).

The District Court cites *Franklin v. Massachusetts* (JA1532), but skirts its holding that declaratory relief confers standing, instead framing Justice Scalia's concurrence as authority, despite that Scalia dissented from the Court on the standing issue. *See* 505 U.S. at 824 ("I disagree with the Court's conclusion on the standing question[.]"). The District Court's other authorities are also inapposite. In *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998), the right of action belonged to the U.S. Treasury, not to the plaintiff and therefore it sought not "remediation of its own injury . . . but vindication of the rule of law." Here, Plaintiffs are seeking declaratory relief for their own injuries and a declaration that Defendants are violating Plaintiffs' rights can redress those injuries. And *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020), is simply not analogous. The plaintiffs there

sought not only to enjoin the federal government from permitting, authorizing, and subsidizing fossil fuel use, but also prepare a plan for judicial approval to draw down harmful emissions. *Id.* Their own experts opined that this would entail "no less than a fundamental transformation of this country's energy system, if not that of the industrialized world." *Id.* at 1171. It is no leap to conclude that such might be outside the scope of redress available from a federal court, whether issued by declaration or injunction, or both.

What Plaintiffs are asking for here is well within the realm of redressability. Declaratory relief could put Defendants on notice that their conduct is illegal. It could incentivize them to seek more appropriations from the West Virginia legislature and take other steps to bring the Department into compliance with the law. The District Court was wrong to dismiss these claims.

## V. Reassignment Is Necessary to Ensure Impartiality, or at Minimum Preserve the Appearance of Justice.

Since taking over this case, the District Court judge has been clear about his long-held and erroneous view that federal courts have no power to order systemic reform of state institutions and his firm belief that the undertaking is futile. (JA1531). This Court has said "[w]e must seek to avoid both actual bias and the mere appearance of bias. . . [w]e also must be concerned about the public's perception of bias[.]" *United States v. McCall*, 934 F.3d 380, 384 (4th Cir. 2019). Even absent a claim of actual bias, there are "unusual circumstances where both for

the judge's sake and the appearance of justice an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality." *United States v. Nicholson*, 611 F.3d 191, 217 (4th Cir. 2010) (quoting *United States v. Guglielmi*, 929 F.2d 1001, 1007 (4th Cir. 1991)). The circumstances of this case warrant reassignment, for the sake of justice and the District Court judge.

This Court has adopted a three-part test to determine whether reassignment upon remand is warranted: "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected"; "(2) whether reassignment is advisable to preserve the appearance of justice;" and "(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Guglielmi*, 929 F.2d at 1007 (adopting test from *United States v. Robin*, 553 F.2d 8 (2d Cir. 1977)).

Various factors can influence the seriousness of the problem, including "the firmness of the judge's earlier-expressed views or findings" and the "reasons for the reversal." *Robin*, 553 F.2d at 10. "Where the judge sits as the fact-finder, reassignment is the preferable course, since it avoids any rub-off of earlier error." *Id.* Expressions of a judge with respect to his or her policy views in certain kinds of cases may appear to "border[] on personal bias." *Id.* (citing *United States v.*

*Thompson*, 483 F.2d 527, 529 (3d Cir. 1974)). Further, where a case has been remanded once already due to errors of a similar nature, reassignment is warranted. *United States v. Aberant*, No. 19-4786, 2021 U.S. App. LEXIS 34308, at *8 (4th Cir. Nov. 18, 2021).

Reassignment is warranted here. Given the entrenched views of the District Court judge, it can reasonably be expected that he would have difficulty putting his erroneous views to the side on remand. The lack of respect for precedent, including *Jonathan R. I*, that is reflected in the District Court judge's Order, coupled with his open antagonism toward institutional reform litigation demonstrates that reassignment is necessary to preserve the appearance of justice. That the same judge would be the fact-finder in a bench trial on remand further militates in favor of reassignment. In addition, any potential waste or duplication would not outweigh these factors. There has been no trial nor has summary judgment been decided. To the contrary, reassignment would prevent the waste of inevitable future appeals prompted by the District Court judge's hardened posture.

## A. It Is Reasonable to Expect That Upon Remand, the District Court Judge Will Have Substantial Difficulty Putting Aside His Long-Held Views on the Unconstitutionality of Institutional Reform.

Given the serious errors in the District Court's Order, their similarity to errors corrected in the first appeal, the District Court judge's statements throughout the opinion and his admittedly long-held concerns regarding institutional reform, it is

reasonable to expect that the District Court judge would have substantial difficulty putting these views to the side on remand.

First, as previously discussed, the District Court failed to heed this Court's rulings and reasoning in *Jonathan R. I*, which was clear that federalism posed no bar to this case or to the relief Plaintiffs request. That the District Court judge found a way to side-step this instruction and disagreed with specific findings in the opinion indicates that he will have difficulty putting aside his erroneous views regarding the constitutional constraints of federal court jurisdiction. *See Aberant*, 2021 U.S. App. LEXIS 34308, at *8 (reassigning where case had been remanded once already); *Robin*, 553 F.2d at 11 ("where a judge has repeatedly adhered to an erroneous view after the error is called to his attention . . . reassignment to another judge may be advisable").

Second, the District Court judge has firm and long-held beliefs about the impropriety of institutional reform of state institutions. His view on the matter is quite clear: "the court has no business in reforming state institutions." (JA1527). And he was also "clear" that this has been a "long-held concern that courts lack the kind of power sought by Plaintiffs in this case." (JA1531). Citing his prior decisions as evidence of his "long-held concern," the District Court judge describes his continued skepticism of "any relief requiring [the court] to assume control of a state agency and direct how that agency manages its program and allocates its funds" and

his regret that challenges to state agencies "are resulting in the forced resolution of policy issues through litigation in the judicial arena." (JA1531 (citing *Sommerville v. Union Carbide Corp.*, No. 2:19-cv-00878, 2024 U.S. Dist. LEXIS 86064, at *5 (S.D. W. Va. May 13, 2024)).[7] He criticizes courts who grant injunctions in institutional reform cases as having "given in to their altruistic impulses." (JA1524). And he critiques institutional reform litigation as "a perilous enterprise" that "inexcusably exhausts judicial resources, usurps state and local authority, and creates disputes that polarize the judiciary." (JA1524, JA1527). In short, this District Court judge believes that institutional reform litigation is fundamentally incompatible with the Constitution and that principles of federalism categorically bar federal courts from issuing systemic relief to correct constitutional violations traceable to statewide policies and practices. When "such firmness is evident in the trial court's repeated rulings" reassignment is warranted. *Maldonado Santiago v. Velazquez Garcia*, 821 F.2d 822, 832-33 (1st Cir. 1987); *Robin*, 553 F.2d at 10.

Third, as the District Court concedes, no federal court has ever dismissed a case of this kind for lack of redressability on the basis that court-ordered reform

---

[7] It is notable that in *Sommerville v. Union Carbide Corp.*, 2024 U.S. Dist. LEXIS 86064, which the same District Court judge presided over and cited as further evidence of his long-held concern, he also dismissed the case for lack of standing due in part to an overly expansive view of "Separation of Powers Concerns." *Id.* at *12, *30-33. An appeal of the decision is currently pending in this Court. *See* No. 24-1491 (4th Cir.).

would offend principles of federalism. (JA1527-1530). In fact, several courts have held the opposite, which the Order cites and explicitly disagrees with. (JA1529-1530). To make matters worse, the District Court clearly ignored decades of Supreme Court precedent holding that federal courts have both the equitable authority and the obligation to issue institutional reform injunctions in appropriate circumstances. *See supra* II.B. "When a district court can still conclude" that it lacks jurisdiction "in the face of such straightforward dictates," "remanding the case to that court with our own reminder of the correct law would most likely be 'an exercise in futility.'" *United States v. Martinovich*, 810 F.3d 232, 245 (4th Cir. 2016) (quoting *Guglielmi*, 929 F.2d at 1007).

The completely unexpected and *sua sponte* nature of the District Court's decision, issued on the eve of trial – "late in litigation to address standing" (JA1530) – is further confirmation of the need for reassignment. The unprecedented nature of the decision might encourage a more neutral and objective judge to avail himself of the clarity and comprehensiveness that adversarial proceedings produce. But the District Court judge apparently did not believe that he could be persuaded to abandon his deeply entrenched belief that institutional reform litigation is fundamentally incompatible with the Constitution.

**B. Reassignment Is Necessary to Preserve the Appearance of Justice.**

It is incompatible with "the appearance of fairness and impartiality" to permit the District Court judge to continue to supervise a case that it believes is fundamentally impermissible under the Constitution. *McCall*, 934 F.3d at 384. The Order evinces a single-minded bias against adjudicating Plaintiffs' claims and issuing any relief sought. It ignores relevant authorities, offers gratuitous examples of unsuccessful institutional reform efforts, and cites primarily scholarship critical of institutional reform litigation. *See supra* II, III. Even the critical academic literature does not support the District Court's extreme views. In support of the Court's premise that "the U.S. Constitution prevents federal courts from intervening in complex state institutions," (JA1522), it cited Jeffries and Rutherglen, *Structural Reform Revisited*, 95 Calif. L. Rev. at 1416. Far from asserting that federal courts are constitutionally prohibited from enjoining complex state institutions, Jeffries and Rutherglen affirmatively state the opposite: "Radical assumptions of judicial incapacity are negated by" "the long history of judicial innovation and flexibility in devising appropriate remedies for constitutional violations." *Id.* at 1422; *see also id.* at 1388-89 ("[S]tructural reform injunctions [against state and local governments] . . . should be presumptively available when it [sic] provides the only effective remedy for constitutional violations."). The authors present a much more nuanced critique of institutional reform injunctions: "the crucial question is not judicial power but

rather the conditions under which that power can be usefully and effectively exercised." *Id.* Many more examples of the misapplication of authorities permeate the District Court's Order, such as the lower court's reliance on *Steel Co.* 523 U.S. 83, and *Franklin*, 505 U.S. 788, to dismiss Plaintiffs' claims for declaratory relief. *See supra* IV.

In sum, the District Court judge has "displayed deep-seated and unequivocal antagonism" toward institutional reform litigation that would appear to "render fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 556 (1994). All future decisions will be tainted by the appearance of partiality and the perception that judicial decisions flow from the District Court judge's hostility towards institutional reform litigation rather than the application of law to fact. Accordingly, reassignment is necessary to preserve the appearance of justice.[8]

### C. Any Waste or Duplication Would Not Be Out of Proportion to the Appearance of Fairness a Reassignment Will Preserve.

Finally, the burdens of reassignment do not outweigh concerns about the appearance of bias. *See McCall*, 934 F.3d at 384. The Court "more freely reassign[s] a case when it will not require substantial duplication of effort." *Id.* The case was

---

[8] It is particularly important that the public continues to have faith in the rule of law. Members of all branches of government are expected to put aside their personal opinions and ensure that the decisions of federal courts are faithfully carried out. *Garcia v. Noem*, No. 25-1404, 2025 U.S. App. LEXIS 9237, at *7-8 (4th Cir. Apr. 17, 2025). When there is reasonable doubt that a federal jurist will be able to do that, reassignment is essential.

only recently assigned to Judge Goodwin. (JA97 (Apr. 3, 2023)). Several pre-trial motions are pending but have not yet been decided. A new judge would need only review the briefing and rule on those motions. Therefore, reassignment "will not require substantial duplication of effort" that outweighs the importance of preserving the appearance of fairness and impartiality in this case. *McCall*, 934 F.3d at 384.

Furthermore, "reassignment to a different judge should offer a reduction in waste because if [this Court] were simply to remand, we could reasonably expect more appeals of this nature." *United States ex rel. Little v. Shell Expl.*, 602 F. App'x 959, 976 (5th Cir. 2015) (reassigning where judge disregarded rulings from prior appeal and issued an opinion "consist[ing] almost entirely of conclusory statements" and "reach[ing] the same conclusion he reached in his previous opinion by employing the same overly broad reasoning that we rejected before"). The District Court judge's entrenched beliefs will make it impossible for him to maintain an open mind about either the merits of Plaintiffs' claims or the remedies to which they are entitled. If this case continues on the same track, there is a strong likelihood this Court will have to intervene yet again.

## CONCLUSION

This Court should reverse the District Court's Order dismissing the case for lack of standing, remand the case for proceedings consistent with its opinion, and order the case to be reassigned to another judge on remand.

## REQUEST FOR ORAL ARGUMENT

Under Local Rule 34(a), Plaintiffs-Appellants respectfully request oral argument. Given the importance of the issues in the case, both for the parties and for all civil rights litigants seeking relief against state and local government from a federal court, oral argument would assist the Court's consideration of the matter.

Respectfully submitted,

*/s/ Marcia Lowry*
A Better Childhood
Marcia Lowry
mlowry@abetterchildhood.org
Julia K. Tebor
jtebor@abetterchildhood.org
Laura Welikson
lwelikson@abetterchildhood.org
Robyn Goldberg
rgoldberg@abetterchildhood.org
John Hazelwood
jhazelwood@abetterchildhood.org
David Baloche
dbaloche@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel.: (646) 795-4456
Fax: (212) 692-0415

*/s/ Richard W. Walters*
Shaffer & Shaffer, PLLC
Richard W. Walters
rwalters@shafferlaw.net
J. Alexander Meade
ameade@shafferlaw.net
2116 Kanawha Boulevard, East
Post Office Box 3973
Charleston, West Virginia 25339-3973

Tel.: (304) 344-8716
Fax: (304) 344-1481

*/s/ Nicholas Ward*
Disability Rights of West Virginia
Nicholas Ward
nward@drofwv.org
5088 Washington St W, St. 300
Charleston, WV 25313
Tel.: (304) 346-0847


**Counsel for Plaintiffs-Appellants**

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,564 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: May 13, 2025

*/s/ Richard W. Walters*