# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————————

**JONATHAN R., et al.,**

*Plaintiffs-Appellants,*

v.

**PATRICK MORRISEY, et al.,**

*Defendants-Appellees.*

———————————

**LAW SCHOLARS, et al.,**

*Amici Supporting Appellants / Cross-Appellees*

———————————

On appeal from the United States District Court,
Southern District of West Virginia Huntington Division
No. 3:19-cv-00710
The Honorable Judge Joseph R. Goodwin

———————————

## BRIEF OF AMICI CURIAE LAW SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLANTS

———————————

Virginia M. Creighton
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
303.244.1800
creighton@wtotrial.com

*Counsel for Amici Law Scholars*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF *AMICI CURIAE*.........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.....................................2

ARGUMENT.................................................................................4

I.     ARTICLE III PERMITS THE FEDERAL COURTS TO
       ADJUDICATE INSTITUTIONAL REFORM CASES................................4

       A.     The U.S. Supreme Court has Allowed the Federal Courts to
              Adjudicate Institutional Reform Cases for Decades. ..........................4

       B.     Existing Doctrine and Litigation Practice Ensure that
              Institutional Reform Litigation Honors Federalism and
              Separation of Powers Principles..........................................7

              1.     The Supreme Court Has Fashioned Flexible Doctrines
                     that Balance Respect for State and Local Governments
                     Against the Obligation to Protect Rights. .................................8

              2.     Institutional Reform Litigation Does Not Turn Judges
                     into Executive or Legislative Branch Officials.......................12

II.    INSTITUTIONAL REFORM REMEDIES SUCCESSFULLY
       REDRESS SYSTEMIC RIGHTS VIOLATIONS. ...................................19

       A.     Institutional Reform Litigation Routinely Redresses Different
              Types of Government Harm............................................20

       B.     Neither the Passage of Time for Implementation nor
              Enforcement Challenges Can Strip Federal Courts of
              Jurisdiction. ..................................................................24

CONCLUSION ............................................................................26

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)....................................29

# TABLE OF AUTHORITIES

## CASES

*Bailey v. City of Philadelphia,*
No. 10-cv-05952-SD (E.D Pa. 2010) ........................................................22, 23

*Ball v. DeWine,*
No. 2:16-cv-282 (S.D. Ohio May 10, 2019) ......................................................5

*Benjamin v. Fraser,*
343 F.3d 35 (2d Cir. 2003) .................................................................................13

*Brown v. Bd. of Educ.,*
347 U.S. 483 (1954) ........................................................................................4, 26

*Brown v. Plata,*
563 U.S. 493 (2011) ................................................................... 3, 6, 8, 16, 26

*Charlie H. v. Whitman,*
213 F.R.D. 240 (D.N.J. 2003) ............................................................................23

*Charlie H. v. Whitman,*
83 F. Supp. 2d 476 (D.N.J. 2000) ......................................................................23

*Cobell v. Norton,*
237 F. Supp. 2d 71 (D.D.C. 2003) .....................................................................13

*Collins v. City of Milwaukee,*
No. 17-CV-234-JPS (E.D. Wis. July 23, 2018) ..................................................5

*Daughtry v. Emmons,*
No. 5:15-CV-41 (MTT), 2024 WL 1791717
(M.D. Ga. Apr. 23, 2024) ...................................................................................15

*Disability Rts. S.C. v. McMaster,*
24 F.4th 893 (4th Cir. 2022) ..............................................................................25

*Doe 4 ex rel. Lopez v. Shenandoah Valley Juvenile Ctr. Comm'n,*
985 F.3d 327 (4th Cir. 2021) .......................................................... 6, 13, 17, 19

*Dwayne B. v. Granholm,*
No. 2:06-cv-13548, E.D. Mich., July 18, 2008 .................................................18

*Frew ex rel. Frew v. Hawkins,*
    540 U.S. 431 (2004) ...................................................................6, 7

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ......................................................................13

*Horne v. Flores,*
    557 U.S. 433 (2009) ...................................................................7, 10

*J.J. v. Litscher,*
    No. 17-CV-00047-JDP (W.D. Wisc. 2017) .........................20, 21, 22

*Jensen v. Shinn,*
    609 F. Supp. 3d 789 (D. Ariz. 2022).............................................5, 26

*Jensen v. Thornell,*
    No. CV-12-00601-PHX-ROS, 2023 WL 2838040
    (D. Ariz. Apr. 7, 2023) ..................................................................17

*Jeremiah M. v. Crum,*
    695 F. Supp. 3d 1060 (D. Alaska 2023)...........................................18

*Jonathan R. v. Justice,*
    344 F.R.D. 294 (S.D. W. Va. 2023)..................................................11

*Jonathan R. v. Morrissey,*
    -- F. Supp. 3d --, No. 3:19-CV-00710, 2025 WL 655811
    (S.D. W. Va. Feb. 28, 2025) ...........................3, 6, 8, 13, 14, 15, 17, 19

*L.J. v. Wilbon,*
    633 F.3d 297 (4th Cir. 2011) ............................................................7

*LaShawn A. v. Kelly,*
    887 F. Supp. 297 (D.D.C. 1995) ......................................................16

*Lewis v. Casey,*
    518 U.S. 343 (1996) ...................................................................7, 10

*Lynn E. v. Lynch,*
    No. 12-cv-53-SM, D.N.H., Feb. 12, 2014.........................................18

*M.B. v. Howard,*
    No. 18-CV-02617-DDC-GEB (D. Kan. July 8, 2020) ........................5

*M.D. v. Abbott*,
    152 F. Supp. 3d 684 (S.D. Tex. 2015),
    *aff'd in part*, 907 F.3d 237 (5th Cir. 2018)........................................11

*M.D. v. Abbott*,
    929 F.3d 272 (5th Cir. 2019) ...............................................9

*Matherly v. Andrews*,
    859 F.3d 264 (4th Cir. 2017) ...............................................6

*McClendon v. City of Albuquerque*,
    79 F.3d 1014 (10th Cir. 1996) ..............................................9

*Meese v. Keene*,
    481 U.S. 465 (1987) ..........................................................25

*Melendres v. Arpaio*,
    784 F. 3d 1254 (9th Cir. 2015) .............................................9

*Melendres v. Arpaio*,
    No. CV-07-2513-PHX-GMS, 2016 WL 2783715
    (D. Ariz. May 13, 2016).......................................................9

*Melendres v. Arpaio*,
    No. CV-07-2713-PHX-GMS, 2016 WL 3996453
    (D. Ariz. July 26, 2016).......................................................9

*Melendres v. Maricopa Cnty.*,
    897 F.3d 1217 (9th Cir. 2018) ..............................................9

*Milliken v. Bradley*,
    433 U.S. 267 (1977) ........................................................9, 10

*Missouri v. Jenkins*,
    515 U.S. 70 (1995) ............................................................8

*Nunez v. N.Y.C. Dep't of Corr.*,
    --- F. Supp. 3d ---, 2024 WL 4896317
    (S.D.N.Y. Nov. 27, 2024).....................................................16

*Olivia Y. by and through Johnson v. Barbour*,
    No. 04CV251TSL-FKB, 2011 WL 13353278
    (S.D. Miss. May 17, 2011) ...................................................16

*Phillips v. Sheriff of Cook Cnty.*,
828 F.3d 541 (7th Cir. 2016) ...........................................................12

*Plata v. Schwarzenegger*,
603 F.3d 1088 (9th Cir. 2010) .........................................................16

*Preiser v. Rodriguez*,
411 U.S. 475 (1973) ........................................................................10

*Procunier v. Martinez*,
416 U.S. 396 (1974) ..........................................................................8

*R.C. ex rel. the Ala. Disabilities Advoc. Program v. Walley*,
475 F. Supp. 2d 1118 (M.D. Ala. 2007)...........................................23

*Rahman v. Chertoff*,
530 F.3d 622 (7th Cir. 2008) .............................................................5

*Rosie D. ex rel. John D. v. Romney*,
474 F. Supp. 2d 238 (D. Mass. 2007) ..............................................10

*Salazar v. Buono*,
559 U.S. 700 (2010) ..........................................................................7

*Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*,
783 F.3d 156 (3d Cir. 2015) ............................................................24

*Smentek v. Sheriff of Cook Cnty.*,
No. 09 C 529, 2010 WL 4791509
(N.D. Ill. Nov. 18, 2010) ...........................................................11, 12

*Smentek v. Sheriff of Cook Cnty.*,
No. 09 C 529, 2014 WL 7330792
(N.D. Ill. Dec. 22, 2014)..................................................................12

*United States v. Hinds Cnty. Bd. of Supervisors*,
128 F.4th 616 (5th Cir. 2025) .........................................................16

*Wal-Mart Stores Inc. v. Dukes*,
564 U.S. 338 (2011) ........................................................................11

*Watson v City of Memphis*,
373 U.S. 526 (1963) ........................................................................18

# RULES

Fed. R. App. P. 29 ............................................................................2

Fed. R. Civ. P. 23 ...........................................................................11

Fed. R. Civ. P. 60 ......................................................................7, 10

# OTHER AUTHORITIES

13A Charles Alan Wright et al.,
*Federal Practice and Procedure* § 3531.6 (3d ed. Apr. 2025 update)...............26

Aditya Bamzai,
*The Path of Administrative Law Remedies*,
98 Notre Dame L. Rev. 2037 (2023) ..................................................9

Andy Grimm,
*CHA to settle lawsuit with 'poorest of the poor' residents*,
Chi. Sun Times, July 25, 2022 ...........................................................5

Andy Shookhoff,
*Reflections on the Role of the Monitor in Child Welfare Litigation, in Center for
the Study of Social Policy, For the Welfare of Children: Lessons Learned from
Class Action Litigation* 23 (2012) ...........................................15, 25

Camden Coalition,
*The First Annual Performance Report on the New Jersey Division of Child
Protection and Permanency*, Dec. 2024 ...........................................24

Center for the Study of Social Policy,
*Charlie and Nadine H. v. Murphy: Final Addendum Report, Progress of the New
Jersey Department of Children and Families, April 25 – October 25, 2023* ......24

Center for the Study of Social Policy,
*Progress of the New Jersey Department of Children and Families: Monitoring
Report for Charlie and Nadine H. v. Corzine, July 1-December 31, 2007*, Apr.
16, 2008 .....................................................................................24

Charles F. Sabel & William H. Simon,
*The Duty of Responsible Administration
and the Problem of Police Accountability*,
33 Yale J. on Reg. 165 (2016) ........................................................14

Charles F. Sabel & William H. Simon,
  *Destabilization Rights: How Public Law Litigation Succeeds*,
  117 Harv. L. Rev. 1015 (2004)......................................................................5, 13

*Child Welfare Reform Update*,
  at https://www.michigan.gov/mdhhs/inside-mdhhs/legal/child-welfare-
  reform/reform-overview .....................................................................................14

David Marcus,
  *The Persistence and Uncertain Future of the Public Interest Class Action*,
  24 Lewis & Clark L. Rev. 395 (2020).................................................................11

Douglas Laycock & Richard L. Hasen,
  *Modern American Remedies: Cases and Materials 326* (5th ed. 2019)...............6

Edward L. Rubin,
  *Embracing Consent: An Administrative Era Approach to Consent Decrees, in
  Consent and its Discontents: Policy Issues in Consent Decrees 55* (Andrew
  Rachlin ed., 2006) ..............................................................................................20

Jack Kelly,
  *Tony Evers proposes $500 million prison overhaul*, Wisconsin Watch, Feb. 16,
  2025 ...................................................................................................................21

John C. Jeffries, Jr. & George A. Rutherglen,
  *Structural Reform Revisited*,
  95 Calif. L. Rev. 1387 (2007)..............................................................................5

John O'Toole & Leecia Welch,
  *Litigation Leads to Sustainable Reform: A Case Study of Utah's Success, in For
  the Welfare of Children* .......................................................................................23

Kathleen G. Noonan et al.,
  *Reforming Institutions: The Judicial Function in Bankruptcy and Public Law
  Litigation*,
  94 Ind. L.J. 545 (2019).......................................................................................18

Malcolm M. Feeley & Edward L. Rubin,
  *Judicial Policy Making and the Modern State: How the Courts Reformed
  America's Prisons 13* (1998) ................................................................................5

Margo Schlanger,
*Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*,
81 N.Y.U. L. Rev. 550 (2006) ........................................................................4, 5

Molly Armstrong et al.,
*New Jersey: A Case Study and Five Essential Lessons for Reform*, *in For the Welfare of Children* ...........................................................................................24

Patrick Marley & Jason Stein,
*Lincoln Hills: Scott Walker to close troubled teen prison and open five regional centers for juvenile offenders*, Milwaukee J. Sentinel, Jan. 8, 2018 ...................21

Patrick Marley,
*Crisis at Lincoln Hills juvenile prison years in the making*, Milwaukee J. Sentinel, Dec. 17, 2016......................................................................................20

Peter H. Schuck,
*Suing Government: Citizen Remedies for Official Wrongs* 156 (1983) ..............13

Public Catalyst,
Progress of the Michigan Department of Human Services: Monitoring Report for *Dwayne B. v. Whitmer* (Jan. 14, 2025)...............................................................15

Rebecca Ellis & Keri Blakinger,
*LA. County legal spending skyrocketed to $1 billion last year, as Sheriff's Department settlements balloon*, L.A. Times, Feb. 7, 2024 ...............................19

Richard Lezin Jones & Leslie Kaufman,
*New Jersey Opens Files Showing Failures of Child Welfare System*, N.Y. Times, Apr. 15, 2003...................................................................................................23

Richard Lezin Jones & Tina Kelley,
*An Infant Dies Suddenly at a Child Welfare Office*,
N.Y. Times, Oct. 21, 2005................................................................................23

Samuel R. Bagenstos,
*The Past and Future of Deinstitutionalization Litigation*,
34 Cardozo L. Rev. 1 (2012) ..............................................................................5

Susan P. Sturm,
*The Legacy and Future of Corrections Litigation*,
142 U. Pa. L. Rev. 639 (1993) ............................................................15

Theodore Eisenberg & Stephen C. Yeazell,
*The Ordinary and the Extraordinary in Institutional Reform Litigation*,
93 Harv. L. Rev. 465 (1980) ........................................................4, 19

William C. Wertz,
*Outside Monitoring of Oklahoma's Troubled Child Welfare System May Soon
End*, The Oklahoman, Mar. 22, 2023 .............................................14

Zach Strassburger,
*Crafting Complaints and Settlements in Child Welfare Litigation*,
21 U. Pa. J.L. & Soc. Change 219 (2018) ..........................................5

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are scholars of federal courts, civil rights litigation, and civil procedure ("the Amici Law Scholars"). They research, write, and teach about federal jurisdiction and institutional reform litigation. The Amici Law Scholars have a professional interest in the jurisdictional rules that affect access to the federal courts, particularly for groups of people seeking to vindicate rights. They can place the District Court's Article III standing analysis in proper doctrinal context, and they can describe institutional reform litigation's relevant history and current realities.

The Amici Law Scholars include:[1]

- Ahilan Arulanantham, Professor from Practice, UCLA School of Law;

- Maureen Carroll, Professor of Law, University of Michigan Law School;

- Erwin Chemerinsky, Dean and Jesse H. Choper Distinguished Professor of Law, UC Berkeley School of Law;

- Sharon Dolovich, Professor of Law, UCLA School of Law;

- Myriam Gilles, Paul R. Verkuil Professor of Public Law, Cardozo Law School;

- Helen Hershkoff, Herbert M. and Svetlana Wachtell Professor of Constitutional Law and Civil Liberties, New York University School of Law;

- Aaron Littman, Assistant Professor of Law, UCLA School of Law;

- David Marcus, Professor of Law, UCLA School of Law;

---

[1] Amici Law Scholars' institutional affiliations are provided for identification purposes only.

1

- Edward L. Rubin, University Distinguished Professor of Law and Political Science, Vanderbilt University Law School;

- Margo Schlanger, Wade H. and Dores M. McCree Collegiate Professor of Law, University of Michigan Law School;

- William H. Simon, Arthur Levitt Professor of Law Emeritus, Columbia Law School; and

- Adam Zimmerman, Adam Kingsley Professor of Law, USC Gould School of Law.[2]

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, institutional reform litigation has proceeded in federal courts to remedy widespread rights violations. Remedies obtained in these lawsuits have protected countless people who suffer serious harm inflicted by governments indifferent to their legal obligations. Federal courts have successfully supervised the implementation of these remedies. In many instances, these efforts have ensured that governments manage bureaucracies in ways that respect the U.S. Constitution and other laws.

---

[2] Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief. In compliance with Rule 29(a)(4)(E), no counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund its preparation or submission. Additionally, no person other than amici or counsel for amici made a monetary contribution to the preparation or submission of this brief.

Children in West Virginia's child welfare system should have the same access to the federal courts that has benefited millions before them. But the District Court placed in their way an unprecedented jurisdictional barrier wholly inconsistent with the federal courts' lengthy and ongoing legacy. *Compare Jonathan R. v. Morrissey*, -- F. Supp. 3d --, No. 3:19-CV-00710, 2025 WL 655811, at *5 (S.D. W. Va. Feb. 28, 2025) ("[T]he U.S. Constitution prevents federal courts from intervening in complex state institutions."), *with Brown v. Plata*, 563 U.S. 493 (2011) (affirming the issuance of an injunction to address serious deficiencies in California's prison system). The District Court gave two reasons for why standing's redressability prong ostensibly requires an institutional reform case's dismissal. First, it unearthed a nonexistent constitutional prohibition on the issuance of remedies that institutional reform plaintiffs tend to seek. Second, it described these remedies as invariably ineffective responses to extensive government harm.

Neither reason has any support in the doctrine the U.S. Supreme Court has fashioned for institutional reform litigation, in this litigation's realities, or in its track record of success. For decades, the Supreme Court has opted to regulate institutional reform litigation with doctrines that weigh the federalism and separation of powers concerns the District Court invoked against the imperative that courts remedy harms. The District Court would replace these well-established doctrines with a blunt, insurmountable standing barrier that precludes this balance. The District Court's

reasons for its jurisdictional innovation reflect common misperceptions about this litigation. Its explanation also ignores many instances when federal litigation has successfully redressed systemic rights violations inflicted by indifferent or hostile government bureaucracies.

## ARGUMENT

### I. ARTICLE III PERMITS THE FEDERAL COURTS TO ADJUDICATE INSTITUTIONAL REFORM CASES.

Institutional reform litigation has its origins in the litigation that led to *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). This legacy cannot be reconciled with the District Court's claim that Article III denies the federal courts jurisdiction over these cases. A jurisdictional barrier ignores the choices the Supreme Court has made to regulate institutional reform litigation. Its motivations reflect incorrect assumptions about how institutional reform litigation proceeds.

#### A. The U.S. Supreme Court has Allowed the Federal Courts to Adjudicate Institutional Reform Cases for Decades.

Judicial power to issue "elaborate decrees requiring continuous supervision," including to reform government institutions, extends back centuries. Theodore Eisenberg & Stephen C. Yeazell, *The Ordinary and the Extraordinary in Institutional Reform Litigation*, 93 Harv. L. Rev. 465, 481 (1980). The federal courts' exercise of this power to remedy large-scale rights violations by state and local governments dates to school desegregation litigation. *E.g.*, Margo Schlanger, *Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*,

81 N.Y.U. L. Rev. 550, 552 (2006); John C. Jeffries, Jr. & George A. Rutherglen, *Structural Reform Revisited*, 95 Calif. L. Rev. 1387, 1408 (2007). Federal courts began to adjudicate prison conditions cases in the 1960s, and by the 1970s institutional reform litigation involving an array of government agencies and programs had emerged.[3] Plaintiffs today continue with success to litigate cases brought to reform child welfare systems, police departments, prisons and jails, public housing agencies, programs for people with disabilities, and more.[4] Institutional reform litigation is not a "relic" of a "past" era. *Compare Rahman v. Chertoff*, 530 F.3d 622, 626 (7th Cir. 2008) *with* Jeffries & Rutherglen, *supra*, at 1411, *and* Schlanger, *supra*, at 553, *and* Charles F. Sabel & William H. Simon, *Destabilization*

---

[3] *E.g.*, Malcolm M. Feeley & Edward L. Rubin, *Judicial Policy Making and the Modern State: How the Courts Reformed America's Prisons* 13 (1998) (prison conditions); Samuel R. Bagenstos, *The Past and Future of Deinstitutionalization Litigation*, 34 Cardozo L. Rev. 1, 22 (2012) (disabilities); Zach Strassburger, *Crafting Complaints and Settlements in Child Welfare Litigation*, 21 U. Pa. J.L. & Soc. Change 219, 229 (2018) (child welfare); Sabel & Simon, *supra*, at 1043-1052 (public housing and police abuse).

[4] For exemplar cases litigated in the federal courts to a plaintiffs' judgment, a settlement, or a consent decree during the past decade, *see*, *e.g.*, Order and Settlement Agreement, *Collins v. City of Milwaukee*, No. 17-CV-234-JPS (E.D. Wis. July 23, 2018), ECF No. 135 (police practices); Settlement Agreement, *M.B. v. Howard*, No. 18-CV-02617-DDC-GEB (D. Kan. July 8, 2020), ECF No. 133-1 (child welfare); *Jensen v. Shinn*, 609 F. Supp. 3d 789 (D. Ariz. 2022) (prison conditions); Settlement Agreement, *Ball v. DeWine*, No. 2:16-cv-282 (S.D. Ohio May 10, 2019), ECF No. 396-1 (disabilities); Andy Grimm, *CHA to settle lawsuit with 'poorest of the poor' residents*, Chi. Sun Times, July 25, 2022 (public housing, litigated in the Northern District of Illinois).

*Rights: How Public Law Litigation Succeeds,* 117 Harv. L. Rev. 1015, 1018-19 (2004).

Citing to comments in two Fourth Circuit opinions, the District Court wrongly asserted that "the Supreme Court . . . removed district courts from managerial oversight of state institutions" by the end of the 1990s. *Jonathan R.*, 2025 WL 655811, at *5 n.3; *see also Doe 4 ex rel. Lopez v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327, 355 (4th Cir. 2021) (Wilkinson, J., dissenting) (citing cases from 1996, 1995, and 1981); *Matherly v. Andrews*, 859 F.3d 264, 275-76 (4th Cir. 2017) ("[T]he Supreme Court has made clear that the judiciary should not be in the business of administering institutions."). This claim also ignores the twenty-first century.[5] In the 2011 case *Brown v. Plata*, for instance, the Court affirmed a sweeping injunction issued to address significant problems with healthcare in California prisons, endorsing the federal courts' "substantial flexibility when making . . . judgments" about remedial intervention into government institutions. 563 U.S. at 538. Earlier, in *Frew ex rel. Frew v. Hawkins*, the Court affirmed the

---

[5] The *Doe 4* dissent misleadingly quotes a leading casebook for this claim. *Compare Doe 4*, 985 F.3d at 355 (claiming that "the Supreme Court 'lost patience'" with institutional reform litigation and quoting Douglas Laycock & Richard L. Hasen, *Modern American Remedies: Cases and Materials 326* (5th ed. 2019)), *with* Laycock & Hasen, *supra*, at 326 ("Conservatives on the Supreme Court lost patience . . . .").

federal courts' power under the U.S. Constitution to enforce consent decrees entered in institutional reform cases. 540 U.S. 431, 440 (2004).

The Supreme Court did rule against institutional reform plaintiffs in *Horne v. Flores*, 557 U.S. 433 (2009). *Horne* provides guidance for the exercise of discretion under Rule 60(b)(5) of the Federal Rules of Civil Procedure as district courts consider whether to terminate or modify remedies. *Id.* at 450; *see also L.J. v. Wilbon*, 633 F.3d 297, 304 (4th Cir. 2011) (commenting on *Horne* and district court discretion). The termination of federal jurisdiction over institutional reform litigation would make a decision about the adjustment of judgments entered in these cases—and the *Horne* court's claim that Rule 60(b)(5) "serves a particularly important function in institutional reform litigation"—nonsensical. 557 U.S. at 447 (internal citation omitted). *Cf. Salazar v. Buono*, 559 U.S. 700, 734 (2010) (Scalia, J., concurring) (explaining that an injunction cannot be modified in a manner inconsistent with Article III standing limits).

B. **Existing Doctrine and Litigation Practice Ensure that Institutional Reform Litigation Honors Federalism and Separation of Powers Principles.**

Institutional reform litigation involving state and local governments undeniably has implications for federalism and the separation of powers. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 385 (1996) (Thomas, J., concurring). Over decades, the Supreme Court has devised doctrines that account for these concerns while

7

enabling district courts to remedy systemic rights violations. An impermeable jurisdictional barrier permits no such balance. It is not necessary, and its motivations suggest misperceptions about institutional reform litigation.

> 1. The Supreme Court Has Fashioned Flexible Doctrines that Balance Respect for State and Local Governments Against the Obligation to Protect Rights.

The Supreme Court has instructed the federal courts managing institutional reform litigation to balance respect for state institutions against the obligation to remedy rights violations. *Procunier v. Martinez*, 416 U.S. 396, 405-06 (1974). *Cf. Brown v. Plata*, 563 U.S. at 533-34 (refusing to accept the state's preferred remedy, even though it "accord[s] respect to state authority," because it "creates a certain and unacceptable risk of continuing violations of . . . rights"). To empower courts to do so, the Supreme Court has crafted several doctrinal scalpels that allow for the sort of nuanced regulation that the District Court's jurisdictional axe makes impossible.

First, the "tailoring principle" directly rebuts the District Court's assertion that courts in institutional reform cases do not "identify[] a discrete constitutional violation and apply[] a narrowly tailored remedy." *Jonathan R.*, 2025 WL 655811, at *2. The principle requires that "the nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation." *Missouri v. Jenkins*, 515

U.S. 70, 88-89 (1995); *see also Milliken v. Bradley*, 433 U.S. 267, 282 (1977).[6] It ensures that a "court-imposed remedy which displaces local control" flows from the "constitutional violation" that gives the court its "authority" to intervene. *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1021 (10th Cir. 1996). The principle "require[s]" institutional reform remedies to demand no "more of state officials than is necessary to assure their compliance with the Constitution . . . ." *Melendres v. Arpaio*, 784 F. 3d 1254, 1265 (9th Cir. 2015); *see also M.D. v. Abbott*, 929 F.3d 272, 279 (5th Cir. 2019). Courts achieve this balance by undertaking detailed examinations of evidence of rights-violating bureaucratic dysfunction, then matching the remedy's terms to these facts. *E.g.*, *Melendres v. Arpaio*, No. CV-07-2513-PHX-GMS, 2016 WL 2783715 (D. Ariz. May 13, 2016) (making factual findings after a twenty-one-day evidentiary hearing in support of a remedy in a police reform case); *Melendres v. Arpaio*, No. CV-07-2713-PHX-GMS, 2016 WL 3996453, at *2 (D. Ariz. July 26, 2016) (describing the tailoring principle in an order fashioning the responsive remedy), *aff'd sub nom. Melendres v. Maricopa Cnty.*, 897 F.3d 1217, 1221-22 (9th Cir. 2018) (affirming the remedy as consistent with the tailoring principle).

---

[6] *See also* Aditya Bamzai, *The Path of Administrative Law Remedies*, 98 Notre Dame L. Rev. 2037, 2051-56 (2023) (discussing this doctrine and using the term "the tailoring principle").

Second, the Supreme Court has instructed district courts to "take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution," as they fashion remedies. *Milliken*, 433 U.S. at 280-81; *see also Lewis*, 518 U.S. at 362. To do so, courts must give government officials "'the first opportunity to correct the errors made in the internal administration of their'" bureaucracy, even after finding the government liable for systemic rights violations. *Lewis*, 518 U.S. at 362 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 492 (1973)). Courts commonly do so by requesting that officials submit proposals for the injunction to be issued. *E.g.*, *Rosie D. ex rel. John D. v. Romney*, 474 F. Supp. 2d 238, 239 (D. Mass. 2007) (adopting most of a government agency's plan to remedy its Medicaid Act violations).

Third, Rule 60(b)(5) ensures that remedies maintain the right balance over their lifetimes. If changed circumstances make remedial provisions no longer necessary to redress constitutional harms, the government can move under the rule for modification or termination. *Horne*, 557 U.S. at 454-55. A "flexible approach" to Rule 60(b)(5) ensures that "federal courts" can both "vigilantly enforce federal law and . . . award[] necessary relief," *id.* at 450, while reducing the "risk that [a remedy] will improperly interfere with a State's democratic processes," *id.* at 453.

These remedial scalpels are just some of the doctrines that balance rights vindication against deference to government officials' legitimate policymaking and

managerial prerogatives. Rigorous substantive liability standards ensure that no government defendant is held liable absent extensive evidence of bureaucratic dysfunction. *See generally M.D. v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015), *aff'd in part*, 907 F.3d 237 (5th Cir. 2018) (describing in 147 pages evidence of systemic rights violations in Texas's long-term foster care system). Class certification requirements, especially after *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338 (2011), effectively require plaintiffs to preview their evidence of this pervasive dysfunction long before trial, under circumstances that permit appellate review. *E.g.*, *Jonathan R. v. Justice*, 344 F.R.D. 294, 305-310 (S.D. W. Va. 2023) (summarizing factual findings in support of a class certification decision); David Marcus, *The Persistence and Uncertain Future of the Public Interest Class Action*, 24 Lewis & Clark L. Rev. 395, 418-20 (2020) (commenting on *Wal-Mart*'s impact on class certification proceedings); *see also* Fed. R. Civ. P. 23(f) (permitting interlocutory review of class certification decisions).

Litigation involving dental care for pretrial detainees in Cook County, Illinois, illustrates these constraints' operation and flexibility. In 2007, Cook County reduced the number of dentists serving approximately 10,000 detainees from four to one. The single dentist provided no services other than extractions. *Smentek v. Sheriff of Cook Cnty.*, No. 09 C 529, 2010 WL 4791509, at *1 (N.D. Ill. Nov. 18, 2010). The district court certified a class, noting that "delay in treatment [allegedly] occur[s] because

of a deliberate choice to decrease the availability of dental services . . . ." *Id.* at *7.

Subsequently, the county increased the number of dentists serving the detainees.[7]

These changes meant that the detainees' claims of deliberate indifference no longer

presented common questions of law or fact. The district court thus decertified the

class. *Id.* at 554-55.

Substantive, procedural, and remedial constraints render unnecessary a

jurisdictional barrier that blocks the federal courts to any institutional reform

plaintiff. Unlike the barrier, these constraints permit courts to balance respect for

state and local governments against the need to protect people like West Virginia's

children against government-inflicted harm.

> 2.      Institutional Reform Litigation Does Not Turn Judges into
>         Executive or Legislative Branch Officials.

The realities of institutional reform litigation should dispel three common

misperceptions that have prompted concerns like those the District Court voiced

about this litigation's constitutional footing. First, the federal courts have

adjudicated governments' liability for decades, contradicting the claim that judges

lack the capacity to determine whether systemic deficiencies in prison healthcare or

---

[7] These changes resulted from a consent decree entered in separate litigation brought by the U.S. Department of Justice. *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 543 (7th Cir. 2016). The district court determined that the detainees' lawsuit "helped bring about" the changes. *Smentek v. Sheriff of Cook Cnty.*, No. 09 C 529, 2014 WL 7330792, at *10 (N.D. Ill. Dec. 22, 2014).

a child welfare system violate the Constitution. *But see Doe 4*, 985 F.3d at 347 (Wilkinson, J., dissenting) (insisting that judges "are utterly unqualified to . . . determine what constitutes acceptable mental health care" for detainees). Even institutional reform litigation's critics concede that these lawsuits pose no distinctive challenges for liability determinations. *E.g.*, Peter H. Schuck, *Suing Government: Citizen Remedies for Official Wrongs* 156 (1983) (conceding in an otherwise-critical account that "[j]udges seem especially well suited . . . to discern when official practices violate constitutional norms"). Litigation routinely involves "complicated scientific, or otherwise technical," matters, and rules of procedure and evidence give courts plenty of tools to manage them. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 149 (1997) (Breyer, J., concurring). Institutional reform litigation is no different. *Benjamin v. Fraser*, 343 F.3d 35, 46 & n.12 (2d Cir. 2003) (citing Justice Breyer's concurrence in *Joiner*, 522 U.S. at 149, for this point).

Second, institutional reform litigation does not require federal courts to exceed their constitutional roles and "operate[ a] bureaucracy." *Jonathan R.*, 2025 WL 655811, at *5-6. Upon a liability finding, judges typically initiate a process of negotiation over the remedy, one that affords considerable deference to the views of relevant government officials. Sabel & Simon, *Destabilization Rights*, *supra*, at 1067-69. Judges then must assess compliance with the remedy. *E.g.*, *Cobell v. Norton*, 237 F. Supp. 2d 71, 82-85 (D.D.C. 2003) (commenting on this obligation).

13

If the defendant agency fails to meet its remedial obligations, the judge should respond accordingly, as it would anytime a litigant fails to follow a court order. None of these tasks shifts responsibility for the administration of a program or policy from government officials to the court. Charles F. Sabel & William H. Simon, *The Duty of Responsible Administration and the Problem of Police Accountability*, 33 Yale J. on Reg. 165, 177 (2016).

An appointed expert often assists with implementation, standard practice that should address the District Court's concern that it would "lack[] the resources and expertise to ensure compliance with its own orders." *Jonathan R.*, 2025 WL 655811, at *5. This "monitor" or "neutral" is usually someone who has extensive managerial experience with the types of policies and programs that the case implicates.[8] The claim that a monitor ends up "operat[ing] her own bureaucracy to replace the state agency" misunderstands that role. *Id*. The monitor does not actually administer the government program but instead acts as a management consultant of sorts. The monitor gathers information, reports on compliance, provides advice and technical

---

[8] The monitors who have supervised implementation of settlements of child welfare reform cases in Oklahoma and Michigan, for instance, both served as commissioners leading the successful reform of New Jersey's child welfare system. *See* William C. Wertz, *Outside Monitoring of Oklahoma's Troubled Child Welfare System May Soon End*, The Oklahoman, Mar. 22, 2023; *Child Welfare Reform Update*, at https://www.michigan.gov/mdhhs/inside-mdhhs/legal/child-welfare-reform/reform-overview.

assistance to the defendant agency, and mediates disputes. *E.g.*, Andy Shookhoff, *Reflections on the Role of the Monitor in Child Welfare Litigation, in Center for the Study of Social Policy, For the Welfare of Children: Lessons Learned from Class Action Litigation* 23 (2012).[9] Monitors thereby "expand the capacity of government officials to manage the process of reform and to maintain constitutional facilities." Susan P. Sturm, *The Legacy and Future of Corrections Litigation*, 142 U. Pa. L. Rev. 639, 682 (1993). But they do not run agencies themselves.

At any rate, the court sets the terms of the monitor's authority and can thus stop any bureaucratic creep. *E.g.*, *Daughtry v. Emmons*, No. 5:15-CV-41 (MTT), 2024 WL 1791717, at *46 (M.D. Ga. Apr. 23, 2024) (setting a monitor's duties and authority). The court may order, for instance, that "the monitor will not have direct involvement in or authority over [the defendant agency's] operations" and have "no enforcement power." *Id.* A monitor's appointment thus does not lead "inevitabl[y]" to "experts, panels, committees, and other external partners . . . ." *Jonathan R.*, 2025 WL 655811, at *5.

---

[9] For a recent example of a monitor's report, produced in the context of child welfare reform litigation, *see*, *e.g.*, Public Catalyst, Progress of the Michigan Department of Human Services: Monitoring Report for *Dwayne B. v. Whitmer* (Jan. 14, 2025), *available at* https://www.michigan.gov/mdhhs/inside-mdhhs/legal/child-welfare-reform.

Only under extreme circumstances does institutional reform litigation result in the appointment of a receiver, someone who does "take over the day-to-day management of a" government agency. *Plata v. Schwarzenegger*, 603 F.3d 1088, 1094 (9th Cir. 2010). Not just constitutionally permissible, receiverships "must" be considered under appropriate circumstances. *Brown v. Plata*, 563 U.S. at 511. But the appointment of a receiver "is an extraordinary remedy that should be employed with the utmost caution . . . ." *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 636 (5th Cir. 2025) (internal quotation omitted). Here, a receiver would only be a realistic possibility after the failure of "less extreme measures" and years of "bad faith" on the part of West Virginia officials during a remedy's implementation period. *Nunez v. N.Y.C. Dep't of Corr.*, --- F. Supp. 3d ---, 2024 WL 4896317, at *23 (S.D.N.Y. Nov. 27, 2024). *Cf. Olivia Y. by and through Johnson v. Barbour*, No. 04CV251TSL-FKB, 2011 WL 13353278, at *3 (S.D. Miss. May 17, 2011) (declining to appoint a receiver in a child welfare reform case despite "shortcomings in the performance of the duties prescribed" in a settlement agreement); *Hinds*, 128 F.4th at 623-625 (appointing a receiver in a prison conditions case after six years of noncompliance); *LaShawn A. v. Kelly*, 887 F. Supp. 297, 299 (D.D.C. 1995) (appointing a "full receivership" for the District of Columbia's "child welfare system" when the District was "utterly out of

compliance" with a consent decree and multiple other attempts to address the problem failed).

Third, contrary to the District Court's contention, institutional reform litigation does not turn judges into budgetary officials. *Jonathan R.*, 2025 WL 655811, at *1 (insisting that lawsuits oblige judges to "write budgets"). If the children prevail after trial, the District Court will have to fashion an injunction with provisions necessary to address the systemic rights violations that extensive dysfunction at West Virginia's Department of Human Services causes. But the agency would then determine for itself how to spend resources to meet these remedial obligations. The injunction itself would not specify funding allocations. *E.g.*, *Jensen v. Thornell*, No. CV-12-00601-PHX-ROS, 2023 WL 2838040, at *5-34 (D. Ariz. Apr. 7, 2023) (imposing numerous obligations on the Arizona Department of Corrections to improve prison healthcare but not instructing it how to allocate funds).

Nor does institutional reform litigation empower judges to dictate budgetary priorities to state legislatures. *But see Doe 4*, 985 F.3d at 354 (Wilkinson, J., dissenting) (insisting that "institutional reform suits" often "seem nothing so much as an attempt to move a preferred funding request to the head of the line," denying the "legislative process" its prerogative to "*weigh* some needs against others") (emphasis in original). Only rarely can courts order bodies with taxing and spending

authority to act. Kathleen G. Noonan et al., *Reforming Institutions: The Judicial Function in Bankruptcy and Public Law Litigation*, 94 Ind. L.J. 545, 589 (2019). Much more often, remedies expressly disclaim the imposition of an appropriations obligation on the legislature. Rather, they commit defendant agencies to "make their best efforts" to obtain sufficient funds to meet its obligations. *Id.* at 578.[10]

An agency may need to request additional appropriations to meet remedial obligations, funds the legislature may prefer to direct elsewhere. But a court "cannot abdicate [its] duty" to vindicate rights simply "because compliance with the Constitution may be expensive." *Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1089 (D. Alaska 2023); *see also Watson v City of Memphis*, 373 U.S. 526, 537 (1963) ("[V]indication of . . . constitutional rights cannot be made dependent upon any theory that it is less expensive to deny them than to afford them."). An argument to

---

[10] For an example from the child welfare reform context, *see*, *e.g.*, Settlement Agreement, *Dwayne B. v. Granholm*, No. 2:06-cv-13548, at 2 (E.D. Mich., July 18, 2008), ECF No. 140-3 ("Defendants do not speak for the Michigan Legislature, which has the power under Michigan law to determine the appropriations for the State's child welfare programs. However, . . . consistent with existing state budgetary practices and legal requirements, Defendants shall request state funds . . . sufficient to effect the provisions . . . ."). For an example from another context, *see*, *e.g.*, Class Action Settlement Agreement, *Lynn E. v. Lynch*, No. 12-cv-53-SM, at 3 (D.N.H., Feb. 12, 2014), ECF No. 105 ("Defendants do not and cannot bind the New Hampshire General Court, which has the authority . . . to appropriate funds for the State's mental health system . . . ."); *id.* at 27 ("The Governor and the other . . . Defendants agree to request . . . and make their best efforts to secure . . . the funding they believe is necessary to implement the terms of the Settlement Agreement . . . .").

the contrary proves too much, as most litigation against governments has budgetary implications. Eisenberg & Yeazell, *supra*, at 507. A municipal government may have to pay tens of millions of dollars to fund its annual 42 U.S.C. § 1983 damages liability. *E.g.*, Rebecca Ellis & Keri Blakinger, *LA. County legal spending skyrocketed to $1 billion last year, as Sheriff's Department settlements balloon*, L.A. Times, Feb. 7, 2024. The government may prefer to spend this money on "[i]mproved roads" or "[s]afety net health and welfare outlays." *Doe 4*, 985 F.3d at 354 (Wilkinson, J., dissenting). But the obligation to fund constitutional tort liability alone does not make this litigation, a regular staple of the federal judicial diet, unconstitutional. No critic, and certainly not the District Court, has explained why institutional reform litigation's cost implications are so distinctive as to require a bespoke jurisdictional barrier.

## II. INSTITUTIONAL REFORM REMEDIES SUCCESSFULLY REDRESS SYSTEMIC RIGHTS VIOLATIONS.

The District Court's standing argument centered on the claim that the Constitution does not permit district courts to issue institutional reform remedies. But the District Court also expressed doubt that institutional remedies can ever effectively redress rights violations. *Jonathan R.*, 2025 WL 655811, at *9. It offered three "examples" of ostensibly unsuccessful litigation to explain this skepticism. *Id.* at *6-*8 (discussing cases involving prison conditions, disability rights, and child support enforcement).

The reality is quite different. As with any type of litigation, some institutional reform cases "are not always effective," while others "are not always ineffective . . . ." Edward L. Rubin, *Embracing Consent: An Administrative Era Approach to Consent Decrees, in Consent and its Discontents: Policy Issues in Consent Decrees* 55, 71 (Andrew Rachlin ed., 2006). The following three examples of successful cases litigated in the twenty-first century counterbalance the District Court's three examples. These cases involve a range of government institutions and types of rights violations. They exemplify how litigation can catalyze significant reform and protect large numbers of people from government-inflicted harm. While not a representative sample, these cases disprove the empirical premise behind the District Court's jurisdictional barrier: that institutional reform cases invariably fail to redress plaintiffs' injuries.

### A. Institutional Reform Litigation Routinely Redresses Different Types of Government Harm.

*J.J. v. Litscher*, currently pending in the Western District of Wisconsin, challenges conditions of detention in the facilities Wisconsin uses to incarcerate juveniles adjudged to have committed serious offenses. No. 17-CV-00047-JDP (W.D. Wis. 2017); *see* Patrick Marley, *Crisis at Lincoln Hills juvenile prison years in the making*, Milwaukee J. Sentinel, Dec. 17, 2016. The plaintiffs sought a preliminary injunction to protect children from the facilities' disciplinary practices, which included protracted stints in solitary confinement of up to sixty days and the

frequent use of pepper spray. Class Action Complaint for Declaratory and Injunctive Relief, *J.J. v. Litscher*, No. 17-CV-00047-JDP, at 10, 20 (W.D. Wis. Jan. 23, 2017), ECF 1. Issuing the injunction, the district judge described Wisconsin's practices as "well[,] well beyond the national norms even for" the minority of states "that permit the use of punitive solitary confinement" for children. Transcript of Second Day of Motion Hearing, *J.J. v. Litscher*, No. 17-CV-00047-JDP, at 4 (W.D. Wis. July 5, 2017), ECF 67. "This is the most severe and damaging type of solitary confinement that is used in the American penal system," the district judge concluded. *Id.* The use of pepper spray was "clearly excessive" and out of step with "90% of the states . . . ." *Id.* at 4-5.

After the preliminary injunction's issuance, Wisconsin announced plans to close the facilities, which it intends to complete by 2029. Patrick Marley & Jason Stein, *Lincoln Hills: Scott Walker to close troubled teen prison and open five regional centers for juvenile offenders*, Milwaukee J. Sentinel, Jan. 8, 2018; Jack Kelly, *Tony Evers proposes $500 million prison overhaul*, Wisconsin Watch, Feb. 16, 2025. Other aspects of remedial implementation proceeded quickly. Within nine months of a consent decree's entry in September 2018, the state had made

> significant improvements with improving staff and youth interactions, developing more programming options for youth, reducing confinement time, reducing mechanical restraints, reducing staff vacancies, developing staff wellness initiatives, filling new positions to help with data collection and quality assurance, identifying funding for

> various outside experts and funding for physical plant improvements,
> and [making] physical plant improvements.

Third Report of the Monitor, *J.J. v. Litscher*, No. 17-CV-00047-JDP, at 30 (W.D.

Wis. July 1, 2019), ECF 111. As of November 2024, the state was in "substantial

compliance" with forty-one of the consent decree's fifty obligations. Twenty-First

Report of the Monitor, *J.J. v. Litscher*, No. 17-CV-00047-JDP, at 9-26 (W.D. Wis.

Nov. 25, 2024), ECF 157. An average stay in administrative confinement lasted

minutes, not days or weeks, and the use of pepper spray entirely ended. *Id.* at 10-11,

19.

     *Bailey v. City of Philadelphia*, currently pending in the Eastern District of

Pennsylvania, involves a challenge to the Philadelphia Police Department's stop-

and-frisk practices. Complaint, No. 10-cv-05952-SD, at 2 (E.D Pa. Nov. 4, 2010),

ECF 1. At the time the parties settled in 2011, police officers lacked reasonable

suspicion in more than 40% of the hundreds of thousands of stops they conducted

annually. Plaintiffs' Third Report to Court and Monitor on Stop and Frisk Practices,

*Bailey v. City of Philadelphia*, No. 10-cv-05952-SD, at 4 (E.D. Pa. Mar. 19, 2013),

ECF 44. By 2017, that percentage had fallen to 25%. Plaintiffs' Seventh Report to

Court and Monitor on Stop and Frisk Practices: Fourth Amendment Issues, *Bailey

v. City of Philadelphia*, No. 10-cv-05952-SD, at 2 (E.D. Pa. May 2, 2017), ECF 62.

By 2023, the total number of stops in Philadelphia had plummeted to 12,472 from a

peak of more than 250,000 at the time of the case's filing, and more than 90% of

these stops were supported by reasonable suspicion. Defendant City of Philadelphia's Omnibus Eleventh Report to the Court on the Fourth and Fourteenth Amendment, *Bailey v. City of Philadelphia*, No. 10-CV-05952-SD, at 1-2 (E.D. Pa. Feb. 14, 2024), ECF 160. The city itself attributed this success to "the significant investment in training and oversight" that the settlement required. *Id.* at 2.

Finally, the plaintiffs filed *Charlie H. v. Whitman* in 1999 to remedy the "poor management and gross overburdening of the child welfare system in New Jersey." 83 F. Supp. 2d 476, 480 (D.N.J. 2000).[11] The state agreed to settle after media, relying on documents that surfaced during litigation, reported on the "unimaginable death" of a child in the state's custody, as well as "the abuse of his brothers." *Charlie H. v. Whitman*, 213 F.R.D. 240, 252 (D.N.J. 2003); Richard Lezin Jones & Leslie Kaufman, *New Jersey Opens Files Showing Failures of Child Welfare System*, N.Y. Times, Apr. 15, 2003. Remedial implementation accelerated after reports of another child's death in 2005. Richard Lezin Jones & Tina Kelley, *An Infant Dies Suddenly*

---

[11] For two more examples of successful episodes of child welfare reform litigation, *see*, *e.g.*, John O'Toole & Leecia Welch, *Litigation Leads to Sustainable Reform: A Case Study of Utah's Success*, *in For the Welfare of Children*, *supra*, at 97 (describing the successful implementation of a settlement agreement in a child welfare reform case); *R.C. ex rel. the Ala. Disabilities Advoc. Program v. Walley*, 475 F. Supp. 2d 1118, 1122 (M.D. Ala. 2007) (terminating federal court oversight upon finding that Alabama "successfully has reformed its child welfare system by developing a system of care which substantially complies with the requirements of the Consent Decree").

*at a Child Welfare Office*, N.Y. Times, Oct. 21, 2005; Molly Armstrong et al., *New Jersey: A Case Study and Five Essential Lessons for Reform*, in *For the Welfare of Children*, *supra,* at 115. By 2008, the settlement's monitor reported "significant accomplishments" toward fixing New Jersey's system, with "much" for the state "to be proud of." Center for the Study of Social Policy, *Progress of the New Jersey Department of Children and Families: Monitoring Report for Charlie and Nadine H. v. Corzine*, *July 1-December 31, 2007*, Apr. 16, 2008, at 3, 6-7.

Reform continued steadily over the next fifteen years. *E.g.*, Armstrong et al., *supra*, at 115-116. The monitor's final report, issued in 2023, praised the state for its "tremendous strides toward achieving better outcomes for children and families, . . . and working to fulfill its vision that all New Jersey residents are safe, healthy, and connected." Center for the Study of Social Policy, *Charlie and Nadine H. v. Murphy: Final Addendum Report, Progress of the New Jersey Department of Children and Families, April 25 – October 25, 2023,* Oct. 30, 2023, at 4. Federal court monitoring ended in 2023. The next year, an independent audit described a "vastly improved" child welfare system. Camden Coalition, *The First Annual Performance Report on the New Jersey Division of Child Protection and Permanency*, Dec. 2024, at 3.

### B. Neither the Passage of Time for Implementation nor Enforcement Challenges Can Strip Federal Courts of Jurisdiction.

As these examples illustrate, institutional reform tends to come about gradually, not all at once. This fact has no jurisdictional significance. *Shalom*

*Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 162 (3d Cir. 2015) ("[R]edressability hinges on the availability and likelihood of relief, rather than the immediacy of relief."). The time implementation requires should cause no surprise, given the extent and entrenchment of bureaucratic dysfunction that plaintiffs must prove to establish a government agency's liability.

Moreover, the years or decades that full implementation can take can obscure the impact that each step along the way can have. But even a remedy that only "partially redress[es] the . . . injury" suffices for Article III purposes. *Meese v. Keene*, 481 U.S. 465, 476 (1987); *see also Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 914-15 (4th Cir. 2022). As mentioned, while Wisconsin's problematic juvenile detention facilities will not fully close until 2029, conditions for the children detained there improved quickly after the parties entered their consent decree in September 2018. The lawsuit has fully redressed harms caused by excessive stays in solitary confinement and the use of pepper spray, even if more remains to be done.

Finally, delays or difficulties with reform often result from defendants' intransigence. The willingness and ability of a defendant agency's leadership to work collaboratively often determines the success of remedial implementation. *E.g.*, A. Shookhoff, *supra,* at 31 (reporting results from interviews with lawyers, other advocates, and government officials involved in child welfare reform litigation, and identifying "strong agency leadership" as "necessary to implement . . . reforms" ). If

an agency's leadership refuses to do so, reform will proceed haltingly, if at all. *Cf.*
*Jensen*, 609 F. Supp. 3d at 798 (vacating a stipulation settling an Arizona prison
conditions case and proceeding to trial because government officials "consistently
refused to perform the [stipulation's] obligations" and provided "baseless legal and
factual theories for their failures"). Surely government officials' refusal to honor
their legal obligations cannot defeat redressability and strip a federal court of
jurisdiction. *See* 13A Charles Alan Wright et al., *Federal Practice and Procedure*
§ 3531.6 (3d ed. Apr. 2025 update) (noting that "[d]efendants at times . . . argu[e]"
against standing on grounds "that any available remedy can be evaded," and
observing that "[c]ourts do not receive such arguments warmly").

## CONCLUSION

The District Court claimed to discover a jurisdictional barrier to institutional
reform litigation that has gone undetected for more than eight decades. During this
time, the Supreme Court has engaged with institutional reform litigation repeatedly,
fashioning doctrine that enables the sort of nuanced regulation that the District
Court's blunt redressability analysis precludes. Nothing in the District Court's often-
erroneous description of institutional reform litigation suggests anything new that
would warrant an abrupt end to a legacy dating from *Brown v. Bd. of Educ.* to *Brown
v. Plata*. West Virginia's children deserve the same chance that millions of plaintiffs
before them have enjoyed. The Fourth Circuit should reverse the District Court's

order and reinstate this case, to allow these children to seek urgently needed remedies for the serious and systemic harm they suffer.

Dated: May 20, 2025                                     Respectfully submitted,

*s/ Virginia M. Creighton*
Virginia M. Creighton
Wheeler Trigg O'Donnell LLP

*Attorney for Amici Law Scholars*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

[X] this brief contains 5,483 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using
Microsoft Word 2019 in Times Roman 14 point font.

Dated:  May 20, 2025

*s/Virginia M. Creighton*
Virginia M. Creighton
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
303.244.1800
creighton@wtotrial.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on May 23, 2025 which will serve all participants who are registered to receive service.

*s/Virginia M. Creighton*