**No. 25-1232(L) and 25-1239**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

JONATHAN R., *et al.*,

*Plaintiffs-Appellants/Cross-Appellees,*

v.

PATRICK MORRISEY, *et al.*,

*Defendants-Appellees/Cross-Appellants.*

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 3:19-cv-00710 (Goodwin, J.)

## BRIEF OF DEFENDANTS-APPELLEES/CROSS-APPELLANTS

JOHN B. MCCUSKEY
 *Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY
GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
mwilliams@wvago.gov

MICHAEL R. WILLIAMS
 *Solicitor General*
 *Counsel of Record*

HOLLY J. WILSON
 *Principal Deputy Solicitor*
 *General*

CALEB B. DAVID
 *Deputy Solicitor General*

FRANKIE A. DAME
 *Assistant Solicitor General*

*Counsel for Defendants-Appellees/Cross-Appellants*

**TABLE OF CONTENTS**

Introduction.................................................................................................1

Jurisdictional Statement............................................................................3

Issues Presented.........................................................................................3

Statement Of The Case..............................................................................4

I.      West Virginia's Child-Welfare System.........................................4

      A.      Background.............................................................................4

      B.      2019 Memorandum of Understanding.................................8

      C.      Recent Reform Efforts.........................................................9

III.    Plaintiffs' Class-Action Lawsuit. ................................................16

      A.      Institutional Reform Litigation Generally......................16

      B.      This Complaint ...................................................................18

      C.      Class Certification And Other Proceedings.....................20

      D.      Dismissal .............................................................................22

Summary Of The Argument......................................................................24

Standards Of Review.................................................................................25

Argument.....................................................................................................25

I.      Plaintiffs lack standing to pursue a full judicial overhaul of West Virginia's foster care system.................................................25

      A.      Plaintiffs have not shown how the district court could redress their asserted injuries ......................................26

            1.      Federal courts cannot take control of state systems in the way Plaintiffs ask.......................................27

2.     Plaintiffs' proposed injunction would not redress their asserted injuries ........................................36

3.     Plaintiffs' requested declaratory relief would not redress their asserted injuries .............................39

4.     The district court could consider redressability even after *Jonathan R. I* ...............................................43

B.     Plaintiffs have not shown injury in fact .........................51

II.    This Court need not reassign the case on remand ...............................56

III.   The class doesn't satisfy Rule 23 ...............................................58

A.     The district court erred in finding commonality ...........................58

1.     No offending policy or practice applies uniformly..............59

2.     The district court's "common practices" were not actually common.................................................62

B.     The district court erred in finding typicality .................................71

C.     The district court erred in finding that a single injunction or declaratory judgment would provide relief to all .....................75

Conclusion...........................................................................................77

Certificate Of Compliance..................................................................79

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. Immigr. & Customs Enf't Div. of U.S. Dep't of
    Homeland Sec.*,
    No. 07-cv-8224, 2012 WL 1344417 (S.D.N.Y. Apr. 16, 2012).........................63

*Ala. Legislative Black Caucus v. Alabama*,
    575 U.S. 254 (2015)...............................................................................................50

*al-Marri v. Pucciarelli*,
    534 F.3d 213 (4th Cir. 2008)...................................................................................2

*Am. Postal Workers Union v. Frank*,
    968 F.2d 1373 (1st Cir. 1992) ................................................................................1

*Andon, LLC v. City of Newport News*,
    813 F.3d 510 (4th Cir. 2016)................................................................................48

*Andrews v. Chevy Chase Bank*,
    545 F.3d 570 (7th Cir. 2008).................................................................................76

*Ansley v. Warren*,
    861 F.3d 512 (4th Cir. 2017).................................................................................28

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011)...............................................................................................46

*Avritt v. Reliastar Life Ins. Co.*,
    615 F.3d 1023 (8th Cir. 2010)...............................................................................54

*Baines v. City of Atlanta*,
    No. 1:19-CV-0279, 2021 WL 2471041 (N.D. Ga. Jan. 4, 2021) .....................47

*Beck v. McDonald*,
    848 F.3d 262 (4th Cir. 2017)...........................................................................52, 53

*Bell v. Wolfish,*
  441 U.S. 520 (1979)................................................................30, 31, 32

*Benham v. City of Charlotte,*
  635 F.3d 129 (4th Cir. 2011).................................................................51

*Berni v. Barilla S.p.A.,*
  964 F.3d 141 (2d Cir. 2020) .................................................................76

*Block v. Rutherford,*
  468 U.S. 576 (1984)......................................................................30, 32

*Bolden v. Walsh Const. Co.,*
  688 F.3d 893 (7th Cir. 2012)................................................................61

*Brown v. Nucor Corp.,*
  785 F.3d 895 (4th Cir. 2015)...........................................................25, 63

*Brown v. Plata,*
  563 U.S. 493 (2011)................................................................30, 31, 33

*Buscemi v. Bell,*
  964 F.3d 252 (4th Cir. 2020)................................................................46

*California v. Texas,*
  593 U.S. 659 (2021)............................................................................40

*Carolina Youth Action Project v. Wilson,*
  60 F.4th 770 (4th Cir. 2023) ...............................................................54

*Carson P. ex rel. Foreman v. Heineman,*
  240 F.R.D. 456 (D. Neb. 2007).............................................................73

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983)......................................................................53, 54

iv

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)......................................................27, 53, 54

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013)................................................................68

*Comite de Apoyo a los Trabajadores Agricolas (CATA) v. U.S.*
    *Dep't of Lab.,*
    995 F.2d 510 (4th Cir. 1993).............................................40, 42

*Cnty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998)...........................................................59, 72

*Curtis v. Taylor,*
    No. 4:22-cv-00328, 2023 WL 2499956 (E.D. Ark. Mar. 14, 2023)................36

*Deal v. Mercer Cnty. Bd. of Educ.,*
    911 F.3d 183 (4th Cir. 2018).................................................37

*Deiter v. Microsoft Corp.,*
    436 F.3d 461 (4th Cir. 2006).............................71, 72, 73, 75

*DeSpain v. Johnston,*
    731 F.2d 1171 (5th Cir. 1984)................................................35

*Disability Rts. S.C. v. McMaster,*
    24 F.4th 893 (4th Cir. 2022) ................................................36

*D.L. v. District of Columbia,*
    713 F.3d 120 (D.C. Cir. 2013).............................................65, 71

*Doe 4 by & through Lopez v. Shenandoah Valley Juv. Ctr.*
    *Comm'n,*
    985 F.3d 327 (4th Cir. 2021)...............................................28, 34

*EEOC v. Am. Nat'l Bank,*
    652 F.2d 1176 (4th Cir. 1981).............................................65

*EQT Prod. Co. v. Adair,*
   764 F.3d 347 (4th Cir. 2014) ................................................................. 25

*Evans v. Lynn,*
   537 F.2d 571 (2d Cir. 1975) .................................................................... 2

*Evers v. Dwyer,*
   358 U.S. 202 (1958) ............................................................................... 42

*Ford v. NYLCare Health Plans of Gulf Coast, Inc.,*
   301 F.3d 329 (5th Cir. 2002) ................................................................. 50

*Frew v. Hawkins,*
   540 U.S. 431 (2004) ................................................................... 30, 31, 32

*Genesis Healthcare, Inc. v. Becerra,*
   39 F.4th 253 (4th Cir. 2022) ................................................................. 40

*Gen. Tel. Co. of the S.W. v. Falcon,*
   457 U.S. 147 (1982) ............................................................................... 71

*George v. Islamic Republic of Iran,*
   63 F. App'x 917 (7th Cir. 2003) ............................................................ 49

*Goldman v. Brink,*
   41 F.4th 366 (4th Cir. 2022) ................................................................. 51

*Griffin v. Dep't of Lab. Fed. Credit Union,*
   912 F.3d 649 (4th Cir. 2019) ................................................................. 26

*G.T. v. Bd. of Educ.,*
   117 F.4th 193 (4th Cir. 2024) ................................................... 55, 60, 70

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ......................................................................... 26, 42

*Hewitt v. Helms,*
   482 U.S. 755 (1987) ............................................................................... 41

vi

*Hierholzer v. Guzman*,
125 F.4th 104 (4th Cir. 2025) .................................................................37

*Horne v. Flores*,
557 U.S. 433 (2009)..................................................................28, 32

*In re Indu Craft, Inc.*,
630 F. App'x 27 (2d Cir. 2015) .................................................48, 49

*INS v. Chadha*,
462 U.S. 919 (1983)...........................................................................27

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994)..........................................................................29

*Jamie S. v. Milwaukee Pub. Schs.*,
668 F.3d 481 (7th Cir. 2012)...................................................61, 66, 67

*J.B. ex rel. Hart v. Valdez*,
186 F.3d 1280 (10th Cir. 1999)................................................70, 71

*Jonathan R. by Dixon v. Justice*,
41 F.4th 316 (4th Cir. 2022) ............................................43, 44, 45, 46, 47

*Just. 360 v. Stirling*,
42 F.4th 450 (4th Cir. 2022) ........................................40, 41, 42, 43

*Kentucky v. EPA*,
No. 23-5343/5345, 2024 WL 3569525 (6th Cir. July 29, 2024) ......................50

*Larson v. Valente*,
456 U.S. 228 (1982)..........................................................................42

*Lewis v. Casey*,
518 U.S. 343 (1996)......................................................................32, 33

vii

*Liberty Mut. Ins. Co. v. Atain Specialty Ins. Co.*,
  126 F.4th 301 (4th Cir. 2025) ......................................................................51

*Lilly v. Harris-Teeter Supermarket*,
  720 F.2d 326 (4th Cir. 1983) .......................................................................65

*Mancuso v. Consol. Edison Co. of N.Y.*,
  25 F. App'x 12 (2d Cir. 2002) ...............................................................46, 47

*Maryland v. 3M Co.*,
  130 F.4th 380 (4th Cir. 2025) ......................................................................43

*Md. Election Integrity, LLC v. Md. State Bd. of Elections*,
  127 F.4th 534 (4th Cir. 2025) ................................................................25, 53

*Mikel v. Quin*,
  58 F.4th 252 (6th Cir. 2022) ........................................................................40

*Millikin v. Bradley*,
  433 U.S. 267 (1977)................................................................28, 31, 32, 48

*Missouri v. Jenkins*,
  515 U.S. 70 (1995)..........................................................26, 28, 29, 30, 31, 32

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)......................................................................................52

*Moore v. Sims*,
  442 U.S. 415 (1979)......................................................................................35

*Murthy v. Missouri*,
  603 U.S. 43 (2024)........................................................................................63

*Opiotennione v. Bozzuto Mgmt. Co.*,
  130 F.4th 149 (4th Cir. 2025) ................................................................25, 26

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)................................................................................37, 52

viii

*Parent/Pro. Advoc. League v. City of Springfield,*
  934 F.3d 13 (1st Cir. 2019) ...............................................................70, 71

*Procunier v. Martinez,*
  416 U.S. 396 (1974)...............................................................................31

*Rhodes v. Chapman,*
  452 U.S. 337 (1981)..................................................................30, 31, 32

*Rose v. Rose,*
  481 U.S. 619 (1987)...............................................................................35

*Schlesinger v. Reservists Comm. to Stop the War,*
  418 U.S. 208 (1974) ................................................................................1

*Scholastic Ent., Inc. v. Fox Ent. Grp.,*
  336 F.3d 982 (9th Cir. 2003)................................................................48

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso,*
  543 F.3d 597 (10th Cir. 2008)..............................................................75

*South Carolina v. United States,*
  912 F.3d 720 (4th Cir. 2019)...........................................................27, 54

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016)..........................................................................26, 27

*Stafford v. Bojangles' Rests., Inc.,*
  123 F.4th 671 (4th Cir. 2024) ..............................................................60

*State ex rel. W. Va. Dep't of Health & Hum. Res. v. Bloom,*
  880 S.E.2d 899 (W. Va. 2022).................................................13, 64, 67

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998)...................................................................23, 37, 43

ix

*Steffel v. Thompson,*
415 U.S. 452 (1974)..............................................................................42

*Steves & Sons, Inc. v. JELD-WEN, Inc.,*
988 F.3d 690 (4th Cir. 2021)........................................................46, 56

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009)......................................................................51, 52

*Synopsys, Inc. v. Risk Based Sec., Inc.,*
70 F.4th 759 (4th Cir. 2023) ...............................................................40

*Tenet v. Doe,*
544 U.S. 1 (2005)................................................................................44

*Thorn v. Jefferson-Pilot Life Ins. Co.,*
445 F.3d 311 (4th Cir. 2006)..............................................................25

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021)............................................................................52

*United Source One, Inc. v. Frank,*
No. 23-1481, 2024 WL 1108824 (4th Cir. Mar. 14, 2024) ...............51

*United States v. Cannady,*
63 F.4th 259 (4th Cir. 2023) ..............................................................44

*United States v. Chang,*
121 F.4th 1044 (4th Cir. 2024), .........................................................57

*United States v. Hays,*
515 U.S. 737 (1995).............................................................................39

*United States v. Letz,*
383 F.3d 191 (4th Cir. 2004)..............................................................57

*United States v. McCall,*
934 F.3d 380 (4th Cir. 2019).......................................25, 56, 57, 58

x

*United States v. Mississippi,*
　82 F.4th 387 (5th Cir. 2023) ...................................................................74

*United States v. Neal,*
　101 F.3d 993 (4th Cir. 1996)...................................................................56

*United States v. North Carolina,*
　180 F.3d 574 (4th Cir. 1999)...................................................................56

*United States v. Smith,*
　134 F.4th 248 (4th Cir. 2025) ................................................................57

*United States v. Texas,*
　599 U.S. 670 (2023)..................................................25, 26, 27, 32, 40

*United States v. Valencia,*
　600 F.3d 389 (5th Cir. 2010)...................................................................62

*Wal-Mart Stores, Inc. v. Dukes,*
　564 U.S. 338 (2011)........................................58, 59, 60, 62, 66, 68, 75

*Warth v. Seldin,*
　422 U.S. 490 (1975)..................................................................................37

*Whole Woman's Health v. Jackson,*
　595 U.S. 30 (2021)..............................................................................28, 32

*Whitmore v. Arkansas,*
　495 U.S. 149 (1990)............................................................................52, 53

*Younger v. Harris,*
　401 U.S. 37 (1971)....................................................................................21

xi

## Statutes

HB 2026, 2025 Reg. Sess. (W. Va. 2025)..................................................15

SB 200, 2024 Reg. Sess. (W. Va. 2024) ...................................................15

28 U.S.C. § 1291 ............................................................................................3

28 U.S.C. § 1331 ............................................................................................3

28 U.S.C. § 1343 ............................................................................................3

W. VA. CODE § 49-4-105 ..............................................................................68

W. VA. CODE § 49-4-110 ................................................................................6

W. VA. CODE § 49-4-405 ................................................................................6

W. VA. CODE § 49-4-601 ...........................................................................5, 55

W. VA. CODE § 49-4-601a ..............................................................................5

W. VA. CODE § 49-4-602 ................................................................................5

W. VA. CODE § 49-4-604 ...........................................................................5, 66

W. VA. CODE § 49-4-608 ............................................................................5, 6

W. VA. CODE § 49-4-610 ..............................................................................61

## Rules

FED. R. CIV. P. 23........................................................................37, 58, 75

FED. R. CIV. P. 65.................................................................................38

Child Abuse and Neglect Proceedings, W. VA. R.P. 39....................................6

Child Abuse and Neglect Proceedings, W. VA. R.P. 41 .......................................6

Child Abuse and Neglect Proceedings, W. VA. R.P. 51 .......................................6

Child Abuse and Neglect Proceedings, W. VA. R.P. 52 .......................................5

**Other Authorities**

Abram Chayes,
*The Role of The Judge in Public Law Litigation*,
89 HARV. L. REV. 1281 (1976) .................................................................16, 29

BLACK'S LAW DICTIONARY (12th ed. 2024) .........................................................60

Catherine Y. Kim,
*Changed Circumstances: The Federal Rules of Civil
Procedure and the Future of Institutional Reform Litigation
After* Horne v. Flores,
46 U.C. DAVIS L. REV. 1435 (2013).........................................................16, 38

*Child Welfare Dashboard*,
W. VA. DEP'T OF HUM. SERVS.,
https://tinyurl.com/mvp3j7dw (Apr. 2025) .......................................................4

Compl., *Kiera M. v. Quin*, 3:25-cv-00566
(M.D. Tenn. filed May 19, 2025).....................................................................38

Ernest A. Young,
*Standing, Equity, and Injury in Fact*,
97 NOTRE DAME L. REV. 1885 (2022).............................................................47

Federal Judicial Center,
*Reference Manual on Scientific Evidence* (3d ed. 2011)..............................63

xiii

Governor Patrick Morrisey,
*Governor Morrisey Introduces New Foster Care
Transparency and Reform Initiatives,*
YouTube (May 28, 2025), https://tinyurl.com/mry72x6r ............................ 15

Jason Parkin,
*Aging Injunctions and the Legacy of Institutional Reform
Litigation,*
70 Vand. L. Rev. 167 (2017) ................................................................ 18, 30, 31

John Choon Yoo,
*Who Measures the Chancellor's Foot?: The Inherent
Remedial Authority of Federal Courts,*
84 Calif. L. Rev. 1121 (1996) .......................................................... 16, 17, 18, 29

Lauren Trumble,
*In the Eye of the Storm: West Virginia's Uniquely Clear
Opportunity to Revise Its Education Funding Formula
During COVID-19,*
124 W. Va. L. Rev. 523 (2022) .................................................................... 4

Nina Bernstein,
*Despite 20-Year Effort, City Can't Fix System,*
Newsday, July 13, 1993 .............................................................................. 18

Note,
*Implementation Problems in Institutional Reform
Litigation,*
91 Harv. L. Rev. 428 (1977) ....................................................................... 18

Pamela S. Karlan,
*Shoe-Horning, Shell Games, and Enforcing Constitutional
Rights in the Twenty-First Century,*
78 UMKC L. Rev. 875 (2010) ..................................................................... 31

Paul Mishkin,
*Federal Courts as State Reformers,*
35 Wash. & Lee L. Rev. 949 (1978) ........................................................... 17

RODERICK ROSE, ET AL.,
UNIV. OF MD. SCHOOL OF SOCIAL WORK, AGREEMENT
BETWEEN THE STATE OF WEST VIRGINIA AND THE UNITED
STATES DEPARTMENT OF JUSTICE: SUBJECT MATTER EXPERT
COMPLIANCE ANALYSIS (2024),
https://tinyurl.com/2rnn9wy5 ........................................................................9

ROSS SANDLER & DAVID SCHOENBROD,
DEMOCRACY BY DECREE: WHAT HAPPENS WHEN COURTS
RUN GOVERNMENT (2003) ..............................................16, 17, 35, 38

THE FEDERALIST NO. 47,
(James Madison) (Jacob E. Cooke ed., 1961) ..................................29

Toby J. Heytens,
*Reassignment*,
66 STAN. L. REV. 1 (2014)...............................................................57

**INTRODUCTION**

West Virginia foster children matter—that's why West Virginia has worked to improve its foster care system. Those efforts have done some good things; for instance, West Virginia now has the third lowest rate of maltreatment in care in the country. But failings have happened, too. All stakeholders—including executive officials, the Department of Human Services, and the Legislature—still have work to do. On these facts, all agree.

Yet to say that problems exist is not to say that federal courts must be the ones to fix them. "Even an important substantive issue cannot be brought to federal court . . . if a plaintiff fails to satisfy Article III's requirements." *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1378 (1st Cir. 1992). And when plaintiffs lack Article III standing, they must instead look elsewhere for relief. That's by design. "Our system of government leaves many crucial decisions to the political processes." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974).

The district court here applied these concepts to Plaintiffs' claims and concluded that it was compelled to dismiss. It did so after taking a careful and close look at the record—indeed, after engaging with this case for years. The court determined that it was not empowered to undertake the far-reaching

1

takeover of West Virginia's foster-care system that Plaintiffs were seeking. And it employed black-letter standing law in explaining why.

Plaintiffs minced no words in response. They call this decision "incredible," "unprecedented," "brash[]," "brazen," and more. They take the extraordinary step of calling for the judge's removal from the case. And along the way, they attack the Department for its efforts to address the State's vast social needs. But "[d]isagreement . . . , however strongly felt, does not, standing alone, constitute an 'injury' in the Constitutional sense." *Evans v. Lynn*, 537 F.2d 571, 598 (2d Cir. 1975). And "rhetoric and passion—no matter how sincere—cannot substitute for faithful application of the Constitution and controlling legal principles." *al-Marri v. Pucciarelli*, 534 F.3d 213, 218 (4th Cir. 2008) (Motz, J., concurring), *vacated as moot*, 129 S. Ct. 1545 (2009).

Ultimately, the district court's decision respected our Constitution. It vindicated important ideas like the separation of powers and federalism. It took a clear-eyed view of the potential (or lack thereof) of remedying Plaintiffs' alleged harms. And though the court erred in thinking earlier that this case could proceed as a class action, it effectively recognized and corrected that mistake once the record sharpened. The dismissal was sound.

The Court should affirm.

2

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). It granted in part and denied in part Plaintiffs' motion for class certification on August 17, 2023.  JA1357-1403.  It dismissed Plaintiffs' suit for lack of subject matter jurisdiction on February 28, 2025.  JA1515-1533.  Plaintiffs timely filed a notice of appeal on March 10, 2025.  JA1535.  Defendants timely filed a notice of conditional cross-appeal on March 12, 2025.  JA146.  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Have Plaintiffs shown their requested injunctive and declaratory relief will likely redress their injuries?

2. Have Plaintiffs shown a certainly impending injury in fact?

3. If the Court remands, should it reassign the case?

4. Did the district court abuse its discretion in certifying a class without identifying an underlying common policy?

5. Did the district court abuse its discretion in finding that the named Plaintiffs' claims and characteristics were typical of the class?

6. Did the district court abuse its discretion in finding that the requested relief was appropriate to the class as a whole?

3

## STATEMENT OF THE CASE

### I.    West Virginia's Child-Welfare System.

#### A.    Background.

West Virginia's child-welfare system faces undeniable challenges. As one of America's poorest States, West Virginia "has one of the highest percentages of child poverty in the nation." Lauren Trumble, *In the Eye of the Storm: West Virginia's Uniquely Clear Opportunity to Revise Its Education Funding Formula During COVID-19*, 124 W. VA. L. REV. 523, 525 (2022). It also has one of the "highest rates of foster care in the country, particularly due to the opioid crisis." *Id.* Roughly 6,000 children are placed in state custody at any given time. *See Child Welfare Dashboard*, W. VA. DEP'T OF HUM. SERVS., https://tinyurl.com/mvp3j7dw (Apr. 2025).

DHS's Bureau for Social Services tackles these challenges through child-welfare programs, including child-protective services (abuse-and-neglect related), youth services (juvenile-justice and status-offense related), and adoption and foster care systems. JA1445. Ninety percent of the children in foster care come through abuse-and-neglect cases. ECF 160, at 4.

4

Abuse-and-neglect cases follow a strict process. They usually begin when DHS files a petition in circuit court asking to remove a child from a custodian. W. VA. CODE § 49-4-601(a). The court then appoints counsel for the child and persons named in the petition. *Id.* § 49-4-601; Child Abuse and Neglect Proceedings, W. VA. R.P. 52 (A&N Rule). After a preliminary hearing, the court determines whether the child is abused and/or neglected. W. VA. CODE §§ 49-4-601 to -602. If they are, DHS works with a multidisciplinary team to create a case plan that addresses placement and permanency options, a family case plan, and DHS-provided services to address the child's individual needs (e.g., ADA-compliant services). *Id.* § 49-4-604(a)(1)-(2). In most every case, DHS must make "reasonable efforts to preserve the family." *Id.* § 49-4-602(a). If the circuit court orders the child into DHS's custody, the child must go to "the least restrictive [placement] (or most family-like one) available." *Id.* § 49-4-608(e)(3). And the goal is always to find the best permanent placement for the child as quickly as possible. ECF 160, at 4.

Proceedings are designed to ensure that placement decisions are made efficiently and appropriately. Within 45 days of the petition, DHS must tell the court about any kinship placement options. W. VA. CODE § 49-4-601a(4).

5

The court conducts permanent placement review conferences every three months—concentrating on safety, placement appropriateness, plan compliance, parents' or others' "progress," and a "likely" permanent-placement date. *Id.* § 49-4-110(a); A&N Rules 39, 41. The court also must hold annual permanency hearings, where DHS explains permanency efforts. W. VA. CODE § 49-4-608.

The multidisciplinary team is a cornerstone of the state-court placement process. The team assembles within 30 days of removal and includes case managers, parents, foster parents, attorneys, the child's guardian ad litem, and anyone else "who may assist in providing recommendations." W. VA. CODE § 49-4-405; A&N Rule 51(a). It meets quarterly "to assess, plan and implement a comprehensive, individualized service plan" and "advise the court" about the "services" and "placement" that "will best serve" the child. W. VA. CODE § 49-4-405. The team ensures that the child receives appropriate services, including medical care or mental and behavioral health services.

West Virginia offers thirteen placement types, like foster or adoptive homes, residential treatment programs, and out-of-state centers. JA1447-1450. As numbers from May 2024 show, most children are now in family placements:

6

**Placement Settings**

JA1474-1475.

West Virginia has shifted away from residential placements to kinship placements over time. In 2014, nearly 30% of foster children were in residential treatment programs—and that was before youth's mental health struggles skyrocketed and the rate of disabled foster children doubled. JA1475-1477. Now, children in residential placements most often come from juvenile proceedings (77% to residential) compared to abuse-and-neglect (6% to residential). JA1475. Residential stays usually aren't long—fewer than 1% last over a year. JA1475. Using residential treatment requires special assessments; "[f]or the overwhelming majority of" residential-treatment placements, it remains the least restrictive option available. JA1451; *see, e.g.,*

7

JA1031 (Plaintiffs' expert saying out-of-state residential treatment was a good placement for plaintiff Gretchen C.).

### B.      2019 Memorandum of Understanding.

West Virginia has been addressing the issues facing the State's foster children for some time.   In 2014, the State began cooperating with the Department of Justice to identify and fix deficiencies pertaining to child mental health. *See* JA254.

Those efforts led to a 2019 Memorandum of Understanding.  Among other things, DHS's predecessor agency (the Department of Health and Human Resources) agreed to ensure timely access to adequate and individualized in-home, community-based, and emergency services to keep children in their community.  JA289-293.  DHS would provide additional mental-health screening and assistance for the family, foster, or kinship care home.  JA291-292.  And it agreed to craft a detailed, DOJ-approved plan revamping the child-welfare system.  JA293.  This plan required DHS to provide better program and services access, address "workforce shortages" and "provider capacity," and reduce residential-facility placements.  JA293. Extensive recordkeeping and specific improvement timelines ensured DHS complied. *E.g.*, JA294-297.

8

As part of the Agreement, DHS also hired an expert who has since reported favorably on West Virginia's efforts. In its last report in September 2024, for instance, the expert "dr[e]w attention to the commendable efforts and progress [DHS] has made within the greater context of troubling national trends in child mental and behavioral health." RODERICK ROSE, ET AL., UNIV. OF MD. SCHOOL OF SOCIAL WORK, AGREEMENT BETWEEN THE STATE OF WEST VIRGINIA AND THE UNITED STATES DEPARTMENT OF JUSTICE: SUBJECT MATTER EXPERT COMPLIANCE ANALYSIS 3 (2024), https://tinyurl.com/2rnn9wy5. Although work remains, the expert concluded that DHS "has faced and learned from significant challenges in [its] transformation process," producing better placement outcomes. *Id.*; *see also* JA1290-1291 (comparing Agreement-related improvements to the Complaint).

### C.     Recent Reform Efforts.

Apart from the DOJ Agreement, the State has shown other improvements in its foster-care system.

*Case planning.* DHS prioritized quicker youth-services assessments and prevention services and shifted to trauma-informed supervisory relationships. JA1455. It issued new guidance to help make and track contacts, increased multidisciplinary team involvement, addressed families

with substance abuse disorders, and added a managed-care coordinator. JA1455-1456. DHS also introduced several technology updates to increase family participation. JA1455-1457. It created many new operating procedures to smooth processes. JA1456-1457. It increased communication between districts and supervisors and instituted new cross-district training teams. JA1456-1457. DHS also created a "[Q]uality [I]mprovement . . . [P]lan" that uses performance indicators for tracking and evaluation. JA1457. And its ChildStat program uses data analysis and casework practice to set district-improvement goals for workload management, time to first contact, and other measures. JA1457. As "Plaintiffs admit," "West Virginia laws and policies governing case planning are consistent with federal law." JA1455.

*Caseworkers.* Child Protective Services Workers and Youth Services caseworkers now train for 240 hours, pass competency tests, and receive a graduated caseload. JA1454. At least monthly, they visit children and review multidisciplinary team service plans and DHS case plans to ensure compliance. JA1454. DHS does random monthly quality control checks on 10-15 cases to evaluate caseworker performance. JA1454. And the Department conducts workload studies, training, and trauma-coaching programs. JA1458-1459. It instituted leadership training and a new standard

10

operating procedure regarding caseload assignments. JA1460. And DHS developed a children's crisis center and invested in new infrastructure and technology for field staff. JA1458-1459.

DHS has also offered *many* salary increases and retention bonuses for caseworkers and supervisors:



JA1460. And the Legislature exempted the Bureau of Social Services from certain bureaucratic hurdles, giving it flexibility to increase compensation and recruitment, launch retention initiatives, and reduce hiring time from weeks to days. JA1460.

Together, these efforts reduced vacancy and turnover rates and bettered caseworker-to-child ratios:

11





JA1461; *see* JA870 (Plaintiffs' expert admitting national average turnover rate

is 22%). In short, DHS nearly doubled base salaries and cut turnover and

vacancy rates by a third to a half, and child-to-caseworker ratios dropped from

almost 12:1 to 9:1. And at the end of the first quarter of 2025, the staff vacancy

rate was down to 8.1%.  Child Welfare Dashboard, *supra*.  Even courts have "lauded" and "commended" DHS for these efforts, which show the Department is "committed to addressing the challenges presented by [DHS] staffing issues."  *State ex rel. W. Va. Dep't of Health & Hum. Res. v. Bloom*, 880 S.E.2d 899, 910-11 (W. Va. 2022) (cleaned up).

*Placement options.*  In 2018, DHS began studying kinship care and developing protocols to recruit and license kinship caregivers.  JA1461.  It reworked its kinship-finding processes and related recordkeeping, developed a kinship-placement incentive-payment program, and raised subsidy rates across the board.  JA1461-1462.  Its new Kinship Navigator Program gives kinship placements extra help in home studies, licensing, and finances.  JA1461.  DHS also redesigned its home-finding policies and home-recruitment goals, hiring Marshall University to survey foster parents' needs to increase retention.  JA1462.  In 2024, DHS launched a statewide campaign across all media to recruit new foster families.  JA1464.

Kinship placements accordingly rose to 53% in May 2024—the best rate in America.  JA1475, JA1491.

*Community-based services.*  West Virginia's foster children receive full Medicaid coverage.  JA1452-1454; JA1473-1474.  Children under three receive

special developmentally-delayed focused care; every child receives a comprehensive assessment to identify physical, mental, and behavioral health needs. JA1453-1454.

The Department has implemented a variety of other community-based services. For instance, DHS now offers a statewide wraparound program offering individualized therapy, increased payments, and university partnerships. JA1465. It added a Medicaid wraparound program for children with serious emotional disorders and upped spending for existing developmental-disabilities programs. JA1466-1468. With West Virginia University, DHS began providing more individualized services through its new Positive Behavior Support program. JA 1468. DHS expanded its Children's Mobile Crisis Response and Stabilization services by 64% to address behavioral health crises with on-site support, crisis planning, and community-based assistance. JA1470. It started a new community-behavioral-health model of care focusing on integrated care. JA1471.

These programs successfully shifted treatments away from residential options and towards community-based services. JA1473-1474.

14

*Spending.*  Since 2015, West Virginia's spending on community-based mental health services alone has tripled.  JA1484.  This increase is part of a broader trend boosting child-welfare spending.  Take the last two years:

|                    | FY2025        | FY2026        |
|--------------------|---------------|---------------|
| Children's Services | $37,883,039   | $43,092,266   |
| Adoption           | $39,855,069   | $74,283,410   |
| Foster Care        | $110,230,811  | $174,966,649  |
| CPS Caseworkers    | $26,770,365   | $30,121,784   |
| YS Caseworkers     | $4,698,244    | $5,845,579    |

SB 200, 2024 Reg. Sess. (W. Va. 2024), at 22-64 (enrolled); HB 2026, 2025 Reg. Sess. (W. Va. 2025), at 61-63 (enrolled).

***

These changes have produced results.  The U.S. Department of Health and Human Services's Children's Bureau ranked West Virginia second in preventing maltreatment and fourth in achieving permanency for children in foster care longer than 12 months.  ECF 160-9, at 58-60.  Another 2022 review confirmed that West Virginia is far above average in those and similar categories.  JA1302-1356; JA1475-1476.  Median time in care also continues to fall.  JA1475.  And work continues, as Governor Morrisey announced a raft of foster-system changes just two weeks ago.  Governor Patrick Morrisey, *Governor Morrisey Introduces New Foster Care Transparency and Reform Initiatives*, YOUTUBE (May 28, 2025), https://tinyurl.com/mry72x6r.

15

### III.   Plaintiffs' Class-Action Lawsuit.

Dissatisfied with these results, Plaintiffs filed this lawsuit.

### A.   Institutional Reform Litigation Generally.

Plaintiffs in institutional reform litigation like this case seek to transform the structure, policies, or practices of public institutions through court-mandated oversight. *See* Catherine Y. Kim, *Changed Circumstances: The Federal Rules of Civil Procedure and the Future of Institutional Reform Litigation After* Horne v. Flores, 46 U.C. DAVIS L. REV. 1435 (2013); John Choon Yoo, *Who Measures the Chancellor's Foot?: The Inherent Remedial Authority of Federal Courts*, 84 CALIF. L. REV. 1121, 1124-25 (1996).  Unlike traditional lawsuits that resolve disputes between individual parties, institutional reform litigation often involves a class of plaintiffs and targets systemic issues within government-run institutions. *See* Abram Chayes, *The Role of The Judge in Public Law Litigation*, 89 HARV. L. REV. 1281, 1302 (1976).  The goal is to force prospective change. *Id.*

These cases follow a template.  "Reform-minded attorneys identify a program that needs change," they "construct a legal theory that some constitutional or statutory requirement has been violated," and they "file a lawsuit."  ROSS SANDLER & DAVID SCHOENBROD, DEMOCRACY BY DECREE:

16

WHAT HAPPENS WHEN COURTS RUN GOVERNMENT 3 (2003). The suit is meant to produce a decree. *Id.* at 4. Decrees do not "closely or sometimes even approximately track the law"; rather, they are performance improvement plans that reflect "deals" between the parties and embody "a welter of motives." *Id.* at 7; *see also* Paul J. Mishkin, *Federal Courts as State Reformers*, 35 WASH. & LEE L. REV. 949, 957 (1978). Failing to abide by the decree invites severe penalty, usually contempt. SANDLER & SCHOENBROD, *supra*, at 4. After a court enters a decree, it remains involved; plaintiffs' attorneys and court-appointed experts, at the court's behest, continuously monitor compliance. *Id.;* Yoo, *supra*, at 1136-37.

While ambitious, these institutional reform suits often fall short of their aims. *See* SANDLER & SCHOENBROD, *supra*, at 150-51 (discussing how even proponents recognize shortcomings and have turned away from institutional reform litigation). Courts, while powerful in declaring rights, prove less equipped to manage large-scale bureaucracies. *See* Yoo, *supra*, at 1137-38. They have "little experience or facility for operating or administering complex institutions and social programs." *Id.* And courts "possess only imperfect tools for communicating their decrees," have "few resources for guaranteeing compliance," and lack "resources for marshaling political and public support."

17

*Id.*; *see generally* Note, *Implementation Problems in Institutional Reform Litigation*, 91 HARV. L. REV. 428, 429-32 (1977). Moreover, these cases tend to be protracted, costly, and tough to close. *See* Jason Parkin, *Aging Injunctions and the Legacy of Institutional Reform Litigation*, 70 VAND. L. REV. 167, 171-72 (2017). Indeed, near the end of one decades-long case, one of the lawyers representing the plaintiffs—and now representing Plaintiffs here—was forced to concede that she didn't "know what [they] really accomplished." Nina Bernstein, *Despite 20-Year Effort, City Can't Fix System*, NEWSDAY, July 13, 1993.

## B.　This Complaint.

In September 2019, twelve children filed a putative class-action lawsuit against DHS and various state officials, alleging that Defendants mismanaged the child-welfare system. JA148. They alleged "systemic" issues: too few placement options, "placement instability," insufficiently supported kinship placements, overreliance on institutional placements, too few and inadequately trained caseworkers, "unreasonably high caseloads," poor mental-health services, and inadequate case, transition, and permanency planning. JA203-229.

Plaintiffs proposed one General Class (all children in DHS custody) and three subclasses: the Kinship Subclass, ADA Subclass (children with disabilities), and Aging Out Subclass (children over 13). JA157-158. They asserted five claims: (1) substantive due process for all classes; (2) First, Ninth, and Fourteenth Amendments for all classes; (3) Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670, *et seq.*, for all classes; (4) Americans with Disabilities Act for the ADA subclass; and (5) Rehabilitation Act for the ADA subclass. JA237-246.

Besides class certification and declaratory relief, Plaintiffs initially asked the court to order, among other things:

- An outside entity to run foster care placements, including mandatory plan-development timetables;

- A "complete and thorough" needs evaluation (including disability needs) for every child within 30 days of entering care;

- An "adequate and individualized" case plan—including reunification and permanency plans—within 60 days of entering care;

- Tracking to keep caseloads at or below 15 children per worker; and

- A plan to recruit more foster and adoptive homes on a mandatory timeline.

JA247-249.    As the case developed, Plaintiffs asked for even more. JA1408-1414. Among other things, they sought:

- Caseload limits of 10-12 families and 12-15 children;

- Extra hiring qualifications (*e.g.*, social work degree);

- Specific, timebound caseworker recruitment, retention, training, and tracking requirements and processes;

- Caseworkers visit weekly for the first month and then monthly—all outside the caretaker's presence;

- Emergency or temporary placement timeline limits;

- A new placement "matching process";

- "[F]ull and adequate" evaluation within 30 days of entering care;

- Preliminary medical screening within three days of entering care, mental health screening within seven, and a thorough screen within 30;

- Extensive and strict limits on use of and requirements for congregate care placement; and

- Specific numerical limits on maltreatment, placement-stability, and permanency rates.

JA1416-1444.  Plaintiffs' 47 demands also carry strict, specific deadlines and timelines.  JA1416-1444.

## C.    Class Certification And Other Proceedings.

Defendants moved to dismiss based on abstention and other grounds. *See* ECF 17; *see also* ECF 55, 88, 107, and 167 (additional motions to dismiss specific Plaintiffs).  From the start, they argued that Plaintiffs' requests—like "provid[ing] a mechanism for [the district court], through the outside monitor,

20

to review placements that Plaintiffs believe to be inappropriate"—were not properly made in federal court. JA323. Plaintiffs concurrently moved for class certification, *see* ECF 130, which Defendants opposed, *see* ECF 160. In July 2021, the court granted Defendants' motions to dismiss based on mootness (as several Plaintiffs were no longer in DHS's custody) and *Younger* abstention. ECF 258 (citing *Younger v. Harris*, 401 U.S. 37 (1971)).

This Court reversed in July 2022, holding that (1) Plaintiffs' claims weren't moot because they were "inherently transitory" and (2) abstention didn't "preclude federal intervention." JA1187, JA1199. It never mentioned redressability or standing. Nor did it order the district court to take the case to trial, telling the district court to "consider West Virginia's substantive arguments for dismissal and," only "if appropriate," certify classes. JA1195.

On remand, the district court granted in part Defendants' motion to dismiss—leaving part of Count I (General Class and Kinship Subclass) and Counts IV and V (ADA Subclass). JA1230-1272. Plaintiffs have not appealed this decision.

After the original district court judge on the case recused, ECF 310, the case was reassigned to Judge Joseph Goodwin, ECF 311, who then partially granted Plaintiffs' renewed certification motion in August 2023, ECF 351. The

21

court held the General Class had three substantive due process claims in common: deliberate indifference to "caseload practice," "deficiencies in case planning," and "placement array." JA1373-1380. The ADA Subclass had one claim in common: whether West Virginia had "an inadequate infrastructure of therapeutic service providers." JA1384. The court didn't certify the Kinship Subclass because it had no common claims. JA1391. The General Class and ADA Subclass also met the typicality requirements. JA1392-1393. So the court certified them under Federal Rule of Civil Procedure 23(b)(2). JA1400.

Even so, the district court remained "skeptical of any relief requiring it to assume control of a state agency," direct state programs, or "allocate[] [state] funds." JA1358. The court did not address Defendants' standing-related argument against certification. JA1298.

### D.    Dismissal.

After extensive discovery, JA102-127, Defendants moved for summary judgment in July 2024, ECF 533. They noted West Virginia's strides in caseloads, case-planning issues, and placement options. JA1486-1493. These changes prevented *class-wide* constitutional deprivation. JA1495. Plaintiffs also could not show serious risks of subclass-wide institutionalization, as West Virginia now has a comprehensive plan for placing children in the community.

22

JA1497-1503.  Further, Plaintiffs' requested relief would not "redress their alleged injuries"—even aside from how that relief "is 'troubling' and not within [the district court's] 'authority' to order."  JA1511-1512.

In February 2025, the court sua sponte dismissed the action on redressability grounds.  The court acknowledged West Virginia's foster care system's past flaws.  JA1515.  But "[c]onstitutional limits prevent the court from crafting public policy and administering state agencies."  JA1515.  Redressability—an aspect of Article III standing—asks whether "the plaintiff's requested relief" is "the kind appropriate for a federal court to give."  JA1530.  Not here, the court said.  The Constitution does not allow courts to "govern"—to "develop public policy, write budgets, hire caseworkers, or administer state agencies."  JA1515.  This sort of "structural overhaul" "belongs in the hands of policymakers held accountable to the public."  JA1518.  Nor, the court said, would Plaintiffs' request for declaratory relief offer redressability because "psychic satisfaction" alone isn't "an acceptable Article III remedy."  JA1532 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)).  So the court dismissed the case.

This appeal followed.

23

## SUMMARY OF THE ARGUMENT

**I.**     The district court correctly concluded that Plaintiffs lacked standing.  A federal court has no power to redress Plaintiffs' claims through the broad, systemwide seizure that Plaintiffs insisted was necessary.  These measures offend both the separation of powers and federalism.  Plaintiffs also never explained how an injunction would rectify their injuries.  Meanwhile, their declaratory relief was not enough to support jurisdiction where it was not clear it would affect Plaintiffs' actual circumstances.  Redressability aside, Plaintiffs also failed to establish specific injuries in fact, instead relying on more speculative future harms and insufficient allegations of past actions.

**II.**     If the Court disagrees and decides to remand this case, it should not reassign to another judge.  Reassignment is warranted only in exceptional circumstances absent here.  The district court engaged with the issues earnestly and thoughtfully.

**III.**     If the Court decides to remand, it should instruct the district court to decertify the class.  No common policies or practices can be found here.  Instead, Plaintiffs challenge a grouping of discretionary, independent judgments by Department officials with no common thread.  Beyond that, Plaintiffs' claims and circumstances are not typical of the rest of the class.

24

**STANDARDS OF REVIEW**

This Court reviews questions of standing de novo. *Opiotennione v. Bozzuto Mgmt. Co.*, 130 F.4th 149, 152 (4th Cir. 2025). The party claiming federal jurisdiction has the "burden of demonstrating standing for each of its claims." *Md. Election Integrity, LLC v. Md. State Bd. of Elections*, 127 F.4th 534, 537 (4th Cir. 2025).

This Court considers requests for reassignment on remand under its inherent supervisory authority. *See, e.g.*, *United States v. McCall*, 934 F.3d 380, 384-85 (4th Cir. 2019).

This Court reviews a district court's decision to certify a class for abuse of discretion. *Brown v. Nucor Corp.*, 785 F.3d 895, 901 (4th Cir. 2015). A district court abuses its discretion "when it materially misapplies the requirements of Rule 23," *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014), makes an error of law, or clearly errs in its factual findings, *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).

**ARGUMENT**

I.    **Plaintiffs lack standing to pursue a full judicial overhaul of West Virginia's foster care system.**

"The Constitution affords federal courts considerable power, . . . it does not establish government by lawsuit." *United States v. Texas*, 599 U.S. 670,

25

704 (2023) (Gorsuch, J., concurring). Holding otherwise would "transform the least dangerous branch into the most dangerous one." *Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).

So too here. Plaintiffs seek relief they lack standing to pursue. Yet "[a]n 'essential and unchanging part'" of Article III's case-or-controversy "requirement is that a plaintiff must have standing to sue." *Opiotennione*, 130 F.4th at 153 (cleaned up). To establish standing, a plaintiff must "clearly allege facts demonstrating" that she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). "Where these requirements are not met, this court would exceed its authority if it adjudicated the merits of a dispute." *Opiotennione*, 130 F.4th at 153 (quoting *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019)).

Here, Plaintiffs did not establish that the court could redress their injuries, and they did not show a legally cognizable injury in fact.

### A.    Plaintiffs have not shown how the district court could redress their asserted injuries.

"Redressability requires that the court be able to afford relief *through the exercise of its power*." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023)

26

(cleaned up). The district court appropriately held that it did not have the power to provide the relief Plaintiffs sought.

### 1. Federal courts cannot take control of state systems in the way Plaintiffs ask.

Granting Plaintiffs the broad relief they request would offend the separation of powers and basic notions of federalism. Unsurprisingly, then, the Supreme Court has said federal courts cannot offer it.

a. Start from first principles. Standing is "built on a single basic idea—the idea of separation of powers." *Texas*, 599 U.S. at 675 (cleaned up). And separation of powers demands that each branch of government, the Legislative, Executive, and Judicial, must resist exceeding the outer limits of its power. *INS v. Chadha*, 462 U.S. 919, 951 (1983). Standing "serves to prevent the judicial process from being used to usurp the powers of the political branches . . . and confines the federal courts to a properly judicial role." *Spokeo*, 578 U.S. at 338 (cleaned up); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). So out of respect for separation of powers, standing should not be found, for instance, where "the political branches already have made written and legally binding commitments to forestall" an "alleged injury." *South Carolina v. United States*, 912 F.3d 720, 729 (4th Cir. 2019) (cleaned up).

27

Federalism concerns also play a central role in the standing analysis, for "what the federal courts cannot do at the federal level[,] they cannot do against the States." *Missouri*, 515 U.S. at 132 (Thomas, J. concurring). And in institutional reform cases that involve "core state responsibility," such as this one, "federalism concerns are heightened." *Horne v. Flores*, 557 U.S. 433, 448 (2009); *see Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977) (*Milliken II*); *Doe 4 by & through Lopez v. Shenandoah Valley Juv. Ctr. Comm'n*, 985 F.3d 327, 353 (4th Cir. 2021) (Wilkinson, J. dissenting). "Injunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby improperly deprive future officials of their designated legislative and executive powers." *Horne*, 557 U.S. at 449 (cleaned up). And as in other standing contexts, a "relax[ed]" notion of standing in this space "would raise serious federalism concerns and interpose the federal courts as virtual continuing monitors of the wisdom and soundness of state fiscal administration." *Ansley v. Warren*, 861 F.3d 512, 519 (4th Cir. 2017) (cleaned up).

b.    "The equitable powers of federal courts are [also] limited by historical practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021). History disfavors broad requests for relief of the sort Plaintiffs seek here. *See*

28

Chayes, *supra*, at 1283-84; *contra* Op. Br. 21.  Although federal courts can order prospective relief against state officials, ordering a sweeping, systemwide takeover is a different animal altogether.

The Framers would not have intended courts' equitable powers to be so broad.  *Missouri*, 515 U.S. at 130 (1995) (Thomas, J., concurring); *see also* Yoo, *supra*, at 1151-61 (detailing historical evidence showing the Framers' intent).  They drew their guidance from the English court of chancery, which had a "historical prejudice . . . against rendering decrees which called for more than a single affirmative act."  *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 841 (1994) (Scalia, J., concurring) (cleaned up).  For good reason.  As James Madison put it: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator.  Were it joined to the executive power, the judge might behave with all the violence of an oppressor."  THE FEDERALIST NO. 47, at 326 (James Madison) (Jacob E. Cooke ed., 1961) (internal quotations omitted).

Unsurprisingly, then, "no 'structural injunctions' [were] issued by the federal courts, nor were there any examples of continuing judicial supervision and management of government institutions," before certain desegregation

29

litigation in the 1950s and 1960s. *Missouri*, 515 U.S. at 130 (1995) (Thomas, J., concurring). "Such exercises of judicial power would have appeared to violate principles of state sovereignty and of the separation of powers as late in the day as the turn of the century." *Id.* "Structural injunctions" like the one sought here "depart from that historical practice, turning judges into long-term administrators of complex social institutions." *Brown v. Plata*, 563 U.S. 493, 555 (2011) (Scalia, J., dissenting).

Almost as soon as the Supreme Court recognized institutional reform decrees in *Brown v. Board of Education*, it began pulling them back. Now, the Supreme Court is at the very least "deeply skeptical" of these injunctions. Parkin, *supra*, at 185-86. The Court has emphasized "the very limited role that courts should play in the administration of [state] facilities," *Block v. Rutherford*, 468 U.S. 576, 584 (1984), signaled that federal courts should not "become increasingly enmeshed in the minutiae of" ordinary administration, *Bell v. Wolfish*, 441 U.S. 520, 562 (1979), and warned against injunctions that would "improperly deprive future officials of their designated legislative and executive powers," *Frew v. Hawkins*, 540 U.S. 431, 441 (2004). Federal courts must remain laser-focused on the constitutional claimants before them rather than imposing their own "idea of how best to operate" a state system. *Rhodes*

30

*v. Chapman*, 452 U.S. 337, 351 (1981). And courts must always "take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken II*, 433 U.S. at 280-81; *see also Frew*, 540 U.S. at 441 (warning against injunctions that "improperly deprive future officials of their designated legislative and executive powers" and "lead to federal-court oversight of state programs for long periods of time").

Admonitions like these have led commentators to describe institutional reform litigation as functionally extinct. *E.g.*, Parkin, *supra*, at 185-86; Pamela S. Karlan, *Shoe-Horning, Shell Games, and Enforcing Constitutional Rights in the Twenty-First Century*, 78 UMKC L. REV. 875, 886 n.70 (2010).

c.    Three limiting principles—grounded in separation of powers and federalism concerns—emerge from the Supreme Court's precedent and historical practices.

*First*, a lower court should avoid transforming itself into an executive official enmeshed in areas in which it has neither capacity nor expertise. *See Plata*, 563 U.S. at 555-58 (Scalia, J., dissenting); *Missouri*, 515 U.S. at 133 (Thomas, J., concurring); *Bell*, 441 U.S. at 562; *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974). Article III does not "confer on federal judges some

31

'amorphous' power to supervise 'the operations of government' and [to] reimagine [them] from the ground up." *Whole Woman's Health*, 595 U.S. at 40. "Federal courts simply cannot gather sufficient information to render an effective decree, have limited resources to induce compliance, and cannot seek political and public support for their remedies." *Missouri*, 515 U.S. at 132 (Thomas, J. concurring).

*Second,* a decree should avoid hobbling state government by usurping core state functions that are traditionally left to state officials' discretion. *See Horne,* 557 U.S. at 449-50; *Frew,* 540 U.S. at 441; *Block,* 468 U.S. at 584; *Milliken II,* 433 U.S. at 280-81. "Federal courts should pause before using their inherent equitable powers to intrude into the proper sphere of the States," because broad remedial decrees effectively deny State's "existence as independent governmental entities," snatching important discretionary authority and forcing the reallocation of resources. *Missouri*, 515 U.S. at 131 (Thomas, J., concurring); *see Lewis v. Casey,* 518 U.S. 343, 385 (1996) (Thomas, J., concurring).

*Third,* in formulating decrees, lower courts should not create policy. *See Texas*, 599 U.S. at 685; *Horne,* 557 U.S. at 471; *Rhodes,* 452 U.S. at 351; *Bell,*

441 U.S. at 562. Simply, "[t]he Constitution is not a license for federal judges to further social policy goals." *Lewis*, 518 U.S. at 388 (Thomas, J., concurring).

d.      Plaintiffs' requested injunction would conflict with all three principles.

*First*, had the district court issued the injunctions here, it would have become "indistinguishable," from a DHS official. *Plata*, 563 U.S. at 555-58 (Scalia, J., dissenting). The decree would require the court to manage the foster care system top to bottom. The court would have to, among other things, oversee (1) foster placements for 6,118 foster children, (2) the day-to-day work of and training requirements for case planners and supervisors, (3) the contents of policies and procedures, (4) the administration of therapeutic services, and (5) foster home recruitment efforts across the state. *See* JA247-249, JA1408-1414, JA1416-1444, JA1474, JA1453-1456, JA1463. These duties would require the court to continuously engage with budgetary decisions, social services operations, and administrative priorities—all of which are currently entrusted to DHS officials and fall outside the judicial sphere. The judge would become entwined with local politics, bureaucratic limitations, and shifting resource constraints for years

33

and possibly decades. State officials would have no real room to exercise their discretion.

The district court would also end up far afield from "what [it] [is] good at: applying precedent, interpreting statutes, and exercising traditional equitable powers." *Doe*, 985 F.3d at 347 (Wilkinson, J., dissenting). With its new responsibilities would come intractable problems that the lower court is ill-suited to solve. To begin, the district court is no expert in foster care, childhood trauma and development, the delivery of social services, bureaucratic management structures, training procedures, foster home recruitment, or state budgets. The district court also faces structural limitations that handicap its capacity to implement Plaintiffs' requested decree. Primarily, it will be able to make findings only within the context of an adversary process, wherein the parties will play up their own claims while silencing other interested parties. Yet reforming West Virginia's foster care system requires the opinion and expertise of many, not just the parties here. When it comes to enforcement, the court has only one option, a contempt proceeding, which is too blunt a punishment to achieve a finely tuned foster care system. And the court has no way to reward compliance.

34

*Second*, the injunction would stymie ongoing efforts to improve West Virginia's foster care system by usurping control. Plaintiffs want a complete takeover of West Virginia's foster care system. Yet "[f]amily relations are a traditional area of state concern." *Moore v. Sims*, 442 U.S. 415, 435 (1979). "[T]he whole subject . . . belongs to the laws of the States." *Rose v. Rose*, 481 U.S. 619, 625 (1987) (cleaned up); *see also, e.g.*, *DeSpain v. Johnston*, 731 F.2d 1171, 1179 (5th Cir. 1984) ("Child welfare has long been a recognized area of state concern.").

If the court were to assume control as Plaintiffs wish, it would hinder, not help, West Virginia's efforts to fix its foster care system. A decree would create a shadow bureaucracy, vesting lawyers with veto power over state policy. And if Plaintiffs determine the State's efforts aren't up to snuff, the Department would be forced back to the drawing board or face a contempt sanction. Court intervention would "sap[] the power and responsibility" of DHS officials "by limiting what they can do and by telling them what they must do." SANDLER & SCHOENBROD, *supra*, at 144.

*Third*, and finally, the district court would create public policy and, in the process, undermine democratic accountability in West Virginia. Baked into Plaintiffs' requirements that DHS change its practices are myriad policy

35

decisions. Most obviously, the requested order would require the Department to spend state funds on Plaintiffs' preferred policies. *But see Curtis v. Taylor*, No. 4:22-cv-00328, 2023 WL 2499956, at *7 (E.D. Ark. Mar. 14, 2023) (declaring a request that a state "open additional mental-health facilities" "dead on arrival" because "a federal district court cannot enter an injunction ordering a state government to spend state funds"). West Virginia's legislature has already earmarked nearly $200 million dollars for the foster care system, and it would ordinarily get to decide how that money is spent. Not so with an injunction. And by dictating the day-to-day activities of DHS, the court would make policy decisions about the issues and people that take priority. Dissatisfied citizens would have no venue to demand change.

The district court correctly discerned that it had no authority to enter the order—and thus redress the claimed injuries—that Plaintiffs sought.

### 2.    Plaintiffs' proposed injunction would not redress their asserted injuries.

Even if the Court had the power to craft a remedy, Plaintiffs have not shown that their requested injunction would redress their alleged injuries. No evidence shows their injunctive relief would remove "even one obstacle" to the exercise of their rights as a whole class. *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 903 (4th Cir. 2022) (cleaned up).

36

"For [Plaintiffs] to establish redressability, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" for the class. *Hierholzer v. Guzman*, 125 F.4th 104, 116-17 (4th Cir. 2025) (cleaned up); *see* FED. R. CIV. P. 23(b)(2). "Additionally, where injunctive relief is sought, the plaintiff [class] must show a real or immediate threat that [the members] will be wronged again." *Hierholzer*, 125 F.4th at 116 (cleaned up); *see O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). The "very essence" of redressability is that "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co.*, 523 U.S. at 107. Thus, plaintiffs must "show that they personally would benefit in a tangible way from the court's intervention." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) (cleaned up).

Plaintiffs have not cleared this hurdle here. At best, Plaintiffs assert that injunctive relief will improve the foster care system generally, which will in turn make foster care children's lives better. This broad aspiration is not enough, as a plaintiff challenging an unconstitutional practice must "allege specific, concrete facts demonstrating that the challenged practices harm him, and that he would personally benefit in a tangible way from the court's intervention." *Warth v. Seldin*, 422 U.S. 490, 508 (1975). Plaintiffs present no

evidence, through expert testimony or otherwise, to suggest that Plaintiffs and the class will enjoy a reduced risk of harm if caseloads are reduced, supervisors' number of supervisees are limited, and more foster families are recruited. JA247-249. The same goes for the rest of their demands. JA247-249. Indeed, because Plaintiffs target decisions that are outside the Department's control—like requirements for circuit courts' placement decisions and families' decisions to foster—the requested relief is legally impossible. *See* FED. R. CIV. P. 65(d)(2)(B) (injunctions bind only the parties and their "officers, agents, servants, employees, and attorneys").

The Court should not assume that injuries will be redressed here because they purportedly were redressed in similar past cases. For one, many still contest whether institutional reform decrees ever work. "[E]mpirical research on the effectiveness of judicial decrees in reforming public institutions is mixed." Kim, *supra*, at 1475; *see also* SANDLER & SCHOENBROD, *supra*, at 150-53 (discussing debate on success of these decrees). Even Plaintiffs' counsel acknowledged that another state's foster care system was "just as bad, if not worse" after sixteen years of judicial oversight. *See* Compl. ¶¶ 3-8, *Kiera M. v. Quin*, 3:25-cv-00566 (M.D. Tenn. filed May 19, 2025), ECF 1.

38

But even if one assumed these decrees would sometimes work, Plaintiffs have nothing to show it will work *here*. Part of the difficulty is that Plaintiffs have not defined their class-wide injuries with any specificity. They say only that they face a "risk of harm" from "practices that harm foster children." ECF 325, at 1, 4. They never define what that "harm" is, how class members experience it, or how it constitutes a Constitutional harm. *See id.* This omission makes developing a corresponding remedy impossible.

Our judicial system is not designed to entertain "generalized grievance[s] against allegedly illegal governmental conduct," so federal courts have "repeatedly refused" to recognize such conduct "as sufficient for standing." *United States v. Hays*, 515 U.S. 737, 743 (1995). Until Plaintiffs can tie an injunctive remedy to a specific injury, the courthouse doors should remain closed. *See generally* JA1416-1444 (outlining how requests for relief are not appropriate to redress injuries on class-wide basis).

### 3. Plaintiffs' requested declaratory relief would not redress their asserted injuries.

The same goes for declaratory relief: A declaratory judgment in this case is insufficient to redress Plaintiffs' alleged injuries. Plaintiffs have not shown that it is likely—and not speculative—that a declaration will lead to tangible change that reduces harm to foster care children. In Plaintiffs' ideal

39

world, a declaratory judgment "could" put Defendants on notice of unconstitutionality and "could" motivate DHS to respond by doing things Plaintiffs might like. Op. Br. 42, 44. This theory "doesn't work" for Article III standing. *Texas*, 599 U.S. at 691 (2023) (Gorsuch, J., concurring). A simple declaration of unconstitutionality is "the very kind of relief that cannot alone supply jurisdiction." *California v. Texas*, 593 U.S. 659, 673 (2021).

"Declaratory judgments are not get-out-of-standing-free cards." *Mikel v. Quin*, 58 F.4th 252, 259 (6th Cir. 2022). Article III's case and controversy requirement applies the same force to declaratory relief as it does to other remedies. *Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 764 (4th Cir. 2023). And "[b]y itself, a declaratory judgment cannot be the redress that satisfies the third standing prong." *Comite de Apoyo a los Trabajadores Agricolas (CATA) v. U.S. Dep't of Lab.*, 995 F.2d 510, 513 (4th Cir. 1993); *see also Just. 360 v. Stirling*, 42 F.4th 450, 459 (4th Cir. 2022). Plaintiffs, instead, must show some "further concrete relief that will likely result from the declaratory judgment," *CATA*, 995 F.2d at 513, such that they will have "full redress," *Just. 360*, 42 F.4th at 459 (cleaned up). Without this additional step, courts cannot formulate a decree of "conclusive character." *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 259 (4th Cir. 2022) (cleaned up).

40

The Court put these principles into action in *Justice 360 v. Stirling*. Plaintiffs there challenged South Carolina's statute protecting against the disclosure of certain information related to the State's execution protocols. But this Court held that the appellant had failed to show that it would "find *full* redress" through a declaration that the statute was unconstitutional. *Just. 360*, 42 F.4th at 459 (cleaned up). Even with a declaration, the appellee would "retain pure discretion" over whether to give appellant the records it sought, and the appellant would have "no legal right" "to demand the information." *Id.* at 459-60. A declaratory judgment would thus "amount to no more than an impermissible advisory opinion, as the [appellant's] alleged injuries would remain unredressed." *Id.* After all, "[t]he real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*" *Hewitt v. Helms*, 482 U.S. 755, 761 (1987).

Plaintiffs' redressability argument fails because a declaratory judgment will likewise not remedy Plaintiffs' alleged injuries. Standing on its own, a declaratory judgment will not write case plans. It will not reduce caseloads. It will not place children in safe homes. It will not recruit foster families. It's

41

unclear what would happen after a declaratory judgment here; Plaintiffs offer no clarity. While a judgment may be helpful persuasive authority for Plaintiffs to effect change, a judgment has no compulsive effect on *how* those changes get implemented or give Plaintiffs a "legal right" to demand specific steps. *Just. 360*, 42 F.4th at 460; *see Steffel v. Thompson*, 415 U.S. 452, 470 (1974) (recognizing that a declaratory judgment might have persuasive force that may lead to change). That indeterminacy contrasts this case from one like *Larson v. Valente*, 456 U.S. 228, 243 (1982), in which declaratory judgment precluded a state from taking a specific, identifiable act (registration). *See also Evers v. Dwyer*, 358 U.S. 202, 204 (1958) (declaratory judgment would entitle the plaintiff to ride in other portions of a municipal bus). And remember, too, that state judges are the ones who supervise child-welfare proceedings, and those officials are not parties to the suit. *Brackeen*, 599 U.S. at 293.

Here, the possible downstream effects of a declaratory judgment are speculative. Plaintiffs have not met their burden to show "further concrete relief that will likely result." *CATA*, 995 F.2d at 513. The district court correctly concluded that declaratory relief would not redress Plaintiffs' injury

because it would provide only the "'psychic satisfaction' of having DHS declared unconstitutional." JA1532 (quoting *Steel Co.*, 523 U.S. at 107).

### 4. The district court could consider redressability even after *Jonathan R. I.*

In attacking the district court's determinations, Plaintiffs also rewrite this Court's prior decision to weaponize it. *See Jonathan R. by Dixon v. Justice*, 41 F.4th 316 (4th Cir. 2022) (*Jonathan R. I*). But nothing in *Jonathan R. I* foreclosed the district court from performing the ordinary close look at jurisdiction that all federal courts are duty bound to do. For "[n]o matter how interesting or elegant a party's argument, the federal courts have no power to breathe life into disputes that come to [them] without it." *Just. 360*, 42 F.4th at 458 (cleaned up).

a. In *Jonathan R. I*, this Court considered three questions: whether (1) Plaintiffs' claims were moot, (2) *Younger* abstention applied, and (3) *Rooker-Feldman* abstention applied. The Court answered "no" to each. 41 F.4th at 325-41. The Court did not consider anything beyond those three issues, standing or redressability included. Doing so would have departed from the "general rule" that the Court will "not consider issues that were not first addressed by the district court," *Maryland v. 3M Co.*, 130 F.4th 380, 393 (4th Cir. 2025) (cleaned up), as the district court had not addressed standing

43

yet. *See Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) (noting how federal courts can address abstention before standing).

Plaintiffs misread *Jonathan R. I*'s holding in three ways. *See* Op. Br. 26-30.

*First*, Plaintiffs claim that this Court "thoroughly examined the case for federalism" and held that federalism "compel[led]" intervention. Op. Br. 27. But the Court did not address federalism for all times and all purposes. Properly "taking into account . . . the circumstances it embraces," *United States v. Cannady*, 63 F.4th 259, 266 (4th Cir. 2023) (cleaned up), *Jonathan R. I* considered only how federalism might be implicated by the interplay between state and federal *courts*. The Court concluded that the periodic state court hearings presented no obstacle to deciding this case. *Jonathan R. I*, 41 F.4th at 321. But it didn't reject the State's interests *in toto*. So federalism is still on the table, especially now that the expansive nature of Plaintiffs' claimed relief has crystallized.

*Second*, the Court did not hold that "the district court was the most appropriate forum." Op. Br. 27. Rather, the Court concluded that Plaintiffs would need to invoke some "collective" action in either federal or state court *if* they were to obtain some judicial remedy for the "structural changes" they

44

wished "to pursue." *Jonathan R. I*, 41 F.4th at 337. And the Court concluded that collective action wasn't possible through individual child-welfare proceedings in state court. *Id.* Rather than forum selection, the question of remedies was more important to the lower court's decision here—and the Court recognized even in *Jonathan R. I* that the district court could "always reject" a particular remedy "to secure . . . comity interests" like those implicated now. *Id.* at 334.

*Third*, the Court never "explained how Plaintiffs' requested relief [was] likely to redress the alleged harms" or held that "Plaintiffs were on 'sure footing'" to seek institutional reform. Op. Br. 28. Indeed, in pressing this argument, Plaintiffs employ a series of unfortunate selective quotations. In referring to relief against the executive branch, for example, the Court was not endorsing Plaintiffs' theories of relief wholesale. *Contra* Op. Br. 28. Rather, the Court was explaining that Plaintiffs' claims were not aimed at ongoing state judicial proceedings. *Jonathan R. I*, 41 F.4th at 333. Likewise, the Court did not give a quick-peek endorsement of the merits of Plaintiffs' claims. *Contra* Op. Br. 28 ("[The Court] expressly and emphatically held that Plaintiffs were on 'sure footing' to seek such reforms."). Rather, it held that certain principles from *Younger* deference cases—that individual periodic

45

hearings are not an appropriate forum, that federal reform does not undermine state courts, and that a "district court can always decline" to order a given remedy that threaten state autonomy—found "sure footing in [these] facts." *Jonathan R. I*, 41 F.4th at 339.

So the district court did not "reject[]" *Jonathan R. I* by confronting standing. Op. Br. 28. It correctly assumed that the Court had not silently and preemptively addressed the various jurisdictional concerns that later led the district court to dismiss. "When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed."[1] *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011).

b.    The district court also did not decide these issues prematurely. Standing may be brought up at any time, by any party or the court. *See Buscemi v. Bell*, 964 F.3d 252, 258 (4th Cir. 2020). Courts can address standing even after a case has been appealed once before. *See, e.g.*, *Mancuso v. Consol.*

---

[1] Plaintiffs have waived any argument that the district court violated this Court's mandate. In a single sentence, Plaintiffs say "it can nearly be said" that the district court "violate[d] the spirit of this Court's mandate." Op. Br. 30. "[P]erfunctory and undeveloped arguments" like this one "are waived." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021) (internal quotations omitted).

46

*Edison Co. of N.Y.*, 25 F. App'x 12, 13 (2d Cir. 2002) (affirming dismissal of claims on remand for lack of injury and redressability).

*Jonathan R. I* did not change this ordinary rule. The Court spoke briefly on remedies only to say that, after a merits decision, the district court could reject remedies as needed to preserve comity interests. 41 F.4th at 334. Plaintiffs read this to say that district courts cannot address redressability until after deciding the merits. Op. Br. 29-30, 34-36. The logic seems to be that redressability involves remedies, and remedies should be decided after the merits, so redressability should have been off the table. It's true that standing implicates remedies to some degree. *See* Ernest A. Young, *Standing, Equity, and Injury in Fact*, 97 NOTRE DAME L. REV. 1885, 1886 (2022) (explaining how standing analysis "necessitat[es] an inquiry into what relief may be available"). But the syllogism breaks down from there, as neither *Jonathan R. I* nor any other authority forbids considering remedies until after trial. "That courts generally fashion a plaintiff's remedies after a finding of liability . . . does not mean that they should decline to address standing issues undermining their requests for relief." *Baines v. City of Atlanta*, No. 1:19-CV-0279, 2021 WL 2471041, at *3 (N.D. Ga. Jan. 4, 2021).

47

The district court did not decide what remedies would resolve Plaintiffs' claims; it decided only whether it had the power to award a remedy at all, as required. It also did not weigh equitable considerations and decide what remedies should issue to address the problems Plaintiffs allege—the question confronted in *Milliken II*, 433 U.S. at 280. It took Plaintiffs at their word about what they wanted, but it concluded it lacked the authority to give them any of it. Questions about what remedies a federal court *can* offer and what remedies it *should* in each case are different.

c. The district court's decision was also procedurally sound. Plaintiffs concede that the district court was within its rights to dismiss sua sponte. *Andon, LLC v. City of Newport News*, 813 F.3d 510, 513 n.2 (4th Cir. 2016); *see also* Op. Br. 35. But they insist that the district court should have granted them additional notice and opportunity to be heard. They are mistaken.

"While a party is entitled to notice and an opportunity to respond when a court contemplates dismissing a claim on the merits, . . . it is not so when the dismissal is for lack of subject matter jurisdiction." *Scholastic Ent., Inc. v. Fox Ent. Grp.*, 336 F.3d 982, 985 (9th Cir. 2003). That's particularly true when the jurisdictional defect is incurable. *See, e.g., In re Indu Craft, Inc.*, 630 F.

48

App'x 27, 29 (2d Cir. 2015) (allowing sua sponte dismissal for lack of subject matter jurisdiction where flaw is "unmistakably clear" (cleaned up)); *George v. Islamic Republic of Iran*, 63 F. App'x 917 (7th Cir. 2003) (affirming sua sponte dismissal of the complaint for lack of subject matter jurisdiction without providing notice because the jurisdictional defect was incurable).

In any case, the parties knew standing was an issue, and the district court properly chose to act on it. In briefing on their motion to dismiss, Appellees argued that Plaintiffs' requests were not properly made in federal court. JA323. Later, in its order partially granting Plaintiffs' motion for class certification, the district court flagged how it was "skeptical of any relief requiring it to assume control of a state agency and direct how that agency manages its program and allocates its funds." JA1358. It was skeptical of Plaintiffs' request "urging the court to direct how a state executive agency must administer its foster care system." JA1358. The State Defendants then raised redressability on summary judgment, arguing "class-wide relief could not be addressed in a 'single injunction' that benefits the 'class as a whole' without individual tailoring"; "Plaintiffs cannot prove that the relief they request would redress their alleged injuries"; and the relief the Plaintiffs seek

49

"is 'troubling' and not within [the district court's] 'authority' to order." JA1511-1512.

So both the district court and the State Defendants alerted Plaintiffs that redressability was on the table at multiple stages. When "identical issues have already been raised in the litigation, the threat of procedural prejudice is greatly diminished." *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 332 n.1 (5th Cir. 2002) (cleaned up). What's more, Plaintiffs could not have "fixed" the issue even had they been given a chance. Their requested relief is their requested relief, full stop.

Plaintiffs' cases say no different. In *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 269 (2015), the district court sua sponte dismissed a case for lack of standing where it identified a purported gap in the record— but it never gave the plaintiffs a chance to fill the gap. Here, Plaintiffs spent years shaping their theories of relief after extensive discovery; a "gap" had nothing to do with it. In *Kentucky v. EPA*, No. 23-5343/5345, 2024 WL 3569525, at *1 (6th Cir. July 29, 2024), the district court dismissed the complaint for lack of standing right out of the gate—again, not after years of litigation that afforded the plaintiffs a chance to build their case, as here. And the district court in *Frank* dismissed the case for failure to state a claim—not

50

for lack of jurisdiction—based on "faults … that could conceivably be remedied in an amended complaint." *United Source One, Inc. v. Frank*, No. 23-1481, 2024 WL 1108824, at *1 (4th Cir. Mar. 14, 2024). None of that holds here.

Finally, the Court need not vacate the district court's order because it dismissed with prejudice. The Court could just "modify the judgment . . . to reflect that [the] dismissal . . . is without prejudice." *Goldman v. Brink*, 41 F.4th 366, 369 (4th Cir. 2022).

Thus, the district court was well within its rights to consider standing sua sponte and dismiss.

### B.   Plaintiffs have not shown injury in fact.

While the district court focused on the redressability aspect of standing, this Court can affirm on any basis "fairly supported by the record." *Liberty Mut. Ins. Co. v. Atain Specialty Ins. Co.*, 126 F.4th 301, 306 n.7 (4th Cir. 2025) (cleaned up). That's especially so when it comes to standing—an issue that the Court can take up on its own. *Benham v. City of Charlotte*, 635 F.3d 129, 134 (4th Cir. 2011).

Beyond redressability, Plaintiffs also have not shown injury in fact. "[T]he requirement of injury in fact is a hard floor of Article III jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). An injury must be

51

"concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Like the redressability requirement, the injury requirement ensures that "[f]ederal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).

Injuries that are "too speculative"—including "allegations of *possible* future injury"—are insufficient. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added). Particularly relevant here, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *O'Shea*, 414 U.S. at 495-96. And "not all threatened injuries constitute an injury-in-fact." *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017). Even a "realistic threat that reoccurrence of the challenged activity would cause the plaintiff harm in the reasonable near future" is not enough. *Summers*, 555 U.S. at 499. Rather, a plaintiff seeking injunctive relief must show "continuing, present adverse effects" to establish standing. *O'Shea*, 414 U.S. at 495-96.

To avoid "stretch[ing]" Article III "beyond its purpose," a threatened injury must be "certainly impending" to satisfy the imminence requirement.

52

*Clapper*, 568 U.S. at 409. Put differently, the injury must be "concrete in both a qualitative and temporal sense." *Beck*, 848 F.3d at 271 (quoting *Whitmore*, 495 U.S. at 155); *see also, e.g.*, *Md. Election Integrity, LLC*, 127 F.4th at 540 (holding that the "possibility" that the plaintiffs' members might be harmed from "statewide mismanagement" was too "conjectural" to support standing).

"Certainly impending" is a standard with teeth. Take *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), for example. There, the plaintiff had allegedly been subjected to a chokehold by police and police had allegedly caused fifteen chokehold-related deaths during the pendency of his case—even so, the Court still found he lacked standing to pursue an injunction barring chokeholds. *Id.* at 100-03. To show an actionable future injury, the plaintiff needed to allege not only "that he would have another encounter with the police but also to make the incredible assertion either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter . . . or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 105-06.

Plaintiffs here face a similar problem. They allege that the State Defendants have placed them at "risk of harm," but they then defined the harm only as a "risk of being deprived of substantive due process rights."

53

JA238.  And their substantive due process right is then said to be the right to be free from "a substantial *risk* of harm."  ECF 325, at 1.  So they really allege "a highly attenuated chain of possibilities."  *South Carolina*, 912 F.3d at 727 (quoting *Clapper*, 568 U.S. at 410).  They have not identified how they face legally cognizable, constitutional harm from specific policies or practices today, let alone explained how *all* foster children face a "certainly impending" "substantial risk."[2]    *Lyons*, 461 U.S. at 103-06 (collecting authorities establishing that potential future injuries were not enough to establish standing).

Plaintiffs have not identified an authorized practice of the sort that *Lyons* says might suffice to drive the injury.  West Virginia's child welfare statutes are designed to identify children who are abused or neglected, adjudicate the alleged offenders, find appropriate placement and services, and plan for permanent homes, *supra*, at 4-8.  Plaintiffs don't take issue with these statutes or DHS's written policies.  *See* ECF 533-17, PageID 17966 (admitting

---

[2] The better rule is that "[a] class cannot be certified if it contains members who lack standing," *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010), lest Rule 23 be used to evade constitutional requirements.  *But see Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 779 (4th Cir. 2023) (holding otherwise).  That said, Plaintiffs here have not established that any of the *named* Plaintiffs have standing (or had standing at the time the complaint was filed), which is enough to defeat their claims.

54

that "Plaintiffs do not allege that DHHR's written policies in [various policies and manuals] . . . violate the ADA" and conceding that "Plaintiffs do not allege that any West Virginia law violates the U.S. Constitution" or the ADA). In other words, Plaintiffs don't claim that DHS has an official policy that puts every child at risk of harm. Instead, they claim that *some* caseworkers within the overall system won't comply with statute or policy (like an individual police officer in *Lyons*)—and their mistakes won't be caught or corrected by a parent or foster parent or guardian ad litem or special advocate or judge, W. VA. CODE § 49-4-601—and that non-compliance may in turn harm a child. That's hypothetical. It's conjectural. And it doesn't identify a harm that is "certainly impending." So it also doesn't pass Article III muster.

The data confirms the same. The most contemporaneous data available to the court showed that foster children experienced maltreatment on 68 of 2,703,937 days in foster care, a rate of 0.00251%. JA1311-1312. Especially when combined with figures showing other across-the-board improvements in the system, *see supra,* at 8-16, these numbers don't suggest that "the risk of harm is sufficiently substantial to support standing." *G.T. v. Bd. of Educ.*, 117 F.4th 193, 222 (4th Cir. 2024) (Wynn, J., concurring in part).

In sum, Plaintiffs have not carried their burden to show that they have standing. The district court therefore was right to dismiss.

## II.    This Court need not reassign the case on remand.

Plaintiffs insist that the Court should reassign the case if it decides to remand. This Court will reassign a case on remand only in "unusual circumstances," *United States v. North Carolina*, 180 F.3d 574, 582-83 (4th Cir. 1999), where "the appearance of fairness and impartiality is best advanced by reassignment," *United States v. Neal*, 101 F.3d 993, 1000 n.5 (4th Cir. 1996). The Court may consider whether (1) "the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected"; (2) "reassignment is advisable to preserve the appearance of justice"; and (3) "reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *McCall*, 934 F.3d at 385 (cleaned up).

Reassignment is not warranted where a district court, after engaging in "thoughtful analysis," decides incorrectly. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 729 (4th Cir. 2021). Rather, a party seeking reassignment must show obvious "judicial bias, partiality, or other reason for

56

disqualification," *United States v. Chang*, 121 F.4th 1044, 1051 (4th Cir. 2024), or a "practice of frequent and repeated disregard" for procedure and precedent, *United States v. Smith*, 134 F.4th 248, 263-65 (4th Cir. 2025); *see also McCall*, 934 F.3d at 384-85 (personal bias); *United States v. Letz*, 383 F.3d 191, 221-22 (4th Cir. 2004) (personal animus). If a case will "require substantial duplication of effort," the Court takes a conservative approach to reassignment. *McCall*, 934 F.3d at 384. District courts are also generally presumed to disregard information as directed. *See* Toby J. Heytens, *Reassignment*, 66 STAN. L. REV. 1, 48 (2014).

Plaintiffs have not met this Court's demanding standard for reassignment on remand. The district court engaged in a thoughtful analysis to conclude that Plaintiffs' injuries were not redressable, carefully considering both the parties' interests and the precedent. JA1515-1533. The court did not express any personal animus or bias against Plaintiffs. *Cf.* JA1515 (expressing sympathy for Plaintiffs' plight). Nor is there reason to believe the district court would have trouble absorbing this Court's directives. While this Court reversed and remanded in *Jonathan R. I*, that reversal occurred nearly a year before the current judge got involved. And considering the lengthy and complicated history of this case, reassignment would waste judicial resources.

57

The district court judge has "useful knowledge that would be difficult for a new judge to acquire," including familiarity with the facts, law, and plaintiff classes. *McCall*, 934 F.3d at 385.

So if this Court does decide to remand, it should not reassign the case.

## III. The class doesn't satisfy Rule 23.

If this Court reverses the district court's dismissal order, it should likewise reverse the order certifying classes. Class certification is the exception, not the rule. Generally, litigation must be "conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). So before a class is certified, "[a] party . . . must affirmatively demonstrate his compliance with [Rule 23]." *Id.* at 351. Here, a rigorous analysis shows that neither the general class of all West Virginia foster children nor the subclass of those with a disability (as defined by federal law) meets the Rule 23 requirements of commonality and typicality.

### A. The district court erred in finding commonality.

Plaintiffs must establish "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). The key to satisfying commonality "is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution

58

of the litigation." *Wal-Mart*, 564 U.S. at 350 (cleaned up). Plaintiffs must prove that an "official policy" or "well-defined practice" caused *all* class members to suffer the "same injury," such that "common answers" for all class members will "drive resolution" of the case "in one stroke." *Id.* at 350, 358.

Because Plaintiffs bring substantive due process claims on behalf of all foster children, they must identify an official policy or well-defined practice that (1) constitutes "conscience-shocking behavior" and "deliberate indifference" and (2) has harmed all children in the State's custody. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-50 (1998). They have not. Plaintiffs admit no offending policy exists. ECF 533-17, PageID 17966. Instead, Plaintiffs crafted a dozen "common" factual and legal questions. The district court then narrowed these "common" contentions to three "practices" for the general class and one for the ADA subclass. But none is sufficient to resolve a claim. Nor could the district court resolve any of these questions with a single injunction.

### 1. No offending policy or practice applies uniformly.

Plaintiffs don't claim that DHS has any unconstitutional policies or well-defined practices. Again: they concede that West Virginia laws and policies governing case planning are consistent with federal law. ECF 533-17,

59

PageID 17966.  Instead, they argue that DHS sometimes *departs* from its own policies and practices.  *See, e.g.,* ECF 131, at 27 (alleging that DHS has "all but abandoned State policy").

Irregularly departing from rules and norms is not a "practice"— well-defined or otherwise.  A "practice" is "[a]n established custom or prescribed usage."  *Practice*, BLACK'S LAW DICTIONARY (12th ed. 2024).  An unconstrained departure from policy can't be "prescribed."  Plaintiffs' claims are better understood "to be based on multiple, disparate failures to comply with [DHS's] statutory obligations rather than a policy or practice which affects them all."  *G.T.*, 117 F.4th at 206.  And while "it is not enough that 'they have all suffered a violation of the same provision of law,'" *id.* at 205 (quoting *Wal-Mart*, 564 U.S. at 352), Plaintiffs don't even allege that.  They allege they are at *risk* of suffering violation of *various* provisions of law and policy that could coalesce to cause harm.  "[I]t is circular logic for plaintiffs to create a laundry list of factually diverse claims and then assert that these claims, in turn, prove the existence of a uniform . . . policy."  *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 680 (4th Cir. 2024) (noting how courts are skeptical of "nebulous references to 'systemic failures' or 'systemic deficiencies'").

Plaintiffs also assert "well-defined practices" based on conditions Defendants don't control. For instance, courts control case processing, not Defendants. Closing cases—and reducing caseloads—is dependent on courts' approval of improvement periods, which can range from three to fifteen months. *See generally* W. VA. CODE § 49-4-610. In turn, improvement periods and their lengths are based on parent participation, "substantial change[s] in circumstances," and whether continuation will "substantially impair" permanent placement. *Id.* Likewise, DHS can't force citizens to be foster parents. And the court didn't find any "well-defined practice" causing a lack of foster families.

Plaintiffs' theory of liability—which turns on a series of individualized situations and third parties' actions—is insufficient to satisfy Rule 23(a)(2), and the Court's inquiry may end here. *Cf. Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 498 (7th Cir. 2012) (explaining why "[t]here is [generally] no such thing as a 'systemic' failure to find and refer individual disabled children for [Individualized Education Program] evaluation"). "*Wal–Mart* tells us that local discretion cannot support a [system]-wide class no matter how cleverly lawyers may try to repackage local variability as uniformity." *Bolden v. Walsh Const. Co.*, 688 F.3d 893, 898 (7th Cir. 2012).

2. **The district court's "common practices" were not actually common.**

Although the district court purported to identify several common practices, none withstand scrutiny.

a.      The district court first thought it found a practice of offering an "inadequate array of appropriate foster care placements—in number and type—resulting in 'a haphazard placement process.'"  JA1370.  But the evidence proved to be "worlds away from significant proof."  *Wal-Mart*, 564 U.S. at 355 (cleaned up).

For starters, the district court relied on data from 2017 for the proposition that "DHHR has a pattern or practice of maintaining an insufficient array of placements."  JA1372.  It then assumed that "foster care placement stability is correlated with the number of foster care beds available."  JA1372.  That's a dangerous assumption on its own, as "[e]vidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence, because it does not adequately account for other contributory variables."  *United States v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010).

The court overlooked the most recent placement-related data from October 2022.  JA1303-1356.  That data showed that West Virginia was second

62

in the nation in "placement stability," having the second fewest "number of placement moves per day [children] experienced during that year." JA1323-1324. Because "the plaintiffs must proffer evidence that the defendants' allegedly wrongful behavior will likely occur or continue" to "obtain forward-looking relief," *Murthy v. Missouri*, 603 U.S. 43, 69 (2024), the district court's "rigorous analysis" should have accounted for the most recent data. *See, e.g., Aguilar v. Immigr. & Customs Enf't Div. of U.S. Dep't of Homeland Sec.*, No. 07-cv-8224, 2012 WL 1344417, at *7 (S.D.N.Y. Apr. 16, 2012) (finding expert's use of outdated data did not reflect the "scientific rigor" that *Wal-Mart* requires).

Next, the district court relied on anecdotal statements. That was a questionable choice to begin with, as "[a]necdotal reports . . . are ordinarily more helpful in generating lines of inquiry than in proving causation." Federal Judicial Center, *Reference Manual on Scientific Evidence* 217 (3d ed. 2011); *see also, e.g., Nucor Corp.*, 785 F.3d at 948 (Agee, J., dissenting) (describing problems with using anecdotal evidence to show commonality).

The anecdotal evidence here was weak. The first was a statement from January 2019—more than four-and-a-half years before the court's certification order—saying that "West Virginia is *currently* experiencing a drastic

63

shortage of foster homes that are able to meet the needs of the children being placed in care." JA1370 (emphasis added). That years-old comment isn't sufficient to establish "significant proof" of a general policy today, especially considering the contrary empirical evidence. Neither is the testimony that children have, at times, stayed at DHHR offices or hotels because beds were unavailable. JA1371. That testimony was given during a hearing in which a state circuit court issued a statewide injunction prohibiting DHHR from housing children in CPS offices "for any measure of time" and from "housing a child in a hotel or motel for a period exceeding two nights." *Bloom*, 880 S.E.2d at 905. That injunction is no longer in effect, in part because the Supreme Court of Appeals of West Virginia determined that "DHHR has fulfilled its mandatory duty to address the staffing issues in the Kanawha County CPS Office," *id.* at 909. And nothing suggests that children were housed in CPS offices or in hotels (for more than two days) between entry of the injunction in January 2022 and the district court's certification order.

Finally, the district court relied on Plaintiffs' expert reports, which "studied the case records of nine of the Named Plaintiffs." JA1371. But those experts limited their opinions to the case records they reviewed. *See* JA1040 (Getman); JA1061-1062 (Flory); JA1004-1005 (Popchak). None analyzed—let

64

alone rigorously analyzed—the system generally. And the district court never explained why it could extrapolate broader conclusions from these narrow reports. *Cf. Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 337 (4th Cir. 1983) (criticizing expert for making assumptions about broader class based on limited data); *EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1195 (4th Cir. 1981) (deeming expert evidence unreliable where it drew conclusions about seven-year period from only one of those seven years).

At bottom, in examining placements, neither Plaintiffs nor the district court did the basic work that one would expect from a rigorous analysis. They did not identify the number of placements available or the number of placements needed. They did not analyze the overall array of foster placements, why that array was inadequate, and what was needed to make it adequate. They did not consider how West Virginia places over 80% of children in family homes, JA1474, such that adding more foster homes or residential placements wouldn't affect most of the class. They found no "single or uniform policy or practice that bridges *all* [the plaintiffs'] claims." *D.L. v. District of Columbia*, 713 F.3d 120, 127 (D.C. Cir. 2013) (emphasis added).

b.      The district court also mistakenly found whether DHS engaged in a lack of appropriate case planning presented a common question.

65

JA1373-1376.  Lack of case planning purportedly contributes to a lack of permanency. *Id.*

Here again, the district court relied on stale data—this time including data from non-scientific surveys from 2017 and case studies from 2002. JA1374.  The contemporary permanency data tells another story.  While West Virginia was 1.4% below the national average in achieving permanency within 12 months, JA1315-1316, it was third in the country in achieving permanency between 12 and 24 months and best in the country in achieving permanency within the next year after a child is in foster care for 24 months.  JA1317-1320.

Beyond that evidentiary problem, the district court also failed to acknowledge that the case plans for foster children are "highly individualized and vastly diverse." *Jamie S.*, 668 F.3d at 486.  Case plans include placement and permanency options, a family case plan, and DHS-provided services to address the child's individual needs.  W. VA. CODE § 49-4-604(a)(1)-(2).  And those elements of case planning vary from child to child, as evidenced by Plaintiffs' experts' 456-page report reviewing the files of only nine named Plaintiffs.  JA378-850.  What amounts to adequate case planning for one child may be inadequate for another.  So no "single injunction" directing DHS to conduct "adequate" case plans can resolve this claim.  *Wal-Mart*, 564 U.S. at

360. That disparateness makes this claim "unsuitable for class treatment." *Jamie S.*, 668 F.3d at 486.

c.     The district court incorrectly concluded that "having high caseloads is Defendants' common practice," while rejecting Defendants' evidence showing hiring and recruiting efforts because it believed that would require it to "prematurely assess[] the merits of Plaintiffs' case." JA1377. The court here missed the point. Defendants' evidence wasn't intended to prove the absence of deliberate indifference—an element the court was "skeptic[al]" Plaintiffs could prove. JA1377. Rather, Defendants' hiring and recruiting efforts showed a lack of a "well-defined practice" necessary to establish commonality. If Defendants had an "established custom" of understaffing, then they wouldn't have implemented a caseworker career ladder, ECF 160-1, ¶ 86, provided retention payments to reduce turnover, ECF 160-1, ¶ 89, raised salaries by 10% across the board in 2018 and 2019, ECF 160-1, ¶¶ 87-88, 91-92, raised salaries by another 15% in 2022 with added signing bonuses, ECF 322 at 11 n.15, or increased salaries by an additional 20% with additional retention bonuses, ECF 322, at 12 n.16. Those measures belie a "prescribed usage"— they demonstrate "consistent, concerted efforts to remedy . . . staffing issues." *Bloom*, 880 S.E.2d at 911. The district court erred in waving off Defendants'

67

evidence as going to forbidden merits considerations. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) ("[Class certification] will frequently entail overlap with the merits of the plaintiff's underlying claim." (cleaned up)).

d.    The district court certified the ADA subclass based on alleged inadequate infrastructure of therapeutic service providers. JA1384-1389. The district court spent much time determining whether a risk of institutionalization can state a claim under the ADA or Rehabilitation Act. But after dispensing with that issue, it once more failed to rigorously analyze whether Plaintiffs offered "significant proof" that DHS had a well-defined practice or if "common answers" for all subclass members will "drive resolution" of the case "in one stroke." *Wal-Mart*, 564 U.S. at 350, 355, 358 (cleaned up).

Like the claims of the general class, the subclass's claim does not involve a DHS policy or practice. DHS must "[p]rovide community-based services in the least restrictive settings that are consistent with the needs and potentials of the child and his or her family[.]"  W. VA. CODE § 49-1-105(b)(7).  So Plaintiffs again rely on disparate *departures* from, not compliance with, official policy. And the district court again treated DHS's efforts to improve services

68

as merits considerations, rather than recognizing them as evidence that DHS's policy and practice is to provide statutorily sufficient services.

In finding that DHS had a practice of providing a lack of community-based services for children with disabilities, the district court returned to stale data again. DOJ found the Department was not complying with the ADA in 2015. JA1388. But the court ignored the results achieved under the subsequent Memorandum of Understanding. JA285-311. For example, DHS launched a program to provide a broad range of community-based services to up to 2,000 children with mental illness. ECF 160-8, at 3. DHS also implemented an "Assessment Pathway" in 2022 to connect youth to community-based mental health services. ECF 322, at 15 n.18. By January 2023, just 12% of foster children were in residential treatment, compared to 25% in 2014. JA1356. The district court acknowledged that the "national average rate of institutionalization" was "15%" in 2014, JA1386-1387, but it failed to consider that, by the time it issued its ruling, DHS placed children in institutions at a *lower* rate than the national average. It might have dodged the question because resolving it would require individualized reviews of both case plans and facilities—neither of which is appropriate for class resolution.

69

The district court also needed to consider whether the subclass of "all members of the General Class who have physical, intellectual, cognitive, or mental health disabilities, as defined by federal law" could obtain relief in a "single injunction." While the court found "sufficient evidence of systemic deficiencies in the availability of community-based services for children with disabilities," it didn't explain what services were lacking. JA1389. And it didn't analyze whether, for example, a "single injunction" directing DHS to provide additional in-home crisis services would resolve a "common contention" among all the subclass members or only those with *mental* health disabilities. The broadly defined subclass includes four categories of disabilities and countless disabilities within those buckets. The subclass members' disabilities are "highly diverse and individualized," *G.T.*, 117 F.4th at 205, so their needs are, too.

Consequently, their alleged harms are "vastly diverse," and their claims are "based on multiple, disparate failures to comply with" DHS policy. *Id.* at 206; *see also, e.g.*, *Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 31 (1st Cir. 2019) (finding a lack of commonality in proposed class of ADA claimants because the claims and remedies would "depend on that one student's unique disability and needs"); *J.B. ex rel. Hart v. Valdez*, 186 F.3d

70

1280, 1290 (10th Cir. 1999) (affirming denial of certification in ADA case "given the divergent circumstances, legal claims, and corresponding remedy for each child, we hold that the district court did not abuse its discretion in failing to find a single issue of law or fact common to all class members").

\* \* \*

Because Plaintiffs did not identify "'a uniform policy or practice'" that drives the alleged harm to all class members, they failed to demonstrate compliance with the commonality requirement of Rule 23(a). *Parent/Pro. Advoc. League*, 934 F.3d at 30 (quoting *D.L.*, 713 F.3d at 128). The district court erred in certifying the class.

## B.    The district court erred in finding typicality.

Aside from commonality, Plaintiffs didn't satisfy the typicality requirement, either. The Supreme Court has "repeatedly held" that typicality requires that the named plaintiffs "possess the same interest and suffer the same injury" as the putative class members. *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 156 (1982) (cleaned up). While named plaintiffs' claims need not be identical to those of absent class members, they "must simultaneously tend to advance the interests of the absent class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).

71

The Court first must consider whether Plaintiffs' claims are typical. Because "the essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class,'" "the appropriate analysis of typicality must involve a comparison of the [named] plaintiffs' claims or defenses with those of the absent class members." *Deiter*, 436 F.3d at 466-67 (cleaned up). This Court's analysis "begin[s] with a review of the elements of [named] plaintiffs' *prima facie* case," and then determines whether the facts that would prove the elements of that case "would also prove the claims of the absent class members." *Id.* at 467. Here, Plaintiffs would need to show that (1) the defendants' conduct "shocks the conscience" and constitutes "deliberate indifference" and (2) *causes* a deprivation of a constitutional right. *Lewis*, 523 U.S. at 846-50.

The district court never engaged with the elements of a substantive due process claim. So it couldn't determine whether the facts that would prove Jonathan R.'s claim, for instance, would also prove an absent class member's claim. As it turns out, they wouldn't. For example, Plaintiffs' "lack of appropriate case planning" claim would require individualized review of case plans. And while one child might have a substantive due process interest in a certain service, another may not. Plaintiffs need to show that the failure to

provide that service to that child "shocks the conscience" *and* causes deprivation of a constitutional right.

Plaintiff Anastasia M. illustrates the disconnect. She claims she was harmed because DHS tried to reunify her with her biological parent rather than place her in an adoptive home. ECF 131 at 8. While Anastasia M. claims that her case plan is inadequate because reunification efforts were *present*, absent class members may claim that their case plans are inadequate because reunification efforts were *absent*. *See Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 513 (D. Neb. 2007) (finding inadequacy of representation for similar reasons). Given those divergent interests, it can't be said that "as goes the claim of the named Plaintiff, so goes the claims of the class." *Deiter*, 436 F.3d at 466. The class members have unique characteristics, individualized interests, and personal needs that cannot be satisfied in a single stroke.

The same disconnect exists for the ADA subclass. The ADA subclass asks whether DHS provides an adequate array of community-based services, programs, and activities accessible to children with disabilities. JA1389. But whether the array is "adequate" for any individual class member will depend on that child's unique needs and goals; for instance, those grappling with

73

"serious mental illness" could present "unpredictable and varied symptoms and needs" that will require "individualized" "appropriate treatment." *United States v. Mississippi*, 82 F.4th 387, 396 (5th Cir. 2023). Plaintiffs' own experts recognize as much. *See, e.g.*, JA1024 (Plaintiffs' expert testifying that propriety of placement and services not "all-or-nothing kind of thing").

Apart from their claims, the nine named Plaintiffs the court addressed were also atypical as to age, disability, behavior, time in custody, type of placement, number of placements, and reason for entering care. The nine named Plaintiffs were all age 10 or older at the time of certification, and eight of the nine named Plaintiffs were at least 15 years old. Contrast that with the general population of foster children: 43% are under the age of 7 and 62% are under the age of 11. JA959-960. Six of the nine named Plaintiffs are emotionally disturbed, but only 12% of foster children carry that designation. JA960. All nine named Plaintiffs have a disability, but only 16% of foster children have a diagnosed disability. JA960. Seven of the nine named Plaintiffs have been or were in custody for over three years, but 94% of foster children are in custody for fewer than three years, and the median time spent in foster care is 9.8 months. JA961. Plaintiffs claim they have all experienced five or more placements; six have experienced 10 or more. In contrast, the

74

median number of placements for foster care is one; the average number of placements is 2; and 87% of foster children "have been in 3 or fewer placements in their current time in care." JA960-961.

Plaintiffs didn't provide an explanation—and the district court didn't require one—of how the named Plaintiffs' claims are typical of the class and subclass members despite their atypical characteristics and experiences. The named Plaintiffs are not sufficiently like the class such that proof of their claims will "also prove the claims of the absent class members." *Deiter*, 436 F.3d at 467.

## C.    The district court erred in finding that a single injunction or declaratory judgment would provide relief to all.

Plaintiffs also failed to prove that Defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). To make that showing, Plaintiffs must show that "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. They must identify specific class-wide relief (compliant with Rule 65) that would redress the alleged class-wide harm without being "'tailored to each class member.'" *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604-05 (10th Cir. 2008). "Put

75

another way, a class may *not* be certified under Rule 23(b)(2) if *any* class member's injury is not remediable by the injunctive or declaratory relief sought." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 146 (2d Cir. 2020).

The district court didn't rigorously analyze whether Plaintiffs' requested relief met these requirements. It simply stated, without explanation, that "a single injunction or declaratory judgment would provide relief to each member of the class." JA1399. That's not enough to show that all class members' injuries are so similar that "they can be addressed in a single injunction that need not differentiate between class members." *Shook*, 543 F.3d at 604. Their injuries aren't so similar. *See* Section III.B., *supra*. Nor is their requested relief within the court's authority to issue. *See* Section I.A., *supra*. And it's not likely to redress the injury on a class-wide basis. See Section III.A., *supra*. Rather, their proposed remedy is "so inherently personal" that the court could do no more than perhaps "declare that a certain group of plaintiffs have the right" to pursue certain other relief from the State—but "that is not a form of 'final' declaratory relief under Rule 23(b)(2)." *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008). A rigorous analysis shows that no "single injunction" or declaration provides class-wide relief. The district court erred in holding otherwise.

**CONCLUSION**

For these reasons, this Court should affirm the decision to dismiss the case for lack of Article III standing.  If it reverses, then the Court should remand to the same judge but reverse the district court's class certification order and instruct the district court to decertify the class.

Respectfully submitted,

JOHN B. MCCUSKEY
  ATTORNEY GENERAL

/s/ Michael R. Williams
Michael R. Williams
  *Solicitor General*
  *Counsel of Record*

Holly J. Wilson
  *Principal Deputy Solicitor*
  *General*

Caleb B. David
  *Deputy Solicitor General*

Frankie A. Dame
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
mwilliams@wvago.gov
hwilson@wvago.gov
cdavid@wvago.gov
fdame@wvago.gov

Dated:  June 12, 2025

*Counsel for Defendants-*
*Appellees/Cross-Appellants*

78

# CERTIFICATE OF COMPLIANCE

1.    This response brief complies with Fed. R. App. P. 28.1(e)(2)(B)(i) because it contains 15,300 words.

2.    This response brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Michael R. Williams
Michael R. Williams