**Nos. 25-1232 & 25-1239**

---

**IN THE U.S. COURT OF APPEALS FOR THE FOURTH CIRCUIT**

Jonathan R., minor, et al.,

v.

Patrick Morrisey, et al.,

_____

On appeal from the
U.S. District Court for the Southern District of West Virginia
No. 3:19-cv-00710
Hon. Joseph R. Goodwin, United States District Judge

---

**BRIEF OF AMICI CURIAE
STATES OF ALASKA, ALABAMA, ARKANSAS, DELAWARE,
FLORIDA, GEORGIA, IDAHO, IOWA, KANSAS, LOUISIANA,
MISSISSIPPI, NEBRASKA, NEW HAMPSHIRE,
NORTH DAKOTA, SOUTH CAROLINA, AND TEXAS
IN SUPPORT OF WEST VIRGINIA**

---

TREG TAYLOR
ATTORNEY GENERAL

Laura Fox
Margaret Paton Walsh
Katherine Demarest
Assistant Attorneys General
Department of Law
1031 West Fourth Ave, Suite 200
Anchorage, AK  99501
(907) 269-6612
*Attorneys for Amicus Curiae*
STATE OF ALASKA

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ............................................................ iii

INTEREST OF AMICI CURIAE ......................................................1

ARGUMENT ..................................................................................2

I.     Federal courts cannot provide the redress plaintiffs seek...............3

II.    Expensive federal litigation does not improve child welfare. ........9

III.   Child welfare lawsuits do not make proper class actions.............17

      A.    Commonality is absent. .......................................................18

      B.    An appropriate classwide injunction is impossible...........24

CONCLUSION ..............................................................................28

# TABLE OF AUTHORITIES

**CASES**

*Ashley W. v. Holcomb*,
34 F.4th 588 (7th Cir. 2022) ...................................................................10

*Brown v. Plata*,
563 U.S. 493 (2011)........................................................................5, 7

*Carson P. ex rel. Foreman v. Heineman*,
240 F.R.D. 456 (D. Neb. 2007) ...........................................................27

*Connor B. ex rel. Vigurs v. Patrick*,
774 F.3d 45 (1st Cir. 2014)......................................................................7

*C.R. Educ. & Enf't Ctr. v. Hosp. Props. Tr.*,
867 F.3d 1093 (9th Cir. 2017) ...............................................................20

*Disability Rts. Fla., Inc. v. Palmer*,
No. 4:18-cv-342-RH/CAS, 2019 WL 11253085 (N.D. Fla. Aug. 29, 2019) 11

*DL v. District of Columbia*,
713 F.3d 120 (D.C. Cir. 2013)..........................................................19, 21

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)...............................................................................3

*G.T. v. Bd. of Educ. of Cnty. of Kanawha*,
117 F.4th 193 (4th Cir. 2024) ...........................................................18, 20

*Horne v. Flores*,
557 U.S. 433 (2009)................................................................................8

*In re Burrus*,
136 U.S. 586 (1890)................................................................................5

*J.B. ex rel. Hart v. Valdez*,
186 F.3d 1280 (10th Cir. 1999) .............................................................22

*Jeremiah M. v. Crum*,
No. 3:22-cv-00129-JMK (D. Alaska July 15, 2022).....................1, 20, 22, 27

*Jeremiah M. v. Crum*,
695 F. Supp. 3d 1060 (D. Alaska 2023) .......................................................9

*Jeremiah M. v. Crum,*
 No. 3:22-cv-00129-SLG (Mar. 17, 2025) ................................4, 9, 10, 12, 13

*Jonathan R. v. Justice,*
 344 F.R.D. 294 (S.D.W.V. 2023) ........................................17, 20, 22, 23, 26

*Jonathan R. v. Morrisey,*
 2025 WL 655811 (S.D.W. Va. Feb. 28, 2025).....................................3, 7, 16

*Lewis v. Casey,*
 518 U.S. 343 (1996)...........................................................................15

*L.J. v. Massinga,*
 No. 1:84-cv-04409-SAG (D. Md. July 16, 2024) .........................................7

*Maldonado v. Ochsner Clinic Found.,*
 493 F.3d 521 (5th Cir. 2007) .................................................................28

*M.D. ex rel. Stukenberg v. Abbott,*
 119 F.4th 373 (5th Cir. 2024) ......................................................6, 7, 8, 13

*M.D. ex rel. Stukenberg v. Abbott,*
 No. 2:11-cv-00084 (S.D. Tex. Feb. 26, 2025)..........................................6, 13

*Missouri v. Jenkins,*
 515 U.S. 70 (1995)..........................................................................5, 7, 8

*Moore v. Sims,*
 442 U.S. 415 (1979).............................................................................5

*Murthy v. Missouri,*
 603 U.S. 43 (2024)................................................................................4

*Nordstrom v. Ryan,*
 762 F.3d 903 (9th Cir. 2014) .................................................................

*Parent/Prof'l Advocacy League v. City of Springfield,*
 934 F.3d 13 (1st Cir. 2019)...........................................................19, 20, 21

*Shook v. Bd. of Cnty. Comm'rs,*
 543 F.3d 597 (10th Cir. 2008) ................................................................25

*Simon v. E. Ky. Welfare Rts. Org.,*
 426 U.S. 26 (1976)................................................................................4

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021)..............................................................................26

*United States v. Texas*,
    599 U.S. 670 (2023)...............................................................................3

*United States v. Windsor*,
    570 U.S. 744 (2013)...............................................................................5

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)........................................................................*passim*

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021)...............................................................................8

*Willis v. City of Seattle*,
    943 F.3d 882 (9th Cir. 2019) ...............................................................19

*Wyatt B. v. Kotek*,
    No. 6:19-cv-00556-AA, 2024 WL 4867082 (D. Or. Nov. 22, 2024) ...........13

*Youngberg v. Romeo*,
    457 U.S. 307 (1982)...............................................................................7

**FEDERAL STATUTES**

42 U.S.C. § 12101 ...............................................................................17, 18, 26

**FEDERAL RULES**

Fed. R. Civ. P. 23(a)(2)...............................................................................18

Fed. R. Civ. P. 23(b)(2).........................................................24, 25, 26, 27, 28

Fed. R. Civ. P. 65(d)(1)...............................................................25, 26, 28

**OTHER AUTHORITIES**

Alaska Off. of Child.'s Servs.,
    *2025-2029 Child and Family Services Plan*,
    https://dfcs.alaska.gov/ocs/Documents/Child-and-Family-Services-Plan-
    2025-2029.pdf...............................................................................12

Alaska Off. of Child.'s Servs.,
    *Alaska's Fourth Annual Progress and Services Report to the 2020-2024
    CFSP*, https://dfcs.alaska.gov/ocs/Documents/Final-Annual-Report-to-the-
    2020-2024-CFSP.pdf...............................................................................12

Brenda Donald,
*Leading Under a Cloud*, in *Collaboration, Innovation, & Best Practices: Lessons and Advice from Leaders in Child Welfare* 47, 47-54 (C. James-Brown & J. Springwater eds., 2019), https://bit.ly/42uiA9R (last visited June 12, 2025)...................................14, 15

John Bursch & Maura Corrigan,
*Rethinking Consent Decrees*, Am. Enter. Inst. (June 2016), https://bit.ly/35849bv (last visited June 12, 2025) .................................14, 15

Child.'s Bureau,
*Child & Family Services Reviews (CFSRs)*, https://acf.gov/cb/monitoring/child-family-services-reviews (last visited June 12, 2025) ...................................................................12

Child.'s Bureau,
*Monitoring*, https://acf.gov/cb/training-technical-assistance/monitoring (last visited June 12, 2025) ...................................................................12

Child.'s Bureau,
*Title IV-E Reviews*, https://acf.gov/cb/monitoring/title-ive-reviews (last visited June 12, 2025) ...................................................................13

Casey Fam. Programs,
*How can child protection agencies respond to litigation?* (Jan. 4, 2021), https://www.casey.org/litigation-response/ ...................................................14

Casey Fam. Programs,
*Summary of child welfare class-action litigation*, (Feb. 28, 2024) https://www.casey.org/class-action-summary/...............................................14

Casey Fam. Programs,
*Summary of child welfare class action litigation*, (Mar. 11, 2025), https://www.casey.org/class-action-summaries-2025update/
...................................................................................................1, 7

Expert Report of James T. Dimas, Ex. AC to Defs.' Mot. for Summ. J. on Counts One and Two, *Jeremiah M.*, No. 3:22-cv-00129-SLG (Mar. 17, 2025), ECF No. 232-32 ...................................................10, 11, 14, 16, 17

Expert Report of Jon Rubin, Ex. A to Defs.' Mot. for Summ. J. on Counts One and Two, *Jeremiah M.*, No. 3:22-cv-00129-SLG (Mar. 17, 2025), ECF No. 232-2 ...................................................................................................10, 16

Sarah A. Font, Naomi Schaefer Riley,
    *No Harm*, City Journal (Jan. 31, 2024),
    https://www.city-journal.org/article/a-closer-look-at-new-jerseys-child-
    welfare-system ...................................................................................................16

Tex. Dep't of Fam. & Protective Servs.,
    *88th Legislature, Regular Session Quarterly Report on Court Monitor Fees,*
    *Fiscal Year 2025 Quarter 2* at 3-5 (May 2025),
    https://www.dfps.texas.gov/About_DFPS/Reports_and_Presentations/Rider_
    Reports/documents/2025/2025-05-
    23_Court_Monitor_Fees_Report_FY25_Q2.pdf ..........................................13

*The Child Welfare Workforce Crisis – What We're Hearing from the Field*
    (June 20, 2022), https://bit.ly/42cgwlC (last visited June 12, 2025).............10

**INTEREST OF AMICI CURIAE**

Amici curiae are state governments who, like West Virginia, are responsible for the formidable task of providing care and safety for their most vulnerable children. They have faced (or been threatened with) similar federal court litigation seeking to control their child welfare systems and thus have a particular interest in whether federal courts entertain such cases.

For example, in Alaska, as in this case, the New York-based advocacy group A Better Childhood brought a federal class action seeking to reform and, in effect, run Alaska's child welfare system. *See* First Amended Complaint (FAC), *Jeremiah M. v. Crum* (now *Mary B. v. Kovol*), No. 3:22-cv-00129-JMK (D. Alaska July 15, 2022), ECF No. 16. The plaintiffs request sweeping injunctive relief over the state child welfare agency's placement, case planning, permanency, and other decisions. *See id*. at 91-94. Similar litigation is ongoing in Alabama, California, Georgia, Indiana, Louisiana, Maryland, New Hampshire, New York, North Carolina, and Rhode Island. *See Summary of child welfare class action litigation*, Casey Fam. Programs, (Mar. 11, 2025), https://www.casey.org/class-action-summaries-2025update/ (listing "pending litigation"). Additional jurisdictions operate under court oversight following prior such litigation, including in Arizona, Florida, Georgia, Illinois, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi,

Missouri, New Mexico, Oklahoma, Oregon, South Carolina, Tennessee, Texas, and Washington. *See id.* (listing jurisdictions "operating under court oversight").

Alaska and the other amici states thus have a direct interest in whether federal courts allow this high-cost and dubiously effective federal child welfare class action litigation to continue.

## ARGUMENT

Federal court takeovers of state child welfare systems are both jurisdictionally inappropriate and—as a practical matter—unhelpful. Top-down, across-the-board decrees from federal courts in class action lawsuits like this one improperly entangle courts in state administration and do not produce better results than state courts and agencies in individual child welfare cases.

The Court should affirm the dismissal and end this ineffective litigation. It is beyond the judiciary's Article III jurisdiction because federal courts cannot provide the redress that plaintiffs seek, which is for federal judges to step in and govern in the place of state agencies. Even when federal judges try to step in and govern, they do not actually improve child welfare outcomes because they cannot command out of existence the many barriers to perfection in child welfare work.

Nor do cases like this make appropriate class actions under the federal rules, as West Virginia argues on cross-appeal. The plaintiffs here have neither established commonality—which requires that all class members have suffered the

same injury—nor crafted proper injunctive relief that could apply classwide without reference to individual facts. So, if the Court reaches West Virginia's cross-appeal, it should reverse the district court's class certification order.

## I. Federal courts cannot provide the redress plaintiffs seek.

These cases are beyond the judiciary's Article III jurisdiction because federal courts cannot run state child welfare agencies. To have standing, a plaintiff must identify an injury that can be redressed by a federal court order. *See United States v. Texas*, 599 U.S. 670, 676 (2023) (requiring an injury that is "traditionally redressable in federal court"); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 n.1 (2024) (noting that redressability can pose an independent bar to standing). But as the district court here correctly observed, child welfare class actions like this one do not "identify[] a discrete constitutional violation" and demand "a narrowly tailored remedy" to fix it; they instead ask courts "to engage in long-term institutional reform—the kind of structural overhaul that belongs in the hands of policymakers held accountable to the public." *Jonathan R. v. Morrisey*, 2025 WL 655811, at *2 (S.D.W. Va. Feb. 28, 2025).

What plaintiffs' counsel in these cases really want is for federal courts to "step in and govern" in the place of state agencies. *Jonathan R.*, 2025 WL 655811, at *1. For example, in Alaska, the plaintiffs want the court to order, among a long list of things, caseworker recruitment and retention measures like "structured

career progression," "salary parity with comparable state positions," and "financial incentives for remote areas"; a strict 15-child cap on caseloads; a "structured training program," "standardized assessment," "shadowing period," and "[a]nnual continuing education" for caseworkers; a "data-driven placement matching process"; and a "comprehensive, readily accessible database." Pls.' Supp. Resp. to Defs.' First Set of Interrogatories, Ex. AB to Defs.' Mot. for Summ. J. on Counts One and Two at 3-11, *Jeremiah M.*, No. 3:22-cv-00129-SLG (Mar. 17, 2025), ECF No. 232-31. They also want the court to order that "Alaska's overall rate of maltreatment in care should not exceed the national average," that the "rate of placement stability shall meet or exceed national standards," and that the agency "ensure equitable access to services across all regions of Alaska" (even though remote areas lack service providers and the court cannot create them).[1] *Id*. These are all matters of policy and resource balancing that would require long-term court oversight of on-the-ground state agency practices disconnected from any legal standards in federal law.

Such wide-ranging and intrusive injunctive relief raises at least four intertwined federalism and institutional competence concerns.

---

[1] Some of this requested relief is a moving target not within state control, and thus also contravenes the "bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41 (1976)).

First, child welfare is traditionally the province of the states, not the federal government. "Family relations are a traditional area of state concern." *Moore v. Sims*, 442 U.S. 415, 435 (1979). "[R]egulation of domestic relations" is "an area that has long been regarded as a virtually exclusive province of the States." *United States v. Windsor*, 570 U.S. 744, 766 (2013) (quoting *Sosna v. Iowa*, 419 U.S. 393, 404 (1975)). "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States, and not to the laws of the United States." *In re Burrus*, 136 U.S. 586, 593–94 (1890). Federal courts should hesitate before wresting away large swaths of the states' traditional control in this area. *See Missouri v. Jenkins*, 515 U.S. 70, 138 (1995) (Thomas, J., concurring) (opining that a federal court's "[u]surpation" of an area of "traditionally local control" "not only takes the judiciary beyond its proper sphere, it also deprives the States and their elected officials of their constitutional powers").

Second, these cases entangle federal courts in long-term state agency administration rather than producing straightforward injunctions that agencies can follow. *See Brown v. Plata*, 563 U.S. 493, 555 (2011) (Scalia, J., dissenting) (explaining that "[s]tructural injunctions" depart from the "historical practice," of courts issuing only injunctions requiring a single simple affirmative act, instead "turning judges into long-term administrators of complex social institutions such as schools, prisons, and police departments" and requiring "judges to play a role

5

essentially indistinguishable from the role ordinarily played by executive officials"). District courts appoint monitors to oversee state agencies indefinitely, rather than terminating court involvement after issuing targeted relief. *See, e.g., M.D. ex rel. Stukenberg v. Abbott*, 119 F.4th 373, 395 (5th Cir. 2024) ("Nearly a decade has passed since the district court entered its first judgment ordering remedial relief. The state has been under constant, intrusive, and costly surveillance by a team of monitors and the district court ever since.").

As one example, in *M.D.*, another case brought by lead plaintiffs' counsel, Texas was ordered to implement a litany of reforms with the district court retaining jurisdiction until after monitors certify its compliance. *See* Pls.' Litigation Summaries, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-00084 (S.D. Tex. Feb. 26, 2025), ECF Nos. 1614-1 & 1614-2. Today, the parties continue to disagree about Texas's compliance, the case has spawned four Fifth Circuit appeals, and the monitors continue to submit invoices for Texas to pay. *See id.*; Docket in *M.D.*, No. 2:11-cv-00084 (S.D. Tex.). Canvassing this lamentable history, the Fifth Circuit commented that "as a general rule of law federal judges are not allowed to become permanent de facto superintendents of major state agencies." *M.D.*, 119 F.4th at 395. Maryland has similarly been operating under a series of federal court consent decrees since the 1980s but still has not satisfied the "Independent Verification Agent" that it has sufficiently met the "40 Exit Standards and 86

6

additional Internal Success Measures" for the "three consecutive reporting periods" required to exit the decree's current iteration. *See* Certification Report for Defs.' 70th Compliance Report at 13, *L.J. v. Massinga*, No. 1:84-cv-04409-SAG (D. Md. July 16, 2024), ECF No. 71-1, https://bit.ly/3YNnJYt; *see also Summary of child welfare class action litigation*, Casey Fam. Programs, (Mar. 11, 2025), https://www.casey.org/class-action-summaries-2025update/ (listing 20 states or localities "operating under court oversight"). These are far from targeted orders remedying specific violations of federal law.

Third, such long-term administration of a child welfare system is not a judicial task—it is an executive and legislative one. *See Jenkins*, 515 U.S. at 132 (Thomas, J., concurring) ("There simply are certain things that courts, in order to remain courts, cannot and should not do."). The district court here correctly recognized that judges cannot "develop public policy, write budgets, [or] hire caseworkers." *Jonathan R.*, 2025 WL 655811, at \*1, \*5. Nor are judges "suited, by training or temperament, to manage institutions, personnel, or the provision of vital state services, even if counselled by monitors." *M.D.*, 119 F.4th at 395. Judges are not "'better qualified than appropriate professionals in' administering an institution." *Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 55 (1st Cir. 2014) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982)); *see also Brown*, 563 U.S. at 558 (Scalia, J., dissenting) ("Three years of law school and familiarity with

pertinent Supreme Court precedents give no insight whatsoever into the management of social institutions."). Article III does not "confer on federal judges some 'amorphous' power to supervise 'the operations of government' and reimagine [them] from the ground up." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 40 (2021). The proper role of courts is narrower.

Fourth, such relief intrudes into state budget allocation. "Sensitive federalism concerns" are "heightened" when "a federal court decree has the effect of dictating state or local budget priorities" because "[s]tates and local governments have limited funds," so "[w]hen a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs." *Horne v. Flores*, 557 U.S. 433, 448-49 (2009); *see also Jenkins*, 515 U.S. at 133 (Thomas, J., concurring) ("Federal judges cannot make the fundamentally political decisions as to which priorities are to receive funds and staff . . ."); *M.D.*, 119 F.4th at 395 ("Federal judges should not be personally allocating resources from the state's taxpayers for purposes not directly tied to and controlled by the state itself in order to abide by a court decree."). The state legislature is supposed to hold the power of the purse and allocate the state budget—which is not unlimited—among many vital competing uses. The district court in the Alaska case rejected these concerns with the comment that it must enforce federal law even though "compliance with the Constitution may be

expensive." *Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1089 (D. Alaska 2023). But taking over long-term state administration as described above goes far beyond just ordering "compliance with the Constitution." For example, the Alaska plaintiffs—like those here—want the district court to commission a "report" to "determine the exact needs of the Alaska child welfare system," thus essentially inserting the court (and the plaintiffs' counsel) directly into the State's broader policy and budgeting decisions rather than ordering it to fix specific legal violations. *See* Ex. AB to Defs.' Mot. for Summ. J. on Counts One and Two at 3-4, *Jeremiah M.*, No. 3:22-cv-00129-SLG (Mar. 17, 2025), ECF No. 232-31.

Of course, federal courts can remedy violations of federal law in the child welfare context by ordering relief tailored to redress identified legal injuries of identified plaintiffs. But that is not what child welfare class actions like this one seek. They seek something much broader: for federal courts to take over state child welfare systems to try to improve their general functioning. The district court here correctly concluded that this is not an Article III court's role.

## II. Expensive federal litigation does not improve child welfare.

In addition to being outside jurisdictional bounds, federal court takeovers of state child welfare systems are simply ineffective. The perpetual challenges that face child welfare agencies cannot be fixed by federal court fiat. This kind of litigation depletes public budgets and lines attorneys' pockets without helping kids.

Child welfare work is inherently hard. Agencies across the country face challenges like high caseworker turnover and difficulty recruiting and retaining foster homes, compounded by pervasive societal issues like the COVID-19 pandemic and the opioid crisis. *See* Expert Report of Jon Rubin at 11-18, Ex. A to Defs.' Mot. for Summ. J. on Counts One and Two, *Jeremiah M.*, No. 3:22-cv-00129-SLG (Mar. 17, 2025), ECF No. 232-2; Expert Report of James T. Dimas at 23-24, Ex. AC to Defs.' Mot. for Summ. J. on Counts One and Two, *Jeremiah M.*, No. 3:22-cv-00129-SLG (Mar. 17, 2025), ECF No. 232-32; Quality Improvement Ctr. for Workforce Dev., *The Child Welfare Workforce Crisis – What We're Hearing from the Field* (June 20, 2022), https://bit.ly/42cgwlC (noting that most states "reported that turnover and the vacancy rate for frontline workers has increased since the start of the pandemic"). The job of a front-line caseworker dealing with families in crisis is intrinsically demanding. And foster home turnover is high because, among other reasons, many foster parents hope to adopt, at which point they will often stop providing foster care, or they only take in relatives or children otherwise known to them (kinship care).

A federal court cannot command such challenges out of existence. As the Seventh Circuit has observed, "short of ordering the state to come up with more money," it is hard to see what value a federal court could add to solving these problems. *Ashley W. v. Holcomb*, 34 F.4th 588, 594 (7th Cir. 2022). Ordering a

state to "come up with more money" is not appropriate given the federalism concerns discussed above, and a million dollars spent complying with a federal court decree is a million dollars not spent on worthy goals like preventing families from falling into crisis to begin with. *See* Expert Report of James T. Dimas, *supra*, at 21-22 (noting that compliance comes at the expense of prevention efforts).

Money is not even the primary issue behind many challenges that child welfare agencies face: a federal court order cannot conjure up a larger, more qualified workforce or a wider variety of service providers in communities with dispersed rural populations. *See id*. at 17-21 (observing that federal court decrees cannot "change a state's population density or the population-driven economic realities of service availability"); *cf. Disability Rts. Fla., Inc. v. Palmer*, No. 4:18-cv-342-RH/CAS, 2019 WL 11253085, at *7 (N.D. Fla. Aug. 29, 2019) (observing that "consumers of products and services have fewer choices in rural areas" and that "[i]ncreasing reimbursement rates might increase availability" of services in such areas "but might not—and the rate that would be required to make services available to an individual at a given location is unknowable").

Child welfare agencies are already subject to extensive oversight that makes layering on federal court oversight redundant. The Alaska plaintiffs, for example, want the federal court to commission a "report" on the needs of Alaska's child welfare system, and to order the State to "conduct an assessment" of its hiring

11

requirements and "identify and implement a plan for addressing necessary changes." *See* Ex. AB to Defs.' Mot. for Summ. J. on Counts One and Two at 3-4, *Jeremiah M.*, No. 3:22-cv-00129-SLG (Mar. 17, 2025), ECF No. 232-31. But the federal government already demands such reports and assessments from states. *See* Child.'s Bureau, *Monitoring*, https://acf.gov/cb/training-technical-assistance/monitoring (last visited June 12, 2025). To receive funding under Title IV-B of the Social Security Act, states must create five-year plans to strengthen their child welfare systems. *See, e.g.*, Alaska Off. of Child.'s Servs., *2025-2029 Child and Family Services Plan*, https://dfcs.alaska.gov/ocs/Documents/Child-and-Family-Services-Plan-2025-2029.pdf. Each year, states submit reports explaining their progress under their five-year plans. *See, e.g.*, Alaska Off. of Child.'s Servs., *Alaska's Fourth Annual Progress and Services Report to the 2020-2024 CFSP*, https://dfcs.alaska.gov/ocs/Documents/Final-Annual-Report-to-the-2020-2024-CFSP.pdf. The federal Children's Bureau also conducts a periodic review of state child welfare systems, after which states must develop and submit five-year "program improvement plans" with strategies to address aspects needing improvement, and annual progress reports. *See* Child.'s Bureau, *Child & Family Services Reviews (CFSRs)*, https://acf.gov/cb/monitoring/child-family-services-reviews (last visited June 12, 2025). States can also be audited under Title IV-E, which examines the state's foster care eligibility determinations, and investigated

12

by the Inspector General. *See* Child.'s Bureau, *Title IV-E Reviews*, https://acf.gov/cb/monitoring/title-ive-reviews (last visited June 12, 2025). Alaska (and other states) similarly require reports on systemic issues under state law. *See, e.g.*, Alaska Office of Children's Services' Annual Report to the Legislature, Ex. M to Defs.' Mot. for Summ. J. on Counts One and Two, *Jeremiah M.*, No. 3:22-cv-00129-SLG (Mar. 17, 2025), ECF No. 232-16.

Not only is federal court oversight redundant, but federal litigation is very expensive, consuming limited resources that could be better spent actually serving children. *See Wyatt B. v. Kotek*, No. 6:19-cv-00556-AA, 2024 WL 4867082, at *1 (D. Or. Nov. 22, 2024) (noting that Oregon spent over $18 million in attorneys' fees over "five years of frequently bitter litigation," and awarding the plaintiffs attorneys' fees of over $10 million). Compliance with federal court decrees (whether under settlements or otherwise) is even more expensive. Texas, for example, has paid $272,505,824 to implement the orders in M.D., of which approximately $75 million are monitor fees. *See* Texas Department of Family and Protective Services, *88th Legislature, Regular Session Quarterly Report on Court Monitor Fees, Fiscal Year 2025 Quarter 2* at 3-5 (May 2025), https://www.dfps.texas.gov/About_DFPS/Reports_and_Presentations/Rider_Repor ts/documents/2025/2025-05-23_Court_Monitor_Fees_Report_FY25_Q2.pdf; *M.D.*, 119 F.4th at 384. The average estimated amount of legal costs alone is $15

million, along with "millions more to manage data requirements and invest in capacity building needed to comply with terms and outcome measures." *How can child protection agencies respond to litigation?*, Casey Fam. Programs, (Jan. 4, 2021), https://www.casey.org/litigation-response/. And the average decree lasts over a decade. *Id*.

Despite their eye-popping expense, the consent decrees that these federal cases produce do not improve child welfare outcomes. *See Summary of child welfare class-action litigation*, Casey Fam. Programs, (Feb. 28, 2024), https://www.casey.org/class-action-summary/; John Bursch & Maura Corrigan, *Rethinking Consent Decrees*, Am. Enter. Inst. (June 2016), https://bit.ly/35849bv. Rigid consent decree mandates introduce tension with child welfare goals—for example, requiring an agency to place children more quickly could result in less stable placements. *See* Bursch & Corrigan, *supra*, at 9; Expert Report of James T. Dimas, *supra*, at 31-32. And data reveals that consent decrees do not improve performance on federal performance metrics. *See id*. at 13-16 (finding this based on federal data).

Consent decrees can also discourage innovation, critical thinking, and creative problem solving in favor of a compliance mindset. *See id*. at 24-28. The director of the Washington, D.C., child welfare agency described the "cloud" of working under one. *See* Brenda Donald, *Leading Under a Cloud*, in *Collaboration,*

*Innovation, & Best Practices: Lessons and Advice from Leaders in Child Welfare* 47, 47-54 (C. James-Brown & J. Springwater eds., 2019), https://bit.ly/42uiA9R (last visited June 12, 2025). She explained that "[m]anaging a lawsuit requires an inordinate amount of time, money, and the ability to keep the agency motivated and focused on the bigger picture. It's also a defensive posture, which is typically not a winning strategy for driving positive, lasting change." *Id*. at 50. Decrees can hamper evolution, as an old order "cannot possibly include the critical elements of a 21st-century, high-performing child welfare agency" *Id*. at 49; *see also* Bursch & Corrigan, *supra*, at 10 (noting the "hidden cost of completing paperwork necessary to show compliance" and "the cost to caseworker morale, effectiveness, and turnover, of spending time filling out forms rather than caring for children"); *Lewis v. Casey*, 518 U.S. 343, 385 (1996) (Thomas, J., concurring) ("Broad remedial decrees strip state administrators of their authority to set long-term goals for the institutions they manage and of the flexibility necessary to make reasonable judgments on short notice under difficult circumstances.").

Increasing the cost and decreasing the flexibility of a state's child welfare system by federal decree could also have the unintended consequence of reducing the number of children that the state removes from dangerous homes. In New Jersey, after 20 years of federal court oversight, commentators noted "a vast reduction in the number of kids in foster care—from more than 10,000 to fewer

than 3,000 in that period." Sarah A. Font, Naomi Schaefer Riley, *See No Harm*, City Journal (Jan. 31, 2024), https://www.city-journal.org/article/a-closer-look-at-new-jerseys-child-welfare-system. A child is not better off simply left with an abusive parent than removed into a foster care system with a caseworker who would be overseeing one too many children according to a federal decree.

State-specific factors can make federal decrees designed by outside advocacy groups particularly unworkable. Just as the district court here recognized that West Virginia's foster care system "is burdened by uniquely West Virginia problems," Alaska's is likewise burdened by uniquely Alaska problems. *Jonathan R.*, 2025 WL 655811 at *10. Alaska's vastness, geography and climate present unique challenges—difficult for outsiders to grasp—that can make it especially hard to meet the needs of families in crisis. Caseworkers often must travel by boat (or drive on frozen rivers in winter), small aircraft, or all-terrain vehicle. *See* Expert Report of Jon Rubin, *supra*, at 20 ("Prior to visiting Alaska, I have never seen a child welfare office that keeps boats outside their office so that staff could access villages when the weather permitted, as I observed in Bethel."). Federal courts are not better poised to tackle such local challenges.

Add to this that in Alaska—home to 40 percent of the nation's Tribes—the State has compacted with several Alaska Native Tribes to assure the well-being of their children in culturally responsive ways. *See* Expert Report of James T. Dimas,

*supra*, at 17-18. Federally imposed requirements based on lower-48 assumptions would prove unworkably inflexible in Alaska, threatening this careful balance. *See id*. 17-21. For example, given Alaska's limited infrastructure, the "uniform licensing requirements that attend most consent decrees" could "inadvertently decrease Alaska's stock of culturally appropriate foster homes." *Id*. at 20.

And of course, federal decrees cannot address the roots of societal problems that put children in foster care in the first place. Federal judges have no special powers to remedy inadequate health care, unemployment, multi-generational trauma and poverty, poor education, substance use, crime, domestic violence, erosion of community, or untreated mental health disease. *See id*. at 5, 21-22.

The Court should affirm the district court's dismissal order.

III. **Child welfare lawsuits do not make proper class actions.**

If the Court reaches West Virginia's cross-appeal, it should reverse class certification. The general class includes "all West Virginia foster children who are or will be in foster care custody of" West Virginia's child welfare agency, and the Americans with Disabilities Act (ADA) subclass encompasses "all members of the General Class who have physical, intellectual, cognitive, or mental health disabilities, as defined by federal law." *Jonathan R. v. Justice*, 344 F.R.D. 294, 318 (S.D.W.V. 2023). Such broad classes ignore the widely different circumstances of foster children*,* lumping them together at odds with key class action requirements.

The district court erred by characterizing intractable problems facing many child welfare agencies—shortages of staff, foster homes, and community-based service providers—as agency *practices* that could sustain classwide substantive due process and ADA claims, ignoring the divergent impact of such problems on different children. Although the court recognized its obligation to "examine the precise nature of the class members' underlying claims" at the certification stage and acknowledged that "[t]his assessment requires the court to 'identify the elements of the class members' case-in-chief," *id*. at 304, it incorrectly deferred to the merits stage critical questions about whether the challenges facing West Virginia's agency constitute classwide practices within its control.

## A.    Commonality is absent.

The commonality prerequisite for class certification demands that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,' " not "merely that they have all suffered a violation of the same provision of law." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Just claiming that the defendant frequently injures class members by failing in its legal obligations is not enough. A "pattern of individualized deficiencies" does not "prove the existence of a common question for class certification." *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 207 (4th Cir. 2024). Without " 'a

18

uniform policy or practice' that drives the alleged harm to all class members," a plaintiff cannot show that all have suffered the same injury. *Id*. (quoting *Parent/Prof'l Advocacy League (PPAL) v. City of Springfield*, 934 F.3d 13, 30 (1st Cir. 2019)). "Allegations of individual instances of mistreatment, without sufficient evidence, do not constitute a systemic deficiency or overarching policy of wrongdoing." *Willis v. City of Seattle*, 943 F.3d 882, 885–86 (9th Cir. 2019) (holding that alleged "practices" of "failing to provide adequate notice" and "destroying personal property" in "sweeps" of homeless encampments did not support commonality because they did not "appl[y] uniformly to all proposed class members" and there was "no evidence that every [class member] experienced the same challenged practice or suffered the same injury"). Commonality is not satisfied where claims are "'based on multiple, disparate failures to comply with . . . obligations rather than a truly systemic policy or practice.'" *PPAL*, 934 F.3d at 31 (quoting *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013)). In other words, unless the defendant applies some consistent policy or practice across the board to all class members—thereby harming *all* class members *in the same way*—commonality is absent.

The district court concluded that commonality was satisfied here on the theory that West Virginia's "policies and practices" included "maintain[ing] an inadequate array of placements to meet the needs of … foster children," "high

caseloads and chronic understaffing," and failing to provide " 'ready access to community-based mental and behavioral health services and professionals' and therapeutic treatment." *Jonathan R.*, 344 F.R.D. at 305, 308, 311. The plaintiffs in the Alaska case similarly invoke difficulties faced by Alaska's child welfare agency as purported "policies" or "practices." *See* Mem. of Law in Support of Pls.' Mot. for Class Certification, *Jeremiah M. v. Kovol*, No. 3:22-cv-00129-SLG (Nov. 15, 2024), ECF No. 135.

But not every child welfare problem or challenge that allegedly causes harm to many class members amounts to a "policy" or "practice" of a state agency. A "policy" or "practice" means "a uniformly applied, official policy" or "an unofficial yet well-defined practice that drives the alleged violation." *PPAL*, 934 F.3d at 29; *accord G.T.*, 117 F.4th at 203; *see Wal-Mart*, 564 U.S. 338 (holding that commonality required the plaintiffs to prove that the defendant "operated under a policy of discrimination"). "While commonality may be established based on a 'pattern of officially sanctioned ... [illegal] behavior,' . . . merely pointing to a pattern of harm, untethered to the defendant's conduct, is insufficient." *C.R. Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1104 (9th Cir. 2017) (quoting *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014)).

For example, if a state uniformly refuses to pay for dental appointments for foster children, that could be a "policy" or "practice" supporting commonality. But

if some percentage of foster children do not receive annual dental appointments for a variety of reasons, including challenges like a shortage of dentists in the state, that does not by itself show a state "policy" or "practice." *See G.T.*, 117 F.4th at 203 (holding that, after *Wal-Mart*, a "pattern and practice of failing to provide" a required service is *not* sufficient to support commonality (quoting *DL*, 713 F.3d at 126)); *PPAL*, 934 F.3d at 30 (holding that expert testimony about a "pattern of legal harm common to the class" was insufficient to establish commonality because it did not "identify[] a particular driver" of the alleged harm in the form of a "uniform policy or practice that affects all class members" (citation omitted)). In that situation, the state's *policy* might be to provide the appointments, but challenges like provider shortages might mean that not all children always receive them. The question of whether the state violated an alleged duty to provide appointments would need to be litigated on an individual basis because not always succeeding is not equivalent to a classwide "policy" or "practice" of failure.

A plaintiff cannot establish a "policy" or "practice" for purposes of commonality just by showing that persistent problems exist—for example, that an agency has not managed to fill all caseworker vacancies or has not recruited enough foster homes in all communities—with no showing of classwide agency conduct driving the problems. What child welfare class action plaintiffs often describe as "policies" and "practices" are in fact things like stubbornly challenging

workforce conditions faced by all employers. A state child welfare agency does not control many factors, such as the availability of private service providers. It cannot force more people to serve as caseworkers, more families to take in foster children, or more service providers to open practices.

In *J.B. ex rel. Hart v. Valdez*, a putative class of foster children argued that "systemic failures" in the state's delivery of "legally-mandated services" to foster children was sufficient for commonality. 186 F.3d 1280, 1289 (10th Cir. 1999). The Tenth Circuit disagreed, explaining: "We refuse to read an allegation of systemic failures as a moniker for meeting the class action requirements." *Id*. The same applies here: purported systemic failures are not a "policy" or "practice" that causes all class members to suffer "the same injury" (or even any injury).

Take the alleged failure to provide " 'ready access to community-based mental and behavioral health services and professionals' and therapeutic treatment," that the district court held was a policy or practice sufficient to support class certification. *Jonathan R.*, 344 F.R.D. at 311. The Alaska plaintiffs likewise point to service array gaps as a "policy." *See* Mem. of Law in Support of Pls.' Mot. for Class Certification at 50-52, *Jeremiah M. v. Kovol*, No. 3:22-cv-00129-SLG (Nov. 15, 2024), ECF No. 135. But child welfare agencies are *consumers* of community-based services, not *providers*. They need services for the children and

families in their care, but they do not establish or maintain services, like counseling or substance use treatment centers.

Instead, such services are typically provided by the private sector and their distribution is governed by many factors beyond the control of child welfare agencies (or any part of state government), like population density and qualified workforce availability. Many of Alaska's residents, for example, live in rural communities that struggle to attract service providers because their population is too small to create sufficient demand or to supply the necessary workforce or amenities. The inability of Alaska's child welfare agency to make it economically viable or attractive for providers to set up shop in these remote communities does not mean that Alaska has a "policy or practice" of failing to provide community-based services. Nor does West Virginia.

Conflating challenges facing child welfare agencies with agency policies and practices also ignores the requirement to show that all class members have suffered "the same injury." *Wal-Mart*, 564 U.S. at 350. Just as the lack of community-based services in rural areas of West Virginia and Alaska is not the product of agency policies or practices, the gaps in service array are not uniform across these states and therefore do not inflict "the same injury" on all class members.

Consider that the district court certified an ADA subclass of all foster children with disabilities. *Jonathan R.*, 344 F.R.D. at 318. Such a broad class

includes children with widely varying needs living in different communities with different service arrays. For example, a child with developmental delays might require speech therapy, and a child experiencing PTSD might need trauma-informed counseling. If they live in urban centers, they will likely both have access to those services. But if they live in small, remote communities they will likely both need to travel to access them. Or, in a mid-sized community, one child's needed service might be available locally and the other's not.

Unlike an agency policy or practice that applies to all foster children, deficiencies in services or foster homes or caseworkers—which are not uniform across a state and impact different children differently—do not inflict "the same injury" on all class members. Even in states with frequent such deficiencies, some foster children will nonetheless have a single competent caseworker and a single foster placement in a community with all needed services. Not only have such class members not suffered the "same injury" as others; they have not been injured at all. With no state policy or practice injuring all class members in the same way, the plaintiffs have not established commonality.

**B.     An appropriate classwide injunction is impossible.**

Plaintiffs seeking Rule 23(b)(2) class certification must also show that the defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Under Rule 65(d), every injunction must "state its terms specifically" and "describe in reasonable detail" the "act or acts restrained or required" so that the enjoined party is fairly apprised and the court can objectively assess compliance. Fed. R. Civ. P. 65(d)(1). Together, these rules require that the harms alleged "can be addressed in a[] single injunction that need not differentiate between class members" without having to "formulat[e] an injunction at a stratospheric level of abstraction" to avoid individualized issues. *Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008). But where, as here, a putative class challenges a constellation of alleged failures without identifying any unifying policy or practice driving them, there is no defendant "conduct" that could be "remedied by a single classwide order" meeting these requirements. *See Wal-Mart*, 564 U.S. at 361.

To use one of the examples mentioned above, if plaintiffs seeking class certification show that a state child welfare agency has a policy of not paying for dental appointments for foster children—i.e., an identifiable policy which applies uniformly to all class members—a district court could provide viable classwide relief by enjoining that classwide policy. But if the plaintiffs instead show just that (for a variety of reasons) foster children do not always receive adequate dental care, the defendant has not "acted or refused to act on grounds that apply generally to the class" and no viable classwide injunction can be crafted. *See* Fed. R. Civ. P.

23(b)(2). An injunction to "provide adequate dental care to all foster children" would not be appropriate because (a) many class members already get adequate dental care, (b) whether a given child's care is "adequate" can only be determined on an individual basis, and (c) "adequate" is too vague to satisfy Rule 65(d).

The injunctive relief requested in this case is inappropriate in just this way: it would not redress *classwide* injuries and compliance could not be assessed on a *classwide* basis. For example, the plaintiffs ask the court to order West Virginia to "ensure" that all foster children are placed in a "safe" home or facility and "adequately" monitored. *See* Complaint at 100–03, *Jonathan R. v. Justice*, No. 3:19-cv-00710 (S.D.W.V. Sept. 30, 2019), ECF No. 1. But many foster children are already placed in safe homes and adequately monitored (because West Virginia has no policy to the contrary), and whether placements are "safe" and "adequately" monitored can only be assessed based on the facts of each individual child's case.[2] Similarly, the plaintiffs ask the court to order West Virginia to "ensure" that all ADA subclass members receive services "in the most integrated setting appropriate to the child's needs." *Id*. But again, many foster children with disabilities already

---

[2]     Indeed, many class members, depending on their circumstances, have never been harmed and face no imminent and substantial risk of harm that would even give them Article III standing to seek such injunctive relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.").

receive services in appropriate settings (because West Virginia has no policy to the contrary) and the needs of (and appropriate settings for) such children vary widely and can only be assessed individually. The Alaska plaintiffs seek relief with the same flaws. *See* First Am. Compl. at 91–94, *Jeremiah M. v. Crum*, No. 3:22-cv-00129-JMK (D. Alaska July 15, 2022), ECF No. 16.

Such injunctions could not be implemented uniformly classwide because individualized assessments are needed to determine "necessary" services and "appropriate" placements. *Cf. Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 507–08 (D. Neb. 2007) (explaining that "there is nothing to be gained by permitting class certification" where relief would direct things like exercising "reasonable professional judgment" on behalf of each child such that "any later attempt of any child seeking to enforce the judgment, or to find the State in contempt, would require th[e] court to review that child's unique circumstances").

"The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360. Such classwide relief is possible when plaintiffs identify a real policy or practice of the defendant that applies uniformly to the entire class and could be enjoined classwide. That is not so here.

Where class action plaintiffs have trouble specifying proper injunctive relief, that "highlights the fact that individualized issues . . . overwhelm class cohesiveness." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). Abstract injunctions that do not target real policies or practices—instead amounting to admonitions to "do better" and "fix everything for everyone"—do not satisfy Rules 23(b)(2) and 65(d).

## CONCLUSION

These cases do not belong before the federal judiciary. The Court should affirm the dismissal or, in the alternative, reverse the class certification.

RESPECTFULLY SUBMITTED June 20, 2025.

STATE OF ALASKA
TREG TAYLOR
ATTORNEY GENERAL

By: */s/ Laura Fox*
Laura Fox
Margaret Paton Walsh
Katherine Demarest
Assistant Attorneys General
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
(907) 269-6612 phone
(907) 276-3697 fax

*Counsel for Amicus Curiae*
STATE OF ALASKA

Counsel for joining amici states:

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA

TIM GRIFFIN
ATTORNEY GENERAL OF ARKANSAS

KATHLEEN JENNINGS
ATTORNEY GENERAL OF DELAWARE

JAMES UTHMEIER
ATTORNEY GENERAL OF FLORIDA

CHRISTOPHER M. CARR
ATTORNEY GENERAL OF GEORGIA

BRENNA BIRD
ATTORNEY GENERAL OF IOWA

RAÚL LABRADOR
ATTORNEY GENERAL OF IDAHO

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

LIZ MURRILL
ATTORNEY GENERAL OF LOUISIANA

LYNN FITCH
ATTORNEY GENERAL OF MISSISSIPPI

MICHAEL T. HILGERS
ATTORNEY GENERAL OF NEBRASKA

JOHN FORMELLA
ATTORNEY GENERAL OF NEW HAMPSHIRE

DREW WRIGLEY
ATTORNEY GENERAL OF NORTH DAKOTA

ALAN WILSON
ATTORNEY GENERAL OF SOUTH CAROLINA

KEN PAXTON
ATTORNEY GENERAL OF TEXAS

# CERTIFICATE OF COMPLIANCE

This brief contains 6,492 words, excluding the items exempted by FRAP

32(f). The brief's size and typeface comply with FRAP 32(a)(5) and (6).

*/s/ Laura Fox*
Laura Fox

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on June 20, 2025.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

*/s/ Laura Fox*
Laura Fox