**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 25-1232**

———————

JONATHAN R., minor, by Next Friend, Sarah Dixon; ANASTASIA M., minor, by Next Friend, Cheryl Ord; SERENA S., minor, by Next Friend, Sarah Dixon; THEO S., minor, by Next Friend, L. Scott Briscoe; GARRETT M., minor, by Next Friend, L. Scott Briscoe; GRETCHEN C., minor, by Next Friend, Cathy L. Greiner; DENNIS R., minor, by Next Friend, Debbie Stone; CHRIS K., CALVIN K., and CAROLINA K., minors, by Next Friend, Katherine Huffman; KARTER W., minor, by Next Friend, L. Scott Briscoe; ACE L., minor, by Next Friend, Isabelle Santillion; and individually and on behalf of all others similarly situated,

Plaintiffs – Appellants,

v.

PATRICK MORRISEY, in his official capacity as the Governor of West Virginia; ALEX J. MAYER, in his official capacity as Secretary of the West Virginia Department of Human Services; CAMMIE CHAPMAN, in her official capacity as Deputy Secretary of the Department of Health and Human Resources; LORI BRAGG, in her official capacity as Interim Commissioner of the Bureau for Social Service; WEST VIRGINIA DEPARTMENT OF HUMAN SERVICES,

Defendants - Appellees.

----------------------------

LAW SCHOLARS; THE NATIONAL CENTER FOR YOUTH LAW AND 32 ADDITIONAL ORGANIZATIONS; THE ARC OF THE UNITED STATES; THE CENTER FOR PUBLIC REPRESENTATION; THE NATIONAL HEALTH LAW PROGRAM; THE JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW,

Amici Supporting Appellants.

THE LIBERTY JUSTICE CENTER; STATES OF ALASKA; ALABAMA; ARKANSAS; DELAWARE; FLORIDA; GEORGIA; IDAHO; IOWA; KANSAS;

LOUISIANA; MISSISSIPPI; NEBRASKA; NEW HAMPSHIRE; NORTH DAKOTA; SOUTH CAROLINA; TEXAS,

Amici Supporting Appellees.

------

**No. 25-1239**

------

JONATHAN R., minor, by Next Friend, Sarah Dixon; ANASTASIA M., minor, by Next Friend, Cheryl Ord; SERENA S., minor, by Next Friend, Sarah Dixon; THEO S., minor, by Next Friend, L. Scott Briscoe; GARRETT M., minor, by Next Friend, L. Scott Briscoe; GRETCHEN C., minor, by Next Friend, Cathy L. Greiner; DENNIS R., minor, by Next Friend, Debbie Stone; CHRIS K.; CALVIN K., and; CAROLINA K., minors, by Next Friend, Katherine Huffman; KARTER W., minor, by Next Friend, L. Scott Briscoe; ACE L., minor, by Next Friend, Isabelle Santillion,

Plaintiffs – Appellees,

PATRICK MORRISEY, in his official capacity as the Governor of West Virginia; ALEX J. MAYER, in his official capacity as Secretary of the West Virginia Department of Human Services; LORI BRAGG, in her official capacity as Interim Commissioner of the Bureau for Social Services; CAMMIE CHAPMAN, in her official capacity as Deputy Secretary of the Department of Health and Human Resources; WEST VIRGINIA DEPARTMENT OF HUMAN SERVICES,

Defendants – Appellants.

-----------------------------------

THE LIBERTY JUSTICE CENTER; STATES OF ALASKA; ALABAMA; ARKANSAS; DELAWARE; FLORIDA; GEORGIA; IDAHO; IOWA; KANSAS; LOUISIANA; MISSISSIPPI; NEBRASKA; NEW HAMPSHIRE; NORTH DAKOTA; SOUTH CAROLINA; TEXAS,

Amici Supporting Appellants.

LAW SCHOLARS; THE NATIONAL CENTER FOR YOUTH LAW AND 32 ADDITIONAL ORGANIZATIONS; THE ARC OF THE UNITED STATES; THE CENTER FOR PUBLIC REPRESENTATION; THE NATIONAL HEALTH LAW PROGRAM; THE JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW,

Amici Supporting Appellees.

---

Appeals from the United States District Court for the Southern District of West Virginia, at Huntington.  Joseph R. Goodwin, District Judge.  (3:19-cv-00710)

---

Argued:  September 10, 2025                      Decided:  June 4, 2025

---

Before HARRIS and RUSHING, Circuit Judges, and FLOYD, Senior Circuit Judge.

---

Reversed and remanded by published opinion.   Judge Floyd wrote the opinion in which Judge Harris joined.   Judge Rushing wrote an opinion concurring in the judgment in part and dissenting in part.

---

**ARGUED:**  Laura Welikson, A BETTER CHILDHOOD, New York, New York, for Appellants/Cross-Appellees.  Michael Ray Williams, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellees/Cross-Appellants.  **ON BRIEF:**  Marcia Robinson Lowry, Julia K. Tabor, Robyn Goldberg, John Hazelwood, David Baloche, A BETTER CHILDHOOD, New York, New York; Richard W. Walters, J. Alexander Meade, SHAFFER & SHAFFER, PLLC, Charleston, West Virginia; Nicholas Ward, DISABILITY RIGHTS OF WEST VIRGINIA, Charleston, West Virginia, for Appellants/Cross-Appellees.  John B. McCuskey, Attorney General, Holly J. Wilson, Principal Deputy Solicitor General, Caleb B. David, Deputy Solicitor General, Frankie A. Dame, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellees/Cross-Appellants.  J. Michael Showalter, Sarah L. Lode, Samuel A. Rasche, ARENTFOX SCHIFF LLP, Chicago, Illinois, for Amici the National Health Law Program, the Arc of the United States, the Judge David L. Bazelon Center for Mental Health Law, and the Center for Public Representation.  Hannah Benton Eidsath, Jean Strout, NATIONAL CENTER FOR YOUTH LAW, Oakland, California; Krishna Shah, San Francisco, California, Daniel Albert-Rozenberg, Boston, Massachusetts, Sydney Leigh Martin, Mauni Jalali, Los Angeles, California, Todd Anten, Maura Grealish, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, for Amici National Center for Youth Law and

3

32 Additional Organizations.  Virginia M. Creighton, WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, for Amici Law Scholars.  Reilly Stephens, LIBERTY JUSTICE CENTER, Austin, Texas; Joel S. Nolette, WILEY REIN LLP, Washington, D.C., for Amicus Liberty Justice Center.  Treg Taylor, Attorney General, Laura Fox, Assistant Attorney General, Margaret Paton Walsh, Assistant Attorney General, Katherine Demerest, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALASKA, Anchorage, Alaska, for Amicus State of Alaska.  Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama.  Tim Griffin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas.  Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. James Uthmeier, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF FLORIDA, Tallahassee, Florida, for Amicus State of Florida.  Christopher M. Carr, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF GEORGIA, Atlanta, Georgia, for Amicus State of Georgia.  Brenna Bird, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa, for Amicus State of Iowa.  Raúl Labrador, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IDAHO, Boise, Idaho, for Amicus State of Idaho.  Kris W. Kobach, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amicus State of Kansas.  Liz Murrill, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana, for Amicus State of Louisiana.  Lynn Fitch, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSISSIPPI, Jackson, Mississippi, for Amicus State of Mississippi.  Michael T. Hilgers, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska.  John Formella, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW HAMPSHIRE, Concord, New Hampshire, for Amicus State of New Hampshire.  Drew Wrigley, Attorney General, OFFICE OF THE ATTORNEY GENERAL, Bismarck, North Dakota, for Amicus State of North Dakota. Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina.  Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas.

------------

FLOYD, Senior Circuit Judge:

This appeal is the latest chapter in the lawsuit brought on behalf of thousands of West Virginia's foster children against the state's officials. Having already reversed a prior dismissal of the case in *Jonathan R. ex rel. Dixon v. Justice* (*Jonathan R. I*), 41 F.4th 316 (4th Cir. 2022), we now review a second dismissal by the lower court. This time, at stake is whether the district court is within its power to provide the injunctive and declaratory relief sought by Plaintiffs. Because federal courts not only have the authority, but also a duty, to remedy systemic constitutional rights violations, we reverse.

I.

On September 30, 2019, twelve children in foster care[1] filed a class action complaint in the Southern District of West Virginia against five defendants, including Governor Jim Justice and the West Virginia Department of Health and Human Resources (DHHR). Under Governor Justice's administration, DHHR served as "the legal guardian of children in the state's foster care system." J.A. 149. That agency has since been reorganized and oversight of the foster care system now belongs to the Department of Human Services (DHS).

Plaintiffs' proposed General Class included approximately 6,800 children who were in the foster care custody of the state at the time of filing suit. Plaintiffs proposed three

---

[1] The Complaint included ten Named Plaintiffs: Jonathan R., Anastasia M., Serena S., Theo S., Garrett M., Gretchen C., Dennis R., Karter W., Ace L., and siblings Chris K., Calvin K., and Caroline K. At the time of filing, each was a minor in the custody of West Virginia DHHR.

other subclasses: a "Kinship Subclass" consisting of children placed with relatives, an "ADA Subclass" comprising children with disabilities, and an "Aging Out Subclass" that included children above the age of 14 who were nearing transition out of the program.

The alleged abuses and rights violations within the foster care system are well documented in our previous opinion, *Jonathan R. I.*  For example, in their Complaint, Plaintiffs proffered data showing the 2017 "rate of child deaths related to abuse and neglect per 100,000 children in West Virginia was more than double the national average." J.A. 149.  Plaintiffs also cited abuse, neglect, inadequate foster care placement rates, understaffing, lengthy delays in case assessments, over-reliance on institutional care, and wide-ranging failures to supply in-home physical and mental health services.  Plaintiffs allege these dysfunctional practices deprived them of their Fourteenth Amendment substantive due process rights to "freedom from maltreatment," "services necessary to prevent unreasonable risk of harm," and "treatment and cares consistent with the purpose and assumptions of government custody," among others.  J.A. 238.  In addition, Plaintiffs cited violations of their First Amendment rights to free association and the Ninth Amendment's reservation of rights to the people.  West Virginia's practices also allegedly deprived them of certain federal statutory rights, including those under the Adoption Assistance and Child Welfare Act, 42 U.S.C. § 670; the Americans with Disabilities Act, 42 U.S.C. § 12101; and the Rehabilitation Act, 29 U.S.C. § 794.[2]

---

[2] Plaintiffs' class action was not the first time concerns were raised over West Virginia's foster care system.  The Complaint also alleges that in 2015, the U.S. Department of Justice Civil Rights Division investigated DHHR and published a report finding many similar concerns about the welfare of children in foster care.

Ultimately, Plaintiffs requested declaratory relief; namely, for the court to "declare unconstitutional and unlawful" violations of Plaintiffs' constitutional and statutory rights. J.A. 246–47. Plaintiffs also requested injunctive relief, including but not limited to the following:

i. Require DHHR to contract with an appropriate outside entity to complete a needs assessment of the state's provision of foster care placement and services.

ii. Require that DHHR ensure that all children who enter foster care placement receive within 30 days of entering care a complete and thorough evaluation of the child's needs.

iii. Require that DHHR ensure that all children who enter foster care placement receive within 60 days of entering care an adequate and individualized written case plan for treatment.

iv. Require that DHHR ensure that all children whose case plan identifies a need for services and/or treatment timely receive those services and/or treatment.

v. Require that DHHR shall ensure that all children who are placed in foster care are placed in a safe home or facility and are adequately monitored in accordance with federal standards.

vi. Require that DHHR shall hire, employ, and retain an adequate number of qualified and appropriately trained caseworkers.

vii. Require DHHR to develop an adequate statewide plan, to be approved by [a court-appointed neutral monitor].

J.A. 246–48.[3] In 2023, the district court dismissed the case, first finding that the claims of adopted plaintiffs were moot, then holding that it was "barred from consideration of this

---

[3] Plaintiffs tailored the requested injunctive relief to each of the four subclasses. *See* J.A. 247–250. This quoted list encompasses the injunctive relief requested for the General Class, which is the "major class" in this action. J.A. 157.

case under *Younger* [*v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971),] and its progeny, based on concern that federal court proceedings could interfere with "state-initiated abuse and neglect proceedings." *Jonathan R. v. Justice*, No. 3:19-cv-00710, 2021 WL 3195020, at *5, 8, 14 (S.D. W. Va July 28, 2021), *rev'd Jonathan R. I*, 41 F. 4th 316. We reversed on appeal, holding that neither abstention nor mootness principles precluded federal court review. *Jonathan R. I.*, 41 F.4th at 339–41.

Upon remand, the district court certified Plaintiffs' proposed General Class and ADA Subclass and denied certification to the two other subclasses. The parties proceeded with extensive document discovery and took a total of forty-five depositions. Trial was scheduled for May 6, 2025.

In July 2024, West Virginia filed a motion for summary judgment. Without resolving that motion, the district court *sua sponte* dismissed the case with prejudice for lack of standing in late February 2025 pursuant to Federal Rule of Civil Procedure 12(h)(3).[4] *Jonathan R. v. Morrisey*, 768 F. Supp. 3d 756, 768–70 (S.D. W. Va. 2025). In dismissing the case, the district court neither provided notice to the parties nor gave opportunity for briefing.

The lower court concluded it was powerless under the limitations inherent to Article III of the Constitution to provide the injunctive remedies Plaintiffs sought. *Id.* at 760–61.

---

[4] The district court committed one of several legal errors by dismissing the case with prejudice. "A dismissal for lack of standing—or any other defect in subject matter jurisdiction—must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits." *S. Walk Broadlands Homeowner's Ass'n, Inc. v. OpenBand Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013).

Plaintiffs, therefore, failed to meet the "redressability" requirement necessary for Article III standing. *Id.* at 759. Furthermore, the district court found that not even declaratory judgment would suffice to establish redressability. *Id.* at 769.

Plaintiffs appeal the *sua sponte* dismissal, seeking reversal and reassignment to a different district court judge. West Virginia urges us to affirm the decision of the district court, either based on the court's redressability analysis or in the alternative, because Plaintiffs failed to establish injury in fact. West Virginia also filed a conditional cross-appeal to seek class decertification if we reverse.

## II.

At its core, this appeal is about the extent to which federal courts may intervene in state institutions to remedy rights violations. The district court tethered its vision of restricted judicial power to Article III standing requirements in its dismissal. Under the doctrine of standing, the Constitution requires plaintiffs to establish that: (1) they have suffered an injury in fact, (2) that injury is "fairly traceable" to the defendant's actions, and (3) it is "likely" the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (citation modified). We will first address redressability, the grounds on which the district court dismissed this case. Because we find that Plaintiffs' injuries are redressable, we then turn

9

to West Virginia's alternative argument raised on appeal that Plaintiffs do not establish an injury in fact.[5]

"We review a district court's dismissal for lack of standing de novo." *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009). We analyze a challenge to a plaintiff's standing differently "depending on the stage of litigation at which the challenge is brought." *Overbey v. Mayor of Balt.*, 930 F.3d 215, 227 (4th Cir. 2019). "When standing is challenged on the pleadings," as here, "we accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party."[6] *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018).

A.

This Court's test for redressability is exemplified by the two-step inquiry in *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020), which first assesses whether "the court has the power to grant the plaintiff's requested relief" and second whether "such relief would redress the plaintiff's injury." Both steps require an affirmative response for standing to exist.

---

[5] Neither party challenges the notion that Plaintiffs' injuries are traceable to the state's actions. Because injury in fact and redressability are the only standing elements challenged, we focus on those two elements. *See Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 621 (4th Cir. 2018).

[6] The district court framed its conclusion on redressability within Plaintiffs' Complaint. *Jonathan R.*, 768 F. Supp. 3d at 762 ("Plaintiffs' Complaint asks this court to do many things."), 763 ("This court cannot order the relief Plaintiffs seek.").

The district court ended the *Buscemi* inquiry at step one when concluded it was powerless to "order the relief Plaintiffs seek." *Jonathan R.*, 768 F. Supp. 3d at 763. Yet, despite the district court's assertion that the "Constitution does not permit federal courts to step in and govern" state programs, *id.* at 759, longstanding precedent firmly bestows federal courts with the power to mandate and oversee the reform of state institutions when they systematically deprive citizens of constitutional rights. Upon concluding that the first prong of *Buscemi* is satisfied, we turn to the second prong and ultimately find that Plaintiffs' injuries are redressable.

### 1.

First, we address whether it is within the power of the courts to grant the requested relief. *See Buscemi*, 964 F.3d at 259. In so doing, we consider and respond to each of the district court's legal errors about the extent of its own injunctive authority as derived from Article III. First, precedent establishes a lengthy history of institutional reform decrees in the federal court system spanning most of the last century. Second, modern, binding authority affirms the use of comprehensive institutional reform. Third, the courts may enact expansive reforms including the judicial authority to direct the use of state funds, provided the court follows the guardrails that the Supreme Court has established to guide the exercise of judicial power. Fourth, Plaintiffs' requests fall well within the boundaries of lawful injunctive relief. The district court erred in its contrary conclusions. As such, we reverse the district court's finding that Plaintiffs' claims are not redressable.

i.

The federal courts have a lengthy and robust history of granting injunctive relief akin to Plaintiffs' requested remedies. Though the case needs no introduction, *Brown v. Board of Education* (*Brown I*) resulted in the Supreme Court delivering a sweeping rebuke of widespread Fourteenth Amendment rights violations in segregated school systems. 347 U.S. 483, 495, 74 S. Ct. 686, 98 L. Ed. 873 (1954). At the same time, the Court considered "formulating decrees" as the essential method of remedying these violations. *Id.* One year later, the Supreme Court supplemented its decision with *Brown v. Board of Education* (*Brown II*), 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955), which introduced the machinery of judicial enforcement. The Supreme Court directed "the District Courts to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases." *Id.* at 301. The Court thus ushered in the modern structural reform injunction. John C. Jeffries, Jr. & George A. Rutherglen, *Structural Reform Revisited*, 95 Calif. L. Rev. 1387, 1408 (2007).

As Amici Law Scholars explain, institutional reform litigation expanded beyond the context of school desegregation in the 1960s. Br. of Amici Curiae Law Scholars in Support of Appellants-Plaintiffs at 5. Plaintiffs increasingly targeted state penal systems for Eighth and Fourteenth Amendment rights violations. A "dramatic proliferation of prison decisions" swept across the United States, with courts frequently declaring entire prison systems to be unconstitutional and placing them under comprehensive court-ordered

12

reform.[7]  Malcom M. Feeley & Edward L. Rubin, JUDICIAL POLICY MAKING AND THE MODERN STATE 39–49 (1998).  For example, in *Hutto v. Finney*, 437 U.S. 678, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978), the Supreme Court affirmed the district court's precise policy reform of an Arkansas prison's rules regarding punitive isolation.[8]  *See id.* at 681, 688 ("[W]e find no error in the inclusion of a 30-day limitation on sentences to punitive isolation as a part of the District Court's comprehensive remedy.").

Today, structural reform litigation exists in areas of state administration beyond schools and prisons.  A brief survey of recent consent decrees from across the country is illuminating.[9]  In 2018, the Eastern District of Wisconsin ordered the introduction of over a dozen policy reforms for the Milwaukee Police Department to remedy systemic Fourth Amendment rights violations.  Order and Settlement Agreement, *Collins v. City of Milwaukee*, No. 17-CV-234 (E.D. Wis. July 23, 2018), Dkt. No. 135.  In Ohio, plaintiffs achieved judicial reform of state programs for people with disabilities.  Opinion and Order

---

[7] Plaintiffs found initial success in Arkansas, whereafter "federal courts declared prisons in Mississippi, Oklahoma, Florida, Louisiana, and Alabama to be unconstitutional, in whole or part."  Malcom M. Feeley & Edward L. Rubin, JUDICIAL POLICY MAKING AND THE MODERN STATE 39–40 (1998).  "[F]ederal courts ended up promulgating a comprehensive code for prison management, covering such diverse matters as residence facilities, sanitation, food, clothing, medical care, discipline, staff hiring, libraries, work, and education.  The decisions themselves . . . specify many requirements in . . . painstaking or excruciating detail."  *Id.* at 41.

[8] *Abrogated on other grounds by Dep't of Agric. Rural Dev. Rural Housing Serv. v. Kirtz*, 601 U.S. 42, 56 (2024).

[9] "Consent decrees, of course, are injunctions."  *Juan F. ex rel. Lynch v. Weicker*, 37 F.3d 874, 878 (2d Cir. 1994).  Although consent decrees may contemplate broader reforms than court-ordered injunctions, this survey demonstrates that there are a multitude of options before the district court to order relief that redresses injuries of the type Plaintiffs allege.

Granting Settlement Agreement, *Ball v. DeWine*, No. 2:16-cv-282 (S.D. Ohio Apr. 24, 2020), Dkt. No. 473. Institutional reform litigation has reached child welfare programs as well. Since the 1970s, dozens of cases seeking reform of these programs have culminated in "settlement agreements or consent decrees that have resulted in complete restructurings of the child welfare systems of the affected jurisdictions." Zach Strassburger, *Crafting Complaints & Settlements in Child Welfare Litig.*, 21 U. Pa. J.L. & Soc. Change 219, 221–22 (2018).

Courts across our sister circuits have had occasion to review lawsuits specifically seeking institutional reform of state foster care systems too. In *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 963 (9th Cir. 2019), the Ninth Circuit considered a class action suit brought by ten foster children alleging violations of their constitutional and statutory rights against Arizona state agencies. The Plaintiffs "[sought] to enjoin, under the Due Process Clause, certain state-wide policies that allegedly expose them to a substantial risk of not receiving certain medical services." *Id.* at 978 (Adelman, J., concurring in part and dissenting in part). The Court specifically addressed the issue of standing and found that "[i]f those allegedly deficient policies and practices are abated by an injunction, that harm may be redressed by a favorable court decision. [Class Representative] therefore has standing to press the due process claims she brings on behalf of the General Class." *Id.* at 967.

The Fifth Circuit similarly considered a class action claim brought by foster children in *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237 (5th Cir. 2018). There, the circuit court concluded it was a "responsibility" of the federal courts to "issu[e] permanent injunctions

14

mandating institutional reform." *Id.* at 271. Though the court ultimately modified several measures within the lower court's "expansive injunction," *id.*, it agreed "remedial action [was] appropriate" in the form of injunctive relief. *Id.* at 272. It subsequently approved several of the measures imposing major policy change on the state's Department of Family Protective Services. *Id.* at 273, 276.

ii.

The previous section enumerates numerous examples of federal courts entertaining cases calling for institutional reform and entering orders providing relief for plaintiffs. Yet, the lower court would have us assume most of these efforts are unconstitutional. To the contrary, this Court and the Supreme Court continue to affirm the power of the federal courts to reform state institutions.

The lower court declares that "federal courts 'should not be in the business of administering institutions.'" *Jonathan R.*, 768 F. Supp. 3d at 763 (quoting *Matherly v. Andrews*, 859 F.3d 264, 276–77 (4th Cir. 2017)). Though the court invokes our Circuit's decision in *Matherly* to cast doubt on the court's power to redress Plaintiffs' injuries, contextualizing *Matherly* reveals the case does not in fact question the power of federal courts to order institutional reform. In *Matherly*, the plaintiff asked this Court to impose a legal presumption of "punitive conditions" when prisons confine civil detainees in conditions similar to those of their criminal counterparts. 859 F.3d at 276. We expressed concern, however, that imposing a *presumption* to this effect would improperly haul prison administrators into court "to justify their every move." *Id.* at 275–76. This line in

*Matherly*, therefore, served to protect against judicial encroachment into everyday activities of state officials. *See id.* It did not, however, provide a general rule that courts have no role in overseeing and mandating reform if and when they identify that systemic rights violations are occurring.

In contrast with this view, we have repeatedly affirmed the use of injunctive relief in institutional reform litigation. In *Small v. Hunt*, 98 F.3d 789, 792 (4th Cir. 1996), we reviewed a 1985 consent decree ordering improvement of prison conditions in North Carolina. We affirmed the district court's modification of the decree to ensure continued compliance with increased prison standards while simultaneously adapting it to the state's financial needs and changing prison population. *Id.* at 796–97, 799. Nine years later, in *Thompson v. United States Department of Housing and Urban Development*, 404 F.3d 821, 824 (4th Cir. 2005), we considered an appeal regarding a lower court's "Consent Decree [that] impos[ed] numerous obligations on the [Housing Authority of Baltimore City] and HUD." At issue was not merely whether the district court was within its authority to issue such a decree, but rather whether it had the power to modify the decree in light of violations. *Id.* at 827. We answered affirmatively. *Id.* at 833–34. Our vision of the federal judge as a "manager" of institutional reform in these cases was clear:

> In overseeing broad institutional reform litigation, the district court becomes in many ways more like a manager or policy planner than a judge. Over time, the district court gains an intimate understanding of the workings of an institution and learns what specific changes are needed within that institution in order to achieve the goals of the consent decree.

*Id.* at 827 (quoting *Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325, 1338 (1st Cir. 1991)).

16

We have also specifically considered the issue of redressability as applied to a class action suit filed by children seeking declaratory and injunctive relief against a local juvenile detention facility. *See Doe 4 ex rel. Lopez v. Shenandoah Valley Juv. Ctr. Comm'n*, 985 F.3d 327, 334 (4th Cir. 2021). "Because [plaintiffs'] proposed remedy focuse[d] on the treatment and services provided by [the juvenile center]," we held, the child class's requested relief was "likely to redress their injuries." *Id.* at 336. In each of these cases, this Court approved district judges' power to impose injunctive relief in institutional reform contexts.

But don't just take it from us. Contrary to the lower court's assertion, the Supreme Court itself has also affirmed federal courts' fashioning of judicial remedies to unconstitutional conduct by state institutions. In *Milliken v. Bradley*, 433 U.S. 267, 269, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977), the Court considered "whether a District Court can, as part of a desegregation decree, order compensatory or remedial educational programs for schoolchildren who have been subjected to past acts of de jure segregation." Concluding that "the decree . . . was aptly tailored to remedy the consequences of the constitutional violation," *id.* at 287, the Court found no "reason to believe that the broad and flexible equity powers of the [lower] court were abused in this case," *id.* at 288.

More recently, in *Brown v. Plata*, 563 U.S. 493, 499–500, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011), overcrowded prison conditions in California prompted two suits by prisoners alleging violations of their Eighth Amendment rights. After two district courts found that the prison conditions violated plaintiffs' rights, the courts granted the separate plaintiffs' requests "to convene a three-judge court empowered under the [Prison Litigation

Reform Act] to order reductions in the prison population." *Id.* at 509. The cases were consolidated for the panel, which ordered "the State to reduce overcrowding in its prisons" and set a prison population target to achieve this outcome. *Id.* at 500–01. The Supreme Court affirmed this injunctive remedy, acknowledging that "[c]ourts have substantial flexibility when making these judgments." *Id.* at 502, 538. "[T]he scope of a district court's equitable powers," the Court explained, "is broad, for breadth and flexibility are inherent in equitable remedies." *Id.* at 538 (internal quotation marks omitted). The federal judiciary not only holds the power, but a duty, to implement, oversee, and administer reform of state institutions that violate the federal rights of citizens. *Id.* at 511 ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."); *id. at* 542 ("A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order."). Such principles lie in stark contrast with the lower court's assertion in this case that "the Supreme Court has removed district courts from managerial oversight of state institutions." *Jonathan R.*, 768 F. Supp. 3d at 764 n.3. Ultimately, nationwide precedent since *Brown I* provides an unambiguous legal reality: that the federal courts can and must remedy systemic rights violations through comprehensive injunctive reform of state institutions.

18

iii.

We next turn to the permissible breadth and scope of institutional reform. The intervention envisioned in these cases is expansive. The *Plata* Court acknowledged that in complex cases not "susceptible of simple or straightforward solutions[,] . . . [o]nly a multifaceted approach aimed at many causes . . . will yield a solution." 563 U.S. at 525–226. "Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers and the possibility of consent decrees." *Id.* at 511. The Court ultimately affirmed the lower court's order to substantially reduce the state's prison population within two years. *Id.* at 545. In *Hutto*, the district court significantly altered Arkansas state prison policy when it limited "the number of men that could be confined in one cell, required that each have a bunk, discontinued the 'grue' diet, and set 30 days as the maximum isolation sentence." 437 U.S. at 684. The Supreme Court affirmed. *Id.* at 700.

Comprehensive policy reform is available in other contexts of state administration as well. In *Swann v. Charlotte-Mecklenburg Board of Education*, the Supreme Court upheld the implementation of a comprehensive desegregation plan devised by a court-appointed expert, despite the plan's potentially onerous requirements. 402 U.S. 1, 8, 20, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971). "The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems." *Id*. at 28.

19

In the child welfare context, the Second Circuit in *Juan F.* affirmed the lower court's 120-page "comprehensive, multifaceted consent decree." 37 F.3d at 876, 878. "Implementation required development of a manual for each section of the decree." *Id.* at 876. "These manuals [comprised] guidelines and handbooks that set forth directives and details concerning the procedures, timetables, additional staffing requirements, funding requirements, and other matters necessary to implement and monitor the mandates in the consent decree." *Id.* The lower court then appointed a neutral monitor to oversee the reform process. *Id.* And in *M. D. ex rel. Stukenberg*, the Fifth Circuit specifically approved injunctive requirements for the state agency charged with administering foster care to "track caseloads," "report [caseload] figures to the monitor(s)[] on a quarterly basis," and "ensure statewide implementation of . . . [a] training model." 907 F.3d at 273.

The district court next claims it "cannot move state funds . . . to enact statewide reform." *Jonathan R.*, 768 F. Supp. 3d at 763. But the Supreme Court has again suggested otherwise. The Court's decision in *Plata* addressed and rejected the argument made by the lower court in the case before us today:

> Expanding such community-based measures may require an expenditure of resources by the State to fund new programs or expand existing ones. The State complains that the order therefore requires it to "divert" savings that will be achieved by reducing the prison population and that setting budgetary priorities in this manner is a "severe, unlawful intrusion on the State authority." Brief for Appellants 55. This argument is not convincing. The order does not require the State to use any particular approach to reduce its prison population or allocate its resources.

563 U.S. at 537 n.12. This clarifies that relief that requires state expenditures is permissible and does not represent an improper intrusion by the courts. *See id.* Though it is true

"[f]ederalism concerns are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities," *Horne v. Flores*, 557 U.S. 433, 448, 129 S. Ct. 2579, 174 L. Ed. 2d 406 (2009), there is no question a court may generally order the "payment of state funds . . . as a necessary consequence of compliance." *Milliken*, 433 U.S. at 289 (quoting *Edelman v. Jordan*, 415 U.S. 651, 668, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)).

To be sure, there are outer limits to the scope of the institutional reform power. As the district court notes, it is true the federal judiciary does not possess "some 'amorphous' power to supervise 'the operations of government.'" *Jonathan R.*, 768 F. Supp. 3d at 763 (quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 40, 142 S. Ct. 522, 211 L. Ed. 2d 316 (2021)). At the same time, courts still retain the power to protect "the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action." *Raines v. Byrd*, 521 U.S. 811, 829, 117 S. Ct. 2312, 138 L. E. 2d 849 (1997) (quoting *United States v. Richardson*, 418 U.S. 166, 192, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (1974) (Powell, J., concurring)). Acknowledging this tension, the *Brown II* Court declared that "[i]n fashioning and effectuating the [reform] decrees, the courts will be guided by equitable principles." 349 U.S. at 300. The Supreme Court has since provided additional detail on what these principles entail in order to balance the structural reform power with the interests of federalism.

First, "the nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation." *Missouri v. Jenkins*, 515 U.S. 70, 89, 115 S. Ct. 2038, 132 L. Ed. 2d 63 (1995) (quoting *Milliken*, 433 U.S. at 280). This limitation may be referred to

as a "tailoring principle." *See* Br. of Amici Curiae Law Scholars in Support of Appellants-Plaintiffs at 8. For example, in the context of segregated school districts, "[t]he proper response to an intradistrict violation is an intradistrict remedy." *Jenkins*, 515 U.S. at 90. This principle ensures courts may pursue expansive remedies only when necessary, without overstepping their Article III powers.

A second limiting principle requires district judges to consider state and local interests when crafting decrees. The Supreme Court in *Milliken* ordered that "federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." 433 U.S. at 280–81. This principle was later affirmed in *Rufo v. Inmates of Suffolk County Jail* in the context of decree modification. *See* 502 U.S. 367, 392, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992) ("[T]he public interest and [c]onsiderations based on the allocation of powers within our federal system . . . require that the district court defer to local government administrators . . . to resolve the intricacies of implementing a decree modification." (alteration in original) (citations omitted)). Although courts may order reform that implicates state funds, such finances "are a legitimate concern of government defendants in institutional reform litigation and therefore are appropriately considered in tailoring a consent decree modification." *Id.* at 392–93. It follows that courts must also consider the state's financial constraints in fashioning the original decree as well.

Finally, a decree cannot always bind parties forever. "Federal Rule of Civil Procedure 60(b)(5) permits a party to obtain relief from a judgment or order if, among other things, 'applying the judgment or order prospectively is no longer equitable.'" *Horne*, 557

U.S. at 447 (quoting Fed. R. Civ. P. 60(b)(5)) (citation modified). "The party seeking relief bears the burden of establishing that changed circumstances warrant relief" and district courts have a duty to modify accordingly. *Id.* The Supreme Court in *Horne* was acutely aware of the role played by Rule 60(b)(5) in guiding the formation of consent decrees:

> Rule 60(b)(5) serves a particularly important function in what we have termed "institutional reform litigation." . . . For one thing, injunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment.

*Id.* at 447–48 (citation omitted). Accordingly, "courts must take a flexible approach to Rule 60(b)(5) motions addressing such decrees." *Id.* at 450 (citation omitted). This third limiting principle, therefore, ensures that a decree would not "place West Virginia's foster care system under indefinite federal control" as the district court fears. *Jonathan R.*, 768 F. Supp. 3d at 760. Taken together, all these principles create guardrails that guarantee the lower court need not "step beyond constitutional limits." *Contra id.*

iv.

Having explained this judicial power and its guardrails, we may now determine whether it is within the district court's authority to implement Plaintiffs' requests for injunctive relief.[10] Their requests are neither inconsistent with nor anomalous to the many

---

[10] The district court did not challenge the notion that it has the power to issue a declaration that a state agency's actions violate the Constitution (only that such a (Continued)

forms of structural reform imposed on state institutions in the last eight decades. Plaintiffs'

core requests are as follows: needs assessments for foster care placement, time restrictions

on evaluations and placements for new entrants into foster care, imposition of a new child-

per-caseworker ratio, development of an adequate statewide plan for retaining foster

homes, improvement of services for foster children with disabilities, and the institution of

a neutral monitor. Though such measures may implicate state expenditures, Plaintiffs do

not desire for the court to "dictate how the agency should spend state funds or other

resources to meet its obligations." Reply Br. of Appellants-Plaintiffs at 16.

West Virginia relies on non-binding "principles"—which it pulls from dissenting

opinions—to argue these measures would make the district court "'indistinguishable[]'

from a DHS official," Br. of Defendants-Appellees at 33 (quoting *Plata*, 563 U.S. at 555

(Scalia, J., dissenting)), and that "the district court would also end up far afield from 'what

[it] [is] good at: applying precedent, interpreting statutes, and exercising traditional

equitable powers.'" *Id.* at 34 (quoting *Doe 4 ex rel. Lopez*, 985 F.3d at 347 (Wilkinson, J.,

dissenting)). But these arguments, though perhaps valid public policy concerns, do not

represent a legal bar for redressability. Plaintiffs' requests invoke the court's equity power

and are similar to the many forms of institutional reform ordered by courts since *Brown I*.

An "order . . . is not overbroad because it encompasses the entire . . . system." *Plata*, 563

---

declaration as applied to this case would not alleviate their harm). *See Jonathan R.*, 768 F. Supp. 3d at 762–63 (citing Plaintiffs' injunctive requests, but not their declaratory relief request, as outside the scope of the court's authority), 769 (explaining that a declaration "fails to redress Plaintiffs' injuries.").

U.S. at 532. "Nor is the order overbroad because it limits the State's authority to run its [institutions]." *Id.* at 533.

Should the lower court ultimately grant the requested relief, it would still "leave[] much to the State's discretion," *id.*, and in no way itself become a *de facto* state official. West Virginia also expresses concern about the prospect of the court maintaining constant oversight of a complex state system. However, Plaintiffs "seek the appointment of a neutral Monitor to 'conduct record reviews as necessary to ensure compliance' with the ultimate decree" to alleviate this very burden. Opening Br. of Appellants-Plaintiffs at 20 (quoting J.A. 251). Despite West Virginia's policy concerns, "the remedy does not exceed the violation if the remedy is tailored to cure the condition that offends the Constitution." *Milliken*, 433 U.S. at 282 (internal quotation marks omitted). Given Plaintiffs' allegations of systemic rights violations of one of West Virginia's most vulnerable groups, we are confident the district court has the legal authority and guiding principles to fashion a comprehensive decree incorporating any and all of these requests, should Plaintiffs prevail. Consequently, it is easy to conclude that "the court has the power to grant the plaintiff's requested relief." *Buscemi*, 964 F.3d at 259. Any necessary tailoring of their requested relief is better left for "after a determination of the merits of [their] claim[s]." *Id.* at 262.

2.

Having established the court's lawful power to provide redress, we next assess whether "such relief would redress [Plaintiffs'] injury" under the second prong of the *Buscemi* test. *See id.* The district court ruled that the requested declaratory relief would

25

not provide a remedy, although it suggested that Plaintiffs' request for injunctive relief may suffice (but it concluded the court lacked the authority to grant it). *Jonathan R.*, 768 F. Supp. 3d at 768–69. West Virginia contends that neither form of relief would be adequate. We disagree and conclude that both forms of relief would effectively redress Plaintiffs' injuries.

It is well established that both declaratory and injunctive relief may provide redress in the right circumstances. This Court has held that "[t]he removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 285 (4th Cir. 2018). Furthermore, plaintiffs need only demonstrate their "injury would *likely* be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021) (emphasis added) (quoting *Lujan*, 504 U.S. at 560–61). Both the requested injunctive and requested declaratory relief satisfy the second prong of the *Buscemi* test. *See* 964 F.3d at 259.

First, Plaintiffs' requested injunctive relief would redress their alleged injuries. "When an injury . . . is occurring, and a plaintiff offers good reason to think it will continue[,] he can seek redress prospectively through an injunction." *Wells v. Johnson*, 150 F.4th 289, 300 (4th Cir. 2025). Here, Plaintiffs allege ongoing injuries that predate the filing of this suit in 2019 and the district court itself acknowledged the dismal current state of the foster care system in its dismissal this year. *See Jonathan R.*, 768 F. Supp. 3d at 759–60 ("The filings paint a grim picture of a dysfunctional foster care system."). The allegations of long-term, widespread neglect offer sufficient reason to believe such

26

problems will continue.  Plaintiffs accordingly request a variety of injunctive measures that are likely to alleviate at least some of their suffering.

West Virginia argues that Plaintiffs have failed to show with sufficient specificity how any requested relief measures would remove a single obstacle to the proper exercise of their rights.  We agree with Plaintiffs, however, that this contention "defies common sense." Reply Br. of Appellants-Plaintiffs at 21.  Measures reducing caseloads for workers, enforcing strict time limits on initial evaluations, and requiring the state to hire more employees if necessary are all likely to result in quicker foster placement as well as greater attention and treatment for each child in the system.  This in turn would directly alleviate at least some of the alleged constitutional and statutory deprivations the children have suffered, such as those affecting their "right[s] to services necessary to prevent unreasonable risk of harm" and "right[s] to be free from unnecessary institutionalization." J.A. 238–39.

It is telling the district court itself addressed this argument in its dismissal.  Though it believed its lack of jurisdiction foreclosed the redressability inquiry at step one of the *Buscemi* test, it correctly paraphrased the inquiry at step two: "is that relief likely to redress plaintiff's injuries?" *Jonathan R.*, 768 F. Supp. 3d at 768.  The court acknowledged that, if it had the remedial power we believe it does, it must find "that the answer to the second question is . . . yes." *Id.*  We agree with the district court's assessment and conclude that the requested injunctive relief would redress Plaintiffs' injuries.

Second, Plaintiffs also seek declaratory relief, which we find separately satisfies the second prong of the *Buscemi* test.  *See* 964 F.3d at 259.  Though the district court correctly

27

acknowledged the potential efficacy of injunctive relief, it erred when it concluded "a declaration that the actions of DHS are unconstitutional . . . fails to redress Plaintiffs' injuries." *Jonathan R.*, 768 F. Supp. 3d at 769. We need only look to our recent decision in *Wells* to affirm the notion that declaratory judgment may independently confer standing in these circumstances. *See* 150 F.4th at 301.

"To satisfy [Article III's case-or-controversy] requirement—at least as for redressability—a declaratory judgment must 'affect the rights of litigants in the case.'" *Id.* (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S. Ct. 2330, 45 L. Ed. 2d 272 (1975)). Such judgments have the inherent capability to satisfy Article III through their "preclusive effect" on lawsuits. *Id.* However, "to show that a declaration redresses an injury, the plaintiff must show not *merely* that the judgment carries some preclusive effect—for of course it does—but also that this preclusion is at least 'likely' to produce a litigation-related benefit." *Id.* at 302 (quoting *Lujan*, 504 U.S. at 561).

It is thus true that the "psychic satisfaction" derived from a declaratory judgment may not independently confer standing. *See Jonathan R.*, 768 F. Supp. 3d at 769. Our decision in *Wells*—published after the parties completed briefing for this appeal—requires that a plaintiff establish that a declaration "will bind the party he would sue" and "must also offer reason to think the future suit where he wants to use the preclusion will come." 150 F.4th at 303. Because *Wells* was not available when Plaintiffs briefed this argument, and because the district court did not provide any opportunity for the parties to brief this issue before it, we will not hold Plaintiffs to a strict requirement to specifically describe a future suit and "reason to think" it will come. Plaintiffs understand and have already

28

articulated that "if a defendant refuses to comply with a declaratory judgment, plaintiffs may return to federal court to obtain an injunction." Reply Br. of Plaintiffs-Appellants at 32 n.14. And in our view of the record, there is ample evidence to suggest "both that future litigation is likely to happen (at least absent the declaration sought) and that the declaration's preclusive effect will likely help [Plaintiffs] in that litigation." *See Wells*, 150 F.4th at 302.

The lengthy history of litigation and the nature of Plaintiffs' allegations are again insightful. Plaintiffs include a vast general class and a sub-class of particularly vulnerable children in the custody of the state who have alleged ongoing and extensive harm. Even before the suit was filed in 2019, the U.S. Department of Justice published a critique of the dysfunctional system.[11] There is quite clear "reason to think [a] future suit . . . will come" absent systemic, court-mandated change now. *See Wells*, 150 F.4th at 303. This alone satisfies *Wells*' standard for an "offensive" declaratory judgment. *See id.* A declaration that West Virginia has violated the rights of these children, at minimum, is likely to assist future litigation seeking more comprehensive reform should it not be granted right now. This goes beyond psychic satisfaction—it could "put[] state officials on notice that their conduct is illegal" and "it can incentivize them to comply to with the law and deter further illegal conduct." Opening Br. of Appellants-Plaintiffs at 42. Had this suit been limited to

---

[11] Plaintiffs reference the Department of Justice's 2019 report in their Complaint. *See* J.A. 231–31. We are not precluded in our review of the complaint from taking notice of items in the public record such as published reports from the Department of Justice. *See Papasan v. Allain*, 478 U.S. 265, 268 n.1, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986); *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 305 (4th Cir. 2025).

requests for declaratory relief, Plaintiffs would have still met this Court's standard for redressability.

## B.

Having confirmed Plaintiffs' requests are redressable, we next address West Virginia's argument that Plaintiffs did not suffer an injury in fact.[12] We again disagree and find that Plaintiffs' pleadings sufficiently demonstrate an ongoing injury.

Because this analysis remains part of the standing inquiry and is based on the pleadings, we again "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *S. Walk Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 181–82. Furthermore, "[i]n evaluating a class action complaint, we analyze standing based on the allegations of personal injury made by the named plaintiffs." *Hutton*, 892 F.3d at 620. However, to establish standing for a class as a whole, we need not examine the injuries alleged by *all* Named Plaintiffs. For purposes of justiciability, the Constitution merely requires "[a]t least one plaintiff have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439, 137 S. Ct. 1645, 198 L. Ed. 2d 64 (2017); *see also Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006) ("[T]he presence

_____

[12] The district court did not address injury in its dismissal and failed to provide notice and opportunity for briefing, raising questions about which arguments may be preserved for appeal. *See infra* note 18. For the purposes of this appeal, we proceed with the assumption that West Virginia's injury argument has been preserved on appeal given the lack of opportunity for briefing before the district court.

30

of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

The Fourth Circuit has applied this rule to named plaintiffs in class action contexts. *See Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *Town of Chester*, 581 U.S. at 439). In *Kenny*, we held that "at least some of the named plaintiffs" in a class action sufficiently pleaded injury (and thus established standing), allowing the case to proceed. *Id.* at 281. And in *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023), we similarly considered the threshold rules for standing as applied to a class of four minor plaintiffs. There, "[w]e conclude[d] two of the named plaintiffs . . . between them have standing to seek each form of relief requested in the current complaint and granted by the district court. Accordingly, we need not consider whether the other plaintiffs have standing or if their claims are otherwise justiciable." *Id.* (first citing *Town of Chester*, 581 U.S. at 439; and then citing *Rumsfeld*, 547 U.S. at 52 n.2). Because we have already established redressability and traceability for the Plaintiff class as a whole, we need only determine whether a single Named Plaintiff in this case has suffered a legal injury in fact.

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) (citation modified). An injury sufficient for standing may take the form of "an injury to one's constitutional rights." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381, 144 S. Ct. 1540, 219 L. Ed. 2d 121 (2024). To obtain prospective relief (such as an injunction), as here, a plaintiff must establish either an

"ongoing or future injury in fact." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (quoting *Kenny*, 885 F.3d at 287); *see also Deal*, 911 F.3d at 189 (differentiating ongoing from future injuries).

There is no dispute on appeal that Plaintiffs have alleged past physical and psychological injuries to their constitutional and statutory rights with sufficient specificity. In denying Defendants' motion to dismiss, the district court relied on Plaintiffs' allegations that the state placed foster children in locations "known to be dangerous." *Jonathan R. v. Justice*, No. 3:19-cv-00710, 2023 WL 184960, at *6 (S.D. W. Va. Jan. 13, 2023). Take, for example, Named Plaintiff Anastasia M., who alleges that West Virginia placed her "in a facility with a history of child molestation, sexual battery, and sexual assault by patients and employees alike." *Id.* (citing J.A. 167). Or take the lead Named Plaintiff, Jonathan R, who alleges that after he entered the custody of West Virginia DHHR, the agency shuffled him between multiple abusive adoptive homes and out-of-state institutional care facilities through his early adolescence, failing to provide him with needed mental treatment. Jonathan specifically alleges he suffered "emotional and psychological harm" as a result of the Department's deliberate indifference toward his psychiatric needs. J.A. 165. Named plaintiff Gretchen C. describes a similar experience: DHHR failed to secure a foster placement for her for four years, and the substandard conditions in the out-of-state institutions where she has been placed have further exacerbated her emotional harm. All three of these Named Plaintiffs remained in the custody of the state at the time of the Complaint's filing. We agree with Plaintiffs that these allegations reflect concrete, particularized, and actual injuries.

32

West Virginia, however, contends Plaintiffs have not alleged future injuries capable of sustaining injunctive relief. *See* Br. of Defendants-Appellees at 52–53. But past injuries with ongoing harm, as opposed to threatened future injuries, nevertheless suffice. One of the State's cited authorities, *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974), holds as much, explaining that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." Indeed, Plaintiffs' allegations show these effects. The Complaint is not limited to isolated incidents of past abuse—it instead cites empirical evidence about ongoing staffing challenges, appalling abuse rates, inadequate numbers of foster placements, and deeply inconsistent attention to children's needs, all of which culminate in direct physical and psychological harm to foster children.[13] *See* J.A. 149–53. Plaintiffs describe how the state "routinely fails to ensure children achieve placement stability," J.A. 152, and that the agency's "actions and inactions have caused chronic and system-wide failures." J.A. 153. Furthermore, from the perspective of

---

[13] West Virginia presents a swathe of "contemporaneous data" on appeal alleging system improvement since 2019 and argues this undermines Plaintiffs' allegations of ongoing injury. Br. of Defendants-Appellees at 9–15, 55. This information, however, is not relevant to this standing inquiry, where, as here, the district court dismissed for lack of standing based on the pleadings. A facial challenge to subject matter jurisdiction examines the Complaint, "and the defendant's challenge must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). In such challenges, "[w]e will . . . not look beyond the complaint and documents incorporated by reference therein." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 213 (4th Cir. 2017). Plaintiffs correctly note the parties may litigate this new evidence on summary judgment or at trial.

the pleadings, the foster care children comprising the Named Plaintiffs remain in the custody of the state, still susceptible to harm caused by continuing dysfunction.

For example, in describing the deprivations suffered by Jonathan R., the Complaint states: "[a]s a direct result of Defendants' actions and inactions, Jonathan has suffered and continues to suffer emotional and psychological harm." J.A. 165. In his current foster placement, Jonathan also alleges the state "has failed to provide the family with any services or financial supports." J.A. 164. Gretchen C.'s allegations further provide reason to believe these injuries are ongoing. At the time of the Complaint, Gretchen was actively residing in an out-of-state institution. Having been diagnosed with several mental disorders, "[s]he has repeatedly asked her caseworker for one-on-one therapy, but DHHR has failed to arrange it." J.A. 180. Furthermore, the Complaint specifically states "DHHR has no permanency plan in place for Gretchen, and DHHR is not providing her with independent living skills as an alternative to permanency," all of which continue to cause her harm. J.A. 182. The systemic failures described in the pleadings demonstrate continuing, present, and adverse effects on Plaintiffs—these are *ongoing* injuries.

West Virginia also cites *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983), to argue Plaintiffs have failed to show imminent future harm. In *Lyons*, the Supreme Court denied standing to a plaintiff seeking injunctive relief after experiencing a police chokehold because he failed to show "sufficient likelihood that he [would] again be wronged in a similar way." *Id.* at 111. *Lyons*, however, differs from the present case precisely because that plaintiff's alleged injury was a singular incident in the past. *See id.* at 97–98. In contrast, the pleadings here allege uncured systemic policy

34

failures that place children in positions where they suffer ongoing constitutional and statutory rights deprivations. We need not "import the imminence requirement into cases involving ongoing injuries." *See Deal*, 911 F.3d at 188. A demonstration of ongoing injury alone is sufficient to establish injury in fact. *Id.* at 188–89 ("The Supreme Court has always described and treated the two concepts—actual, ongoing injury vs. imminent injury—as disjunctive."). We therefore find that these allegations reflect both "actual" and "ongoing" injuries to, at minimum, several of the named plaintiffs, and are sufficient for prospective relief. *See Deal*, 911 F.3d at 188.

\*      \*      \*

In conclusion, the ongoing injuries suffered by at least one Named Plaintiff are redressable by the district court, and Plaintiffs' requests are indeed likely to provide relief. Neither party disputes the notion that the injuries are traceable to West Virginia's actions. Plaintiffs may seek the requested prospective forms of relief to redress their injuries, including injunctive and declaratory relief. Plaintiffs accordingly have standing.

III.

We turn next to Plaintiffs' request to reassign the case to a new district judge. Despite the lower court's incorrect interpretation of its own power, reassignment is not warranted here.

"When we remand a case, we may reassign it to a different judge when 'the appearance of fairness and impartiality is best advanced by reassignment.'" *United States*

35

*v. McCall*, 934 F.3d 380, 384 (4th Cir. 2019) (quoting *United States v. Neal*, 101 F.3d 993, 1000 n.5 (4th Cir. 1996)).  However, "[a]bsent a claim of bias"—not present in this case— "reassignment is appropriate in '*unusual* circumstances where both for the judge's sake and the appearance of justice an assignment to a different judge is salutary and in the public interest.'"  *United States v. North Carolina*, 180 F.3d 574, 582–83 (4th Cir. 1999) (emphasis added) (quoting *United States v. Guglielmi*, 929 F.2d 1001, 1007 (4th Cir. 1991)).  To determine whether reassignment is warranted we look to the following factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Guglielmi*, 929 F.2d at 1007 (quoting *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977)), *superseded by statute on other grounds as recognized in United States v. Pridgen*, 64 F.3d 147, 149 n.3 (4th Cir. 1995)).  Despite the district court's legal error, none of the relevant criteria applied suggest the public interest would be better served by reassignment.

First, we find no indication that the district judge would have substantial difficulty setting aside previously expressed erroneous views.  Plaintiffs point toward our previous decision in *Jonathan R. I* as evidence of the lower court's continued "lack of respect for precedent."  Opening Br. of Appellants-Plaintiffs at 46.  But our ruling in that case, though clearly preventing dismissal on mootness and abstention grounds, did not preclude the

36

district court from dismissing the case *sua sponte* for lack of standing, even if that dismissal was legally incorrect.[14]

Plaintiffs also cite the district judge's "firm and long-held beliefs about the impropriety of institutional reform of state institutions." Opening Br. of Appellants-Plaintiffs at 47. Though the district judge expressed his "long-held concern that courts lack the kind of power sought by Plaintiffs in this case," *Jonathan R.*, 768 F. Supp. 3d at 769, he still sufficiently engaged in "thoughtful analysis" despite his legal error, *see id.* at 767–70 (citing his legal authority to dismiss the case and discussing other courts' treatment of foster care litigation). Our conclusion under similar circumstances in *North Carolina* lends further support. *See* 180 F.3d at 582–83. There, we "[found] no indication that the judge could not put [previously expressed] views out of his mind," even though the district judge "harshly criticized the terms of the consent decree" governing reform of discriminatory hiring practices within the state's Department of Corrections and "expressed doubt regarding the existence of subject matter jurisdiction." *Id.* at 583; *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 729 (4th Cir. 2021) (weighing the complexity of

---

[14] In *Jonathan R. I*, we wrote that "principles of federalism not only do not preclude federal intervention, they compel it." 41 F.4th at 321. This conclusion, however, remained limited to the holding that mootness did not defeat the plaintiffs' standing and that abstention doctrines did not apply. *See id.* at 325, 339–40. This opinion did not address redressability, an essential element of standing. The Supreme Court has confirmed that all elements of standing must survive through each successive stage of litigation. *Lujan*, 504 U.S. at 561. Furthermore, we have held that "courts are free to raise the question of subject matter jurisdiction *sua sponte* at any time." *Williams v. Jeep Sales & Serv. Co.*, 161 F.3d 5, 1998 WL 614438, at *2 (4th Cir. Sept. 10, 1998) (unpublished table decision). The district court here was well within its power to dismiss the case for lack of standing absent pursuant motion from either party, even if this took place two months before trial was scheduled.

the case and whether reassignment would waste judicial resources and concluding that though we disagreed with some of the lower court's rulings, they nonetheless reflected thoughtful analysis). Similarly, there is no indication the court has previously been, or will be, unable to adjust its legal views in accordance with this Court's mandate.[15]

*Second*, reassignment is also not necessary to preserve the appearance of justice. The district judge has not shown any unfair animus toward Plaintiffs in his dismissal—to the contrary, he openly acknowledged the allegations of their plight. It is true the district judge expressed policy preferences when he questioned the efficacy of institutional reform litigation. But his legal basis for the dismissal (his interpretation of the power of the federal judiciary and Plaintiffs' standing) does not present a "suspicion of partiality." *Cf. United States v. Nicholson*, 611 F.3d 191, 217 (4th Cir. 2010) (quoting *Guglielmi*, 929 F.2d at 1007) (reassigning the case on remand to preserve the appearance of justice).

*Third*, reassignment would certainly waste judicial resources, especially "in light of the lengthy history of this case." *See North Carolina*, 180 F.3d at 583 (declining to reassign the case after, *inter alia*, over a year of settlement discussions and summary judgment

---

[15] The district court's failure to provide notice of its consideration of *sua sponte* dismissal and opportunity for briefing, however, raises concerns. It is a bright-line rule in this Circuit that *sua sponte* dismissals based on a plaintiff's failure to state a claim require "notice and an opportunity to amend the complaint or otherwise respond." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 291 (4th Cir. 2021) (quoting *Chute v. Walker*, 281 F.3d 314, 319 (1st Cir. 2002)). This Court has not specifically addressed whether this mandatory procedure extends to dismissal pursuant to lack of subject matter jurisdiction. The Seventh Circuit, however, warned that "*sua sponte* dismissals without prior notice or opportunity to be heard are hazardous" even in the subject matter jurisdiction context. *See Frey v. E.P.A.*, 270 F.3d 1129, 1132 (7th Cir. 2001). Though we need not create a new rule here, we recognize this may also serve as yet another ground for reversal—but not for reassignment.

38

briefing).  After all, this case is nearly ready for trial, so a new judge would be forced to become acquainted with nearly six years of litigation material in short order.  Because none of the *McCall* factors support reassignment in this case, we decline to do so.

IV.

We finally turn to West Virginia's cross-appeal seeking class decertification. Because of the effect of our reversal of the district court's dismissal as well as the time restrictions governing such appeals in Federal Rule of Civil Procedure 23(f), we find this appeal to be effectively interlocutory and thus unreviewable.

Rule 23(f) permits appeals "from an order granting or denying class-action certification . . . within 14 days after the order is entered." Fed. R. Civ. P. 23(f).  The orders contemplated in this rule are "inherently interlocutory."  *Microsoft Corp. v. Baker*, 582 U.S. 23, 26, 137 S. Ct. 1702, 198 L. Ed. 2d 132 (2017).  Outside of the strictures of Rule 23(f), parties may only appeal class certification orders after final judgment is rendered. *Id.*

To be certain, the district court's dismissal for lack of standing constituted a final judgment in the case.  But we confront a problem when we revive the case via reversal and remand.  Because judgment is no longer final in these circumstances, we believe reversal renders the class certification order interlocutory once more, thereby precluding its appeal to this Court outside of the circumstances established by Rule 23(f).

Though the Fourth Circuit has not had occasion to address this problem before in a published opinion, several of our sister circuits have addressed it in rulings that predate the

39

1998 introduction of the modern Rule 23(f).[16]  The Ninth and Sixth Circuits have held that once a case is revived by an appellate reversal, the appellate court may no longer address a class-certification cross-appeal because that appeal is interlocutory.  In contrast, the Seventh Circuit has reached a class certification cross appeal after reversing the lower court's dismissal but did so without addressing the question of whether the appeal was interlocutory.  As this is a question of first impression in this circuit, we review those decisions in greater detail in turn.

To start, the Ninth Circuit addressed a similar scenario where appellees brought a cross-appeal seeking class decertification after final judgment had been rendered.  *Blake v. City of Los Angeles*, 595 F.2d 1367, 1385–86 (9th Cir. 1979).  After reversing judgment, the court held that "[t]he same considerations that normally bar interlocutory review of class certification orders . . . persuade us that we should not now review the class certification order merely because the district court erroneously entered summary judgment for appellees."  *Id.* at 1386 (citation modified).  Indeed, Rule 23(f) and the cases interpreting it reinforce the court's decision.  *See Microsoft Corp.*, 582 U.S. at 26.

The Sixth Circuit reached a similar conclusion when plaintiffs appealed an order that simultaneously denied their motion for class certification and dismissed the action for lack of subject matter jurisdiction:

> Plaintiffs next argue that this court should reverse the district court's denial of plaintiffs' motion for class certification. We disagree. Because we reverse

---

[16] Despite the fact that these opinions were published before the promulgation of the modern Rule 23(f) in 1998, our interpretation nevertheless harmonizes the reasoning of these cases with our general prohibition on review of interlocutory appeals and the exception carved out in Rule 23(f).

the judgment of the district court dismissing plaintiffs' case for lack of subject matter jurisdiction, there is no longer a final judgment to support our review of interlocutory orders, even though such a judgment existed at the outset of the appeal.  Thus, at this juncture, our reversal of the judgment below prevents us from reviewing the district courts' denial of class certification.

*Milan Express Co. v. W. Sur. Co.*, 886 F.2d 783, 785 n.1 (6th Cir. 1989) (citation modified).

Although Rule 23(f) would now permit the Sixth Circuit to review the denial of class certification as an allowable interlocutory appeal in that case, its logic as applied to this case would apply with greater force: West Virginia had an opportunity to appeal class certification under the Rule, but as this appeal is outside of the time period for allowable interlocutory appeals, our reversal procedurally bars our review of class certification at this point.

It should be noted, however, that the Seventh Circuit moved forward with review of a class certification appeal despite reversing the case's dismissal.  *Council 31, Am. Fed'n of State, Cnty. & Mun. Emps. v. Ward*, 978 F.2d 373, 380 (7th Cir. 1992).  The court determined it could reach the merits of the cross-appeal because the defendants had "become adversely affected by the district court's orders certifying the class" upon reversal.  *Id.*  But following the implementation of Rule 23(f), the problem it identified is resolved: now parties who are adversely affected may appeal within 14 days.  Accordingly, its reasoning is not persuasive following the enactment of the Rule.

We believe the Sixth and Ninth Circuits' interpretations are correct.  Now that the case has been revived by our reversal, there is no longer final judgment.  Any appeal of the 2023 order certifying two of Plaintiffs' proposed classes must be considered

interlocutory.[17]   Because we are now well beyond the timeframe to challenge class certification pursuant to Rule 23(f), we may not entertain this cross-appeal until a final judgment is entered below.

## V.

For the foregoing reasons, the judgment of the district court is REVERSED and the case is REMANDED for further proceedings.

*REVERSED AND REMANDED*

---

[17] The dissent mischaracterizes our holding when it explains we have decided that because Rule 23(f)'s fourteen-day window has passed, "the State is now barred from receiving appellate review after final judgment." Diss. Op. 48. Instead, we merely hold that our reversal of the district court's dismissal renders the lower court's judgment no longer final. The procedural restrictions of Rule 23(f) thus come into play. In short, we agree that we may review the State's class certification once it becomes final and that the parties may request alteration of the class certification order before the district court at any time.

42

RUSHING, Circuit Judge, concurring in the judgment in part and dissenting in part:

The district court believed that it lacked authority to grant any of Plaintiffs' requested relief and so dismissed this case for lack of standing. While the court raised legitimate concerns about the limits of federal judicial power and the effectiveness of institutional reform decrees, precedent establishes that the court could order at least some of the relief Plaintiffs seek. Accordingly, I agree with the majority that we must reverse the district court's judgment dismissing this case for lack of jurisdiction.

West Virginia has filed a conditional cross-appeal, asking us to reverse the district court's order granting class certification if we reverse the final judgment from which Plaintiffs appeal. We have jurisdiction to resolve that cross-appeal; the majority errs in holding that the appeal is "effectively interlocutory and thus unreviewable." Maj. Op. 39. I would exercise our discretion to consider the cross-appeal and resolve West Virginia's arguments about the infirmities in the class certification order. In that respect, I dissent from the majority's judgment.

I.

To establish constitutional standing to pursue this lawsuit, Plaintiffs must demonstrate that they have suffered or likely will suffer an injury in fact that is traceable to Defendants' challenged actions and likely to be redressed by the requested judicial relief. *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1555 (2024). Redressability requires "that the court ha[ve] the power" to grant Plaintiffs' requested relief and "that such relief would redress" Plaintiffs' injuries. *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020). An

injury is not redressable if the court is powerless to provide the relief that Plaintiffs request. *Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025); *see Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 212 (4th Cir. 2025) (asking "whether a federal court is even capable of providing the remedy the plaintiff seeks").

Although, as the district court noted, jurists and scholars disagree about the proper bounds of federal courts' equitable remedial authority, existing precedent instructs that district courts possess the power to enter injunctions that intervene into the operation of state governmental institutions once they find a constitutional violation. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–16 (1971); *cf. Brown v. Plata*, 563 U.S. 493, 511, 538 (2011). At least some of the injunctive relief Plaintiffs seek is within the district court's authority and would relieve at least part of Plaintiffs' injuries. For our purposes, that is sufficient to show redressability.[1]

---

[1] The district court correctly concluded that Plaintiffs' request for a declaratory judgment does not independently establish redressability. The majority misreads *Wells v. Johnson*, 150 F.4th 289 (4th Cir. 2025), in concluding otherwise. *Wells* recognized that a declaratory judgment can provide redress if the plaintiff "show[s] himself likely to use the preclusive effect of the declaration" in a future lawsuit. *Id.* at 303. The majority, however, ignores Plaintiffs' burden to "offer reason to think the future suit where [they] want[] to use the preclusion will come" and that "the preclusion is likely to help redress [their] injury by doing some work in [that] future litigation." *Id.* at 303, 307.

Instead, the majority reasons that a declaratory judgment "is likely to assist" if, at some point in the future, someone decides to pursue litigation seeking "more comprehensive reform" than the district court in this case ultimately grants. Maj. Op. 29. But a judgment's "possible, indirect benefit in a future lawsuit" does not preserve standing. *United States v. Juvenile Male*, 564 U.S. 932, 937 (2011) (per curiam); *see Haaland v. Brackeen*, 143 S. Ct. 1609, 1639 (2023) ("What saves proper declaratory judgments from a redressability problem . . . is that they have preclusive effect on a traditional lawsuit that is imminent." (internal quotation marks omitted)). Nor does the majority's observation that a declaratory judgment would "put[] state officials on notice that their conduct is illegal (Continued)

That said, two different district court judges in this case now have expressed concerns about their authority to interfere with state institutions as radically as Plaintiffs demand. *See Jonathan R. v. Justice*, No. 3:19-cv-00710, 2021 WL 3195020, at *12 (S.D. W. Va. July 28, 2021); *Jonathan R. v. Justice*, 768 F. Supp. 3d 756, 759 (S.D. W. Va. 2025). Both judges were so troubled that they dismissed the case, the first under *Younger* abstention and the second on standing grounds. While dismissal was not warranted in either instance, the judges' sense that they were being asked to stray beyond their purview was legitimate.

The district court was appropriately concerned about the scope of the relief that Plaintiffs seek. "[I]nstitutional reform injunctions often raise sensitive federalism concerns," which are "heightened when, as [here], a federal court decree [would] ha[ve] the effect of dictating state or local budget priorities." *Horne v. Flores*, 557 U.S. 433, 448 (2009). And "[t]he separation of powers imposes additional restraints on the judiciary's exercise of its remedial powers." *Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring). Those restraints are especially relevant here because part of Plaintiffs' lawsuit takes issue with remedies imposed in a Memorandum of Understanding between the U.S. Department of Justice and West Virginia that obligates the State to make certain improvements regarding child welfare.

---

and . . . incentivize them to comply with the law and deter further illegal conduct" suffice for redressability. Maj. Op. 29 (internal quotation marks omitted). Even if a political actor "might do as a court says just because a court says it," a declaration "with no future consequences . . . is just another way of saying *advisory opinion*." *Wells*, 150 F.4th at 302.

45

If Plaintiffs ultimately prevail in proving a constitutional or statutory violation, the district court can and should take these concerns into account when it comes time to fashion injunctive relief tailored to remedying those specific violations. *See Swann*, 402 U.S. at 16 ("[T]he nature of the violation determines the scope of the remedy."); *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977) ("[O]nly if there has been a systemwide impact may there be a systemwide remedy."). The district court was rightly attentive to "the interests of state and local authorities in managing their own affairs," and it can account for those interests when "devising a remedy" in this case, should that prove necessary.[2] *Milliken v. Bradley*, 433 U.S. 267, 280–281 (1977).

## II.

West Virginia has filed a conditional cross-appeal challenging the district court's class certification order. The majority does not merely decline to consider that cross-appeal, it holds that the appeal is interlocutory and that this Court is barred from addressing it. That is incorrect. We have final order jurisdiction to resolve the conditional cross-appeal, and I would exercise our discretion to address the State's arguments identifying multiple flaws in the class certification order.

---

[2] I agree with the majority that reassignment to a different judge on remand is not warranted here. *See Steves & Sons, Inc. v. JELF-WEN, Inc.*, 988 F.3d 690, 728–729 (4th Cir. 2021).

A.

Conditional cross-appeals are conditional precisely because the cross-appellant is not aggrieved by a district court's error when he has prevailed on other grounds. A victor cannot appeal. But we allow prevailing parties to file conditional cross-appeals against the contingency that we may reverse an otherwise satisfactory judgment. *See Council 31, Am. Fed. of State, Cnty. & Mun. Emps., AFL-CIO v. Ward*, 978 F.2d 373, 380 (7th Cir. 1992). If we reverse the judgment in the cross-appellant's favor, then the cross-appellant becomes aggrieved by the decision that is the subject of the cross-appeal.

Conditional cross-appeals frequently challenge interlocutory decisions that, absent a final judgment, could not be appealed on their own. *See, e.g.*, *Eshelman v. Puma Biotechnology, Inc.*, 2 F.4th 276, 285 n.3 (4th Cir. 2021) (after prevailing at trial, plaintiff conditionally cross-appealed an evidentiary ruling and a decision on attorney-client privilege); *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 821, 825–826 (4th Cir. 1999) (after prevailing at trial, plaintiff conditionally cross-appealed from the grant of summary judgment against, and dismissal of, several of its claims as well as from an evidentiary ruling). If we decide to reverse the final judgment and remand the case for further proceedings, we then address the conditional cross-appeal because the issues raised therein will be relevant as the case progresses on remand. *See Eshelman*, 2 F.4th at 285 n.3 ("Because we order a new trial, we do resolve [the plaintiff's] conditional cross-appeals."); *Bank of Montreal*, 193 F.3d at 826 ("Because we grant [the defendant] some of the relief it seeks, we must consider [the plaintiff's] conditional cross-appeals.").

47

The majority turns our approach to conditional cross-appeals on its head. Under circuit precedent, our action reversing the final judgment in the cross-appellant's favor makes the conditional cross-appeal relevant and ripe for decision. But under the majority's reasoning, by reversing the final judgment we lose the ability to consider the conditional cross-appeal because it challenges an otherwise interlocutory decision. That does not accord with our precedent or common sense. Our decision to reverse on one issue does not, mid-opinion, render the remainder of the appeal interlocutory and unreviewable. We have jurisdiction over an appeal from a final judgment, 28 U.S.C. § 1291, and that appeal permits review of all interlocutory rulings that led up to, and merged into, that judgment, *see Jenkins v. Woodard*, 109 F.4th 242, 246–247 & n.1 (4th Cir. 2024).

The fact that a conditional cross-appeal challenges a class certification order does not change the analysis. Federal Rule of Civil Procedure 23(f) was added to *expand* the opportunity for appellate review of class certification decisions beyond those available for other interlocutory decisions. *See* Advisory Committee's Notes on 1998 Amendments to Fed. R. Civ. P. 23(f) ("[S]everal concerns justify expansion of present opportunities to appeal."). If anything, that rule should make us more receptive to this cross-appeal, not less.

The majority reasons that Rule 23(f) gave West Virginia the opportunity to petition for review of the class certification order within fourteen days and, that time having passed, the State is now barred from receiving appellate review after final judgment. That is wrong for multiple reasons.

48

First, the adoption of Rule 23(f) didn't abolish the typical route for appellate review of a class certification decision on appeal from a final judgment. "Final-judgment appeals remain available to review a grant or denial of class certification on appeal from a final judgment that disposes of the entire action, merging in the judgment in the way that many other interlocutory orders merge in a final judgment." 15B *Charles Allen Wright & Arthur R. Miller's Federal Practice & Procedure* § 3914.19 (3d ed. 2026); *see Microsoft Corp. v. Baker*, 582 U.S. 23, 26 (2017).

Second, "[f]ailure to seek discretionary review of an order granting or denying class certification does not forfeit the right to seek review of the order on appeal from the final judgment." 16 *Wright & Miller*, *supra*, § 3931.1. Rule 23(f) creates "an opportunity, not an obligation." *Id.* Because an interlocutory appeal is "permissive rather than mandatory," a party "retains the right to challenge the class certification following the ultimate disposition of the case" despite not previously petitioning for interlocutory review. *M. D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 248 n.15 (5th Cir. 2018); *see also Molski v. Gleich*, 318 F.3d 937, 951 n.17 (9th Cir. 2003); *cf. Clark v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 924 F.2d 550, 553 (4th Cir. 1991) ("[F]ailure to take an available appeal does not of itself waive the right to secure review, on appeal from final judgment, of matters that could have been appealed but were not." (internal quotation marks omitted)).

Third, even if the cross-appeal could be considered interlocutory, Rule 23(f)'s fourteen-day deadline to petition for interlocutory review of a class certification order is "a nonjurisdictional claim-processing rule." *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 192 (2019). The time limit "therefore can be waived or forfeited by an opposing party."

49

*Id.* At no point have Plaintiffs objected to West Virginia's supposedly late request for appellate review; accordingly, Plaintiffs have forfeited the procedural time bar. *See Kontrick v. Ryan*, 540 U.S. 443, 456 (2004) ("[A] claim-processing rule . . . even if unalterable on a party's application, can nonetheless be forfeited if the party asserting the rule waits too long to raise the point."). The majority thus errs in holding that because "this appeal is outside of the time period for allowable interlocutory appeals, our reversal procedurally bars our review of class certification at this point." Maj. Op. 41. Indeed, by sua sponte dismissing the cross-appeal despite Plaintiffs' forfeiture (and without even acknowledging the principle), the majority treats Rule 23(f)'s time limit as jurisdictional in all but name.

The majority relies heavily on two cases from other circuits that were decided before the Supreme Court adopted Rule 23(f) to authorize interlocutory review of class certification orders. Neither persuades.

In *Blake v. City of Los Angeles*, the Ninth Circuit considered it a matter of discretion whether to resolve the conditional cross-appeal filed after final judgment in that case. 595 F.2d 1367, 1385–1386 (9th Cir. 1979). The court reasoned that "[t]he same considerations that normally bar interlocutory review of class certification orders," including the "potential waste of judicial resources," counseled against reviewing the class certification order there. *Id.* at 1386 (internal quotation marks omitted). The court also noted the seemingly fortuitous opportunity for appeal in that case, since the erroneous final judgment would have given the cross-appellants the opportunity for review of a class certification decision before the end of the case, where litigants in other cases would be forced to wait.

50

*Id.* That reasoning no longer applies because Rule 23(f) now provides an opportunity to request an interlocutory appeal.

The Sixth Circuit in *Milan Express Co. v. Western Surety Co.* appears to have concluded it lacked jurisdiction to consider the cross-appeal there, but as the majority acknowledges, its reasoning depended on the state of the law as it existed before Rule 23(f). 886 F.2d 783, 785 n.1 (6th Cir. 1989); Maj. Op. 41. After Rule 23(f), that jurisdictional ruling is no longer good law. *See* 28 U.S.C. § 1292(e); *Nutraceutical*, 586 U.S. at 192.

Conversely, as the majority observes, the Seventh Circuit did resolve a conditional cross-appeal from an order granting class certification after deciding to reverse the district court's grant of summary judgment and remand the case for further proceedings. *Council 31*, 978 F.2d at 380. The court correctly reasoned that, because it reversed the grant of summary judgment, the cross-appellant "has indeed become adversely affected by the district court's order[] certifying the class," and "[t]his development has the effect of invigorating the cross-appeal and supporting our jurisdiction." *Id.* The subsequent adoption of Rule 23(f) does not undermine that reasoning, which applies to conditional cross-appeals from final judgments generally.

Perhaps more importantly, even after Rule 23(f), the Seventh Circuit continues to acknowledge its authority to resolve a cross-appeal "challeng[ing] the district court's class certification decision" after reversing a final judgment. *Henry v. Hulett*, 969 F.3d 769, 787 (7th Cir. 2020) (en banc). The majority identifies no court holding to the contrary after the adoption of Rule 23(f). I would not create a circuit split here.

51

B.

Because we have jurisdiction and there is no procedural bar to our review, it is within our sound discretion to resolve West Virginia's appeal of the class certification order before remanding the case for further proceedings. In my view, judicial economy, the centrality of certification to the litigation, and the substantial weaknesses the State identifies in the certification decision counsel in favor of addressing class certification now. *Cf. Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 139, 144–146 (4th Cir. 2001); *see infra* Section II.C.

As an initial matter, we have received extensive briefing from the parties and numerous amici focused on the class certification issue. The factual record was thoroughly developed below, and the asserted shortcomings of the district court's opinion turn on matters not likely to change on remand. There does not appear to be any meaningful benefit to leaving this question for another day. Although the district court retains authority to alter its class certification ruling, we have no reason to think it will do so absent direction from this Court. And, of course, the possibility of self-correction is not unique here; it exists in any Rule 23(f) appeal and in most cases destined for retrial.

Importantly, the certified classes define the shape of this case. The particular classes certified (and those rejected) are central to articulating the claims to be proven and the available relief. *See* Fed. R. Civ. P. 23(b)(2). A trial on class claims that should not proceed in that posture would be a waste of time and resources. And if permissible classes could be certified following guidance from this Court, waiting to provide that direction until after a merits resolution—requiring yet another remand—would needlessly lengthen this

already protracted litigation. Further, because the scope of injunctive relief is limited to the parties before the court, the range of injunctions available to Plaintiffs and the potential cost of compliance for Defendants is substantially impacted by which and how many classes or subclasses are certified and the sizes and parameters of those classes. While the settlement dynamic in an injunction class action differs from that of a damages class action, certification is no less central—especially here where Plaintiffs seek broad-sweeping policy reforms throughout the entire West Virginia foster care system.

This is the second appeal, second reversal, and second remand in this case thus far. It would be prudent to address any certification errors now, before returning the case to the district court for further proceedings.

## C.

Turning briefly to the merits of the certification decision, West Virginia has alleged extensive problems with the district court's order. I will highlight two.

The district court certified two classes for declaratory and injunctive relief under Rule 23(b)(2). In addition to the requirements of numerosity, commonality, typicality, and adequacy of representation in Rule 23(a), injunctive classes also require that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The district court certified what the parties call the General Class, which consists of "all West Virginia foster children who are or will be in the foster care custody of DHHR or its successor agency." *Jonathan R. v. Justice,*

53

344 F.R.D. 294, 318 (S.D. W. Va. 2023). The General Class was certified to pursue substantive due process claims predicated on three alleged policies or practices of DHHR: (1) maintaining an inadequate array of appropriate foster care placements, (2) engaging in deficient case planning, and (3) permitting a chronic shortage of case workers and high caseloads. *Id.* at 305–309. The court also certified the "ADA Subclass," which consists of "all members of the General Class who have physical, intellectual, cognitive, or mental health disabilities, as defined by federal law." *Id.* at 318. The ADA Subclass was certified to pursue claims under the Americans with Disabilities Act and Rehabilitation Act based on the alleged policy or practice of maintaining an "[i]nadequate [i]nfrastructure of [t]herapeutic [s]ervice [p]roviders." *Id.* at 311.

The first problem West Virginia flags in the district court's certification decision regards its findings that Plaintiffs had established the existence of policies and practices sufficient to support commonality. To demonstrate commonality under their theory of the case, Plaintiffs bore the burden to identify a policy or practice of DHHR driving the alleged harm to every class member. A "pattern of individualized deficiencies" will not do. *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 207 (4th Cir. 2024). Rather, satisfying the commonality prerequisite in this case requires proof of "some glue holding the alleged *reasons* for all" the class members' alleged injuries together. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011).

As West Virginia points out, some of the policies and practices the district court found here seem merely to describe a state of affairs rather than specify an injurious policy or practice of DHHR. For instance, the court found that "[d]eficiencies in the array of

54

placements is a recurring issue" for the State's child welfare system, but it did not identify any policy or practice causing this problem. *Jonathan R.*, 344 F.R.D. at 306. Similarly, the court found that DHHR suffers "chronic understaffing" but did not identify a policy or practice of Defendants that is allegedly causing that problem. *Id.* at 309.

In fact, Defendants produced evidence that the low number of foster homes and case workers is contrary to their policy and not up to the standards they strive to achieve, but the district court refused to consider this evidence. Efforts by West Virginia to bring those shortcomings into conformity with its actual policies are the kind of evidence that would tend to disprove the existence of a generalized practice of acquiescence to failure. For example, Defendants produced evidence of "several steps they have taken to expand the number of caseworkers in West Virginia." *Id.* at 308 (internal quotation marks omitted). But the district court refused to consider Defendants' evidence on the ground that it "prematurely assesses the merits of Plaintiffs' case," since it speaks to whether "Defendants acted with deliberate indifference to Plaintiffs' liberty interest." *Id.*; *see id.* at 313. While West Virginia's reform efforts are relevant to the merits question of deliberate indifference, they are also relevant for evaluating whether the shortcomings complained of represent Defendants' actual policy or practice. *See Wal-Mart*, 564 U.S. at 351 ("Frequently [a court's class certification analysis] will entail some overlap with the merits of the plaintiff's underlying claim."). When evidence is relevant to both class certification and the merits, "a district court may not use the overlap [as a reason] to refuse to consider the evidence" for certification. *Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 n.2 (2021).

55

Second, West Virginia raises significant questions about whether Plaintiffs' contentions are actually common to every member of these broadly defined classes. *See Wal-Mart*, 564 U.S. at 350 ("Their claims must depend upon a common contention . . . ."); *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 680 (4th Cir. 2024) ("[N]ebulous references to 'systemic failures' or 'systemic deficiencies' to satisfy commonality" often "mask a multitude of disparities" within the class.). As the sixteen amici States observe, classes as broad as "all West Virginia foster children who are or will be in foster care" and all foster children with any disability living in any part of the State "ignore the widely different circumstances of foster children." Amicus Curiae Br. of State of Alaska et al. at 17. It is difficult to see how the alleged policies affect every member of such broadly defined classes. *See* Fed. R. Civ. P. 23(b)(2).

For instance, the district court found that common questions exist for the ADA Subclass regarding "whether Defendants' provision of [community-based] services is in fact deficient, and if so, whether the deficiency places foster children with disabilities at risk of unnecessary institutionalization." *Jonathan R.*, 344 F.R.D. at 313. The ADA subclass, however, consists of all current and future foster children in the State with "physical, intellectual, cognitive, or mental health disabilities." *Id.* at 318. The array of services may be adequate for a child with a particular disability in one part of the State, but not for a child with a different disability in a different area. Even when casting the injury as a risk of unnecessary institutionalization, it would seem that not every child with a disability is exposed to that risk. If the State exclusively offered treatment options for schizophrenia in institutions, that could create a risk of unnecessary institutionalization for

56

every foster child in the system with schizophrenia—but it would not do so for a child with anxiety and depression. Or if the State had sufficient community-based providers for anorexia treatment in Morgantown, but not in Parkersburg, it's not clear how a child with anorexia in Morgantown is harmed by the absence of, or would benefit from an injunction to expand, anorexia treatment services in Parkersburg.

Similar reasoning applies to claims in the General Class. Regarding the lack of appropriate case planning, for instance, the district court relied on statistics which suggest that this alleged practice does not present a common contention for every class member— that is, every child who is or will be in foster care in West Virginia. For example, those statistics indicated that while some foster parents were not included in case planning and other important events, foster parents in other cases were appropriately included. *See id.* at 307. Likewise with the supposed policy or practice of high caseloads. According to the district court, "eight of West Virginia's twenty-nine districts have a caseload average within the recommended range." *Id.* at 309. That fact would seem to suggest that children in those districts have not been subjected to this alleged policy or practice, and it could render the requested injunction inappropriate for the class as a whole. *See* Fed. R. Civ. P. 23(b)(2).

Although this Court declines to reach the class certification issue today, the district court retains the power to alter or amend the class certification order at any time, and the parties may ask it to decertify or alter the classes. Fed. R. Civ. P. 23(c)(1)(C). I would resolve the question now to provide guidance for the remand and perhaps save the parties yet another trip to our Court.